**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: SINA CORPORATION SECURITIES LITIGATION

THIS DOCUMENT RELATES TO:

KEVIN LU, Individually and on behalf of others similarly situated. *v*. SINA CORPORATION, *et al*., Case No: 1:25-cv-07820-CM

Case No: 1:25-cv-07820-CM

CLASS ACTION

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

DEMAND FOR A JURY TRIAL

# TABLE OF CONTENTS

NATURE OF THE ACTION ........................................................................................... 1

PRELIMINARY STATEMENT ..................................................................................... 2

JURISDICTION AND VENUE ..................................................................................... 7

PARTIES .................................................................................................................... 7

SUBSTANTIVE ALLEGATIONS .................................................................................. 9

I. BACKGROUND ....................................................................................................... 9

II. SINA DEFENDANTS GRANT CHAO PERSONAL BENEFITS AS HIS POWER CONSOLIDATES ........................................................................ 11

III. THE PROXY FIGHT .............................................................................................. 12

IV. CHAO'S FURTHER CONSOLIDATION OF POWER WHICH CONTINUES TO DEPRESS SINA'S SHARE PRICE ..................................................... 16

V. SINA'S UNDISCLOSED INVESTMENT IN TUSIMPLE BECOMES EXTREMELY VALUABLE ................................................................................. 23

A. Sina Invests Heavily in TuSimple with Chao and B. Zhang Joining TuSimple's Board of Directors ........................................................ 23

B. Sina's Investment in TuSimple Becomes Worth Billions Leading to Chao's Scheme to Purchase Sina ....................................................... 24

VI. THE SCHEME TO STEAL SHAREHOLDER VALUE THROUGH PRIVATIZATION ................................................................................................ 28

A. Sina Is Significantly Underpriced as A Result of Defendants' Actions and Concealment of Material Information ........................................... 28

B. Chao's Offer to Purchase Sina ......................................................................... 29

C. Formation of The Special Committee ............................................................... 33

D. Defendants Collude to Prevent Price Discovery and Consummate The Merger on Terms Favorable to New Wave ........................................... 34

1. Sina Defendants Craft the Terms of The Merger Agreement to Foreclose Any Possibility of Price Discovery ............................. 34

2. Defendants Eliminate The Majority Of The Minority Requirement ..................................................................................... 40

E. Defendants' Scheme to Conceal The True and Fair Value of Sina Shares and Depress The Valuation ........ 41

1. Defendants Undervalue Sina's Investment In TuSimple ........ 41

2. Defendants Delay Release of Weibo's Q2 2020 Financial Results ........ 44

F. September 28, 2020, Merger Agreement Announcement ........ 47

G. The EGM ........ 47

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........ 48

CLASS ACTION ALLEGATIONS ........ 59

ADDITIONAL SCIENTER ALLEGATIONS ........ 62

INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 63

LOSS CAUSATION ........ 63

APPLICABILITY OF PRESUMPTION OF RELIANCE ........ 64

CLAIMS FOR RELIEF ........ 65

COUNT I ........ 65

COUNT II ........ 68

COUNT III ........ 69

PRAYER FOR RELIEF ........ 70

JURY DEMAND ........ 70

## NATURE OF THE ACTION

1. This is a securities fraud class action brought by Lead Plaintiffs Meitav Mutual Funds Ltd. and Migdal Mutual Funds Ltd. ("Lead Plaintiffs") and Plaintiff Kevin Lu (collectively "Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned counsel. The action charges that the defendants named herein violated 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a) and 78t(b)), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC") (17 C.F.R. § 240.10b-5) (the "Action").

2. The Action is brought on behalf of all persons and entities that sold Sina Corporation ("Sina" or "the Company") ordinary shares, including those that sold into the Merger[1] and were damaged thereby, between October 13, 2020 and March 22, 2021, inclusive (the "Class Period"). Excluded from the Class are Defendants (defined below), members of the immediate family of Individual Defendants (defined below), any subsidiary or affiliate of Sina, and the directors and officers of Sina and their families and affiliates at all relevant times, and any Sina ordinary shares for which a petition was filed or for which appraisal rights were exercised and pursued pursuant to Cayman Law.

3. Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, SEC

---

[1] On September 28, 2020, Sina and Defendant Charles Guowei Chao, through his majority-owned companies New Wave MMXV Limited ("New Wave"), New Wave Holdings Limited ("New Wave Holdings" or "Parent"), and New Wave Mergersub Limited ("Merger Sub," and collectively with Defendant Chao, New Wave, and New Wave Holdings, the "Buyer Group"), entered into an agreement and plan of merger (the "Merger" or "Merger Agreement").

filings, wire and press releases published by and regarding Sina, analysts' reports and advisories about the Company, and information readily obtainable on the Internet, including information disclosed through the Section 238 shareholder appraisal action related to the Merger captioned *In the Matter of the Companies Act (2021 Revision); In the Matter of Sina Corp.,* Cause No. FSD 128 of 2021 (RPJ) (Grand Court, F.S.D., Cayman Islands) (the "Cayman Island Action").[2] Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**PRELIMINARY STATEMENT**

4. This action concerns a scheme by Defendants to depress the value of Sina ordinary shares to prevent Sina shareholders from receiving a fair price in connection with a transaction to take the Company private. As a result, Sina shareholders were misled into accepting consideration that was well below fair value.

5. Based in Beijing, China, and incorporated under the laws of the Cayman Islands, Sina is a media technology company that provides region-specific news, information, entertainment, and financial content. Sina is the parent company of Weibo Corporation ("Weibo"), a Chinese platform that is similar to Twitter.

6. Between 2018 and June 2020, Sina invested heavily – over $165 million – in TuSimple Holdings, Inc. ("TuSimple"), a privately-owned autonomous trucking company based in San Diego, California. At 34.44%, Sina was by far TuSimple's largest investor. Moreover, Sina's Chief Executive Officer ("CEO") and Chairman of the Board of Directors – Defendant Charles Guowei Chao ("Chao") – and Sina's Chief Financial Officer ("CFO") – Defendant Bonnie Yi Zhang ("B.

[2] All references to testimony herein refer to testimony given in the Cayman Island Action. All references to internal emails, messages and documents are from discussion of documents in the Cayman Island Action. All quotations to documents are based on the reading of those documents during the Cayman Island Action.

Zhang") – were members of TuSimple's Board of Directors. ***Despite this massive investment and deep involvement, Sina never mentioned TuSimple in any SEC filing***.

7. In June 2020, Sina's investment in TuSimple began to skyrocket. TuSimple was finalizing a critically important partnership agreement with the major US truck manufacturer Navistar International Corporation ("Navistar"), which would take TuSimple's technology to market. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley USA") was engaged for TuSimples's Series E financing and upcoming initial public offering ("IPO"). While the TuSimple had been valued at $1.2 billion in September 2019 for its Series D financing, Morgan Stanley USA was valuing the company at well over $2 billion for its Series E financing and ***upwards of $7 billion for its IPO***.

8. There was one hurdle standing in the way of TuSimple's IPO and Sina's massive payout. TuSimple's management and Morgan Stanley USA determined that as a result of recent U.S. foreign investment regulations the IPO could not proceed while TuSimple's largest investor – Sina – remained a publicly traded company.

9. Chao immediately implemented the scheme to defraud Sina investors and steal the undisclosed value of TuSimple and Sina for himself.

10. On Friday July 3, 2020, TuSimple's Board of Directors formally approved the partnership with Navistar. One business day later, Monday July 6, 2020, Chao sent a letter to Sina's Board of Directors proposing to take Sina private by acquiring all outstanding ordinary shares of Sina not already owned by Chao for $41 per share, well below the fair and true value of the shares.

11. Sina filed the letter with the SEC the same day and told its investors that its Board had created an independent "Special Committee" to "determine[] whether [Chao's] Proposal or

any Alternative Transaction is fair to and in the best interests of…the Company's shareholders other than [Chao]" (the "Minority Shareholders").

12. In truth, the Special Committee was beholden to Chao and sought to ensure that the go-private merger was approved at the lowest price possible and the Minority Shareholders never learned the true value of their Sina shares. For example, the Special Committee demanded that the purportedly independent valuation firm – Defendant Morgan Stanley Asia Limited. ("Morgan Stanley Asia") – massively reduce its valuation for TuSimple to "book value" (approximately ***$186 million***) even though Morgan Stanley USA was valuing TuSimple as high as ***$7 billion***. As an August 31, 2020 Morgan Stanley Asia email states: "*…**[the Special Committee] has called three times since Friday**…**TuSimple – [they] think[] it should be carried at book value which I disagreed given…its latest valuation and IPO in 2021 Q1 in the range of $3.5 – 7.0Bn**"*.[3]

13. Despite internally admitting that "book value" was not a proper metric for valuing TuSimple, Morgan Stanley Asia misrepresented the value of TuSimple in its Fairness Presentation filed with the SEC on October 13, 2020, stating that TuSimple's value was between the company's ***$186 million "book value" and $288 million***, barely above the $165 million that Sina had invested.

14. To ensure that Minority Shareholders did not learn the true value of their Sina shares, Defendants colluded to prevent any realistic and fair opportunity for alternative bidders to pursue a potential deal or for there to be any type of market check or price discovery.

15. To start, in his July 6, 2020, offer letter Chao misleadingly stated that he would vote his purported "58% of the aggregate voting power in the Company" to approve his offer or to veto any competing offer. Chao admitted in the Caymen Island Action that he was "effectively

[3] Unless otherwise noted, all emphasis has been added.

signaling here [his] intention to control the process such that it's a binary process. Either there's a sale to [Chao] or there's no transaction." Chao bluntly testified that he would use his claimed majority voting power to veto any better offer because "***It's not a deal for creating…the best price for all the shareholder***s."

16. Defendants never told shareholders that the shares held by Chao that gave him his majority voting power were issued with the express limitation that they could only be voted for the "best interest of all shareholders" and could not be voted for Chao's personal benefit or to prevent a deal that would result in a better price for all shareholders.

17. Specifically, Chao gained his majority voting power following a difficult proxy fight in 2017 after which Sina's Board of Directors sought to foreclose any future battles by taking the extraordinary measure of issuing 7,150 Class A Preference Shares to Chao for a nominal consideration of $1 per share. Each share would have 10,000 votes, thereby increasing Chao's voting power from a mere 11.1% to a clear majority of 55.5% (despite him having only 11.1% economic interest in the Company), allowing him to essentially unilaterally pass or veto any proposal subject to shareholder vote.

18. The Company's counsel warned the Board that any such shares must be issued and voted for a "proper purpose" and "in the best interests…of the shareholders as a whole." The shares could not be used for Chao's personal benefit, or to prevent anything that would be in the interest of all shareholders.

19. Purporting to heed counsel's advice, the Board meeting minutes state that they issued the Class A shares to Chao for the singular purpose to "avoid future proxy fights with other activist shareholders" and were subject to the limitations identified by counsel. However, when the Company publicly announced the issuance of the Class A shares, it did not identify any such

limitations, instead asserting that the shares "are entitled to vote on all matters submitted to a general meeting of the Company."

20. Defendants leveraged this misstatement of Chao's voting power to prevent any independent market check of the true value of Sina. Despite Defendants internally acknowledging that Chao's offer price "falls short on a break up basis", the Special Committee and Morgan Stanley Asia conducted no price discovery at all, claiming that any price discovery process would be useless because Chao would vote his Class A shares against any alternative transaction even if it was more favorable to all shareholders.

21. Having ignored their obligation to determine whether Chao's offer or any alternative transaction was fair to and in the best interests of the Minority Shareholders, Defendants filed several proxy statements falsely stating, *inter alia*, that: (i) that a sufficient price discovery process was conducted to ensure that the offer price was fair, (ii) the offer price was fair (iii) it was in the best interest of the Minority Shareholders to vote in favor of the Merger, and (iv) other alternative transactions were not superior to the proposed Merger.

22. On December 23, 2020, Sina held an extraordinary general meeting ("EGM"), at which the Merger was approved.

23. Later that very same day, TuSimple confidentially filed with the SEC its draft Form S-1 for its IPO. The TuSimple IPO was completed on April 15, 2021, ***with a value of $8.5 billion***. With an ownership interest of 34.44%, Sina's investment in TuSimple was worth over $2.4 billion, which is approximately ***$2.1 billion more than represented to shareholders***.

24. As a result of Defendants' scheme, shareholders unknowingly sold Sina ordinary shares at substantially deflated values during the Class Period.

## JURISDICTION AND VENUE

25. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

27. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). During the Class Period, Sina's ordinary shares were listed and traded on the NASDAQ, located within this District. In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of a national securities markets.

## PARTIES

28. Lead Plaintiffs Meitav Mutual Funds Ltd. and Migdal Mutual Funds Ltd. And Plaintiff Kevin Lu sold Sina ordinary shares during the Class Period, as set forth in the previously filed certifications (ECF Nos. 36-1, 41-3), incorporated by reference herein, and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

29. Defendant Sina Corporation ("Sina") is incorporated under the laws of the Cayman Islands with its principal executive offices located in Beijing, People's Republic of China. Sina's ordinary shares traded on the Nasdaq Global Select Market under the ticker symbol "SINA."

30. Defendant Charles Guowei Chao ("Chao"), at all relevant times since 2006, was Sina's CEO and, since 2012, Chairman of the Board of Directors. Chao has been a member of TuSimple's Board of Directors since April 22, 2019.

31. Defendant Bonnie Yi Zhang ("B. Zhang"), at all relevant times, was the Company's CFO. B. Zhang has been a member of TuSimple's Board of Directors at least since September 30, 2020.

32. Defendant Ter Fung Tsao ("Tsao"), at all relevant times, was a member of the Company's Board of Directors.

33. Defendant Yan Wang ("Wang"), at all relevant times since 2003, was a member of the Company's Board of Directors. Wang was a member of the independent director committee that considered the Merger (the "Special Committee").

34. Defendant Song-Yi Zhang ("S. Zhang"), at all relevant times since 2004, was a member of the Company's Board of Directors. S. Zhang was a member of the Special Committee.

35. Defendant Yichen Zhang ("Y. Zhang"), at all relevant times since 2002, was a member of the Company's Board of Directors. Y. Zhang was a member of the Special Committee and served as its Chairperson.

36. Defendant James Jianzhang Liang ("Liang"), at all relevant times, was a member of the Company's Board of Directors.

37. Defendants Chao, B. Zhang, Tsao, Wang, S. Zhang, Y. Zhang, Y. Zhang, and Liang (together, the "Individual Defendants"), because of their positions with Sina, possessed the power and authority to control the contents of, *inter alia*, Sina's SEC filings, quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Sina's reports, press releases and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available

to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

38. Morgan Stanley & Co. LLC ("Morgan Stanley USA") served as an underwriter for Tu Simple's IPO. Morgan Stanley is headquartered in New York, New York.

39. Morgan Stanley Asia Limited. ("Morgan Stanley Asia," and together with Morgan Stanley, the "Morgan Stanley Defendants") served as financial advisor to the Special Committee for the Merger. Morgan Stanley is headquartered in New York, New York.

40. Sina and the Individual Defendants are collectively referred to herein as "Sina Defendants."

41. Sina, the Individual Defendants, and the Morgan Stanley Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### I. BACKGROUND

42. Sina was incorporated as an exempted limited liability company under the laws of the Cayman Islands in 1997.

43. Sina was the first Chinese internet company to become listed on the NASDAQ, following an IPO which completed on April 13, 2000. It did so by using a Variable Interest Entity ("VIE") structure (of which it was also a pioneer), which allows foreign investors to invest into sectors which are restricted from foreign ownership in the PRC, such as the media sector.

44. Sina's main business was its "Portal" operation which provides online news and other media content to Chinese users. It was often referred to as "China's Yahoo." It also operates a financial technology business engaged in online micro-lending ("Fintech"). These wholly owned

businesses are referred to as "Sina Standalone." Fintech was set up in a move to diversify its business, given the challenges to the popularity of Sina's Portal operation over time.

45. Sina is predominantly focused on the domestic and global Chinese communities and derives the overwhelming majority of its revenues from inside China. Over the years, Sina became one of the most high-profile and influential online media companies in China.

46. Sina also owns a substantial stake and has a controlling interest in Weibo, a Chinese micro-blogging platform that is similar to Twitter. Weibo is one of China's leading social media sites.

47. The development of Weibo from 2009 allowed Sina to concentrate on the social media business which was to become its biggest source of revenue and value.

48. Weibo was listed on the NASDAQ in April 2014. Weibo also used a VIE structure, with Sina retaining 56.9% of its shares. The majority of Weibo's revenue comes from advertising and marketing customers which can be broken down into three major segments; key accounts ("KA"), small to medium enterprises ("SME"), and Alibaba.

49. Alibaba went on to acquire a 30% interest in Weibo and is now Sina and Weibo's biggest client.

50. In 2014 Weibo completed an IPO of roughly 10% of its total outstanding shares. Following the IPO, Sina continued to hold approximately 57% of Weibo's total outstanding shares.

51. The share prices of Sina and Weibo were in decline between 2018 and July 2020. Sina's share price reached a peak of $122.92 per share on March 7, 2018. Sina's share price on July 2, 2020 closed at $36.67.

## II. SINA DEFENDANTS GRANT CHAO PERSONAL BENEFITS AS HIS POWER CONSOLIDATES

52. Between 2006 and 2017, Chao's control over Sina increased significantly.

53. Following Chao's appointment to CEO and member of the Board of Directors, no new directors were appointed. Rather, the Board of Directors withered from ten members to only five in 2017.

54. Moreover, on two occasions, in 2009 and again in 2015, Sina agreed to sell shares worth hundreds of millions of dollars to Chao such that by the time the transactions closed, Sina's share price had increased considerably, meaning that the transaction price was at a very substantial discount to Sina's share price.

55. On September 21, 2009, Sina issued to Chao 5.6 million shares, constituting 9.3% of Sina. Despite issuing the shares to Chao in September 2009, the Company did not require Chao to pay for them (at the September price) until November 2009 after which the shares had appreciated significantly. Moreover, Chao's purchase was funded, in part, by CITIC Capital (referred to as the Chinese Blackstone), which was Defendant Y. Zhang's fund. Chao then sold the vast majority of the shares (approximately 5 million) over the next 2-3 years as Sina's share price significantly increased.

56. In June 2015, the Company issued and sold 11 million ordinary shares, constituting 15.8% of the Company, for $456 million to New Wave, a BVI special purpose vehicle primarily owned and 100% controlled by Chao (other key members of Sina's management team, including Defendant B. Zhang Sina President and Chief Operating Officer, Hong Du, were minor, non-voting owners of New Wave).[4] New Wave became Sina's largest shareholder, representing 16%

[4] B. Zhang testified that all of her shares were simply given to her by Chao with "a mutual understanding I have to continue working for [Sina] for that." All voting shares of New Wave were held by Chao.

of the issued shares. The shares were sold for an aggregate value of $456 million at a subscription price of $41.49 per share (the average closing price for the 30 days ended May 29, 2015) but New Wave was not required to pay the $41.49 price until five months later in November 2016 after the share price had increased 24% from the subscription price.

57. The issuance and sale of shares to New Wave served no purpose other than to confer a personal benefit to Chao. Sina was not in need of any fundraising. The Company had cash and cash equivalents of $763 million at the end of 2015 (or $307 million if the fundraising did not take place) which had grown to $1.5 billion by June 2017. Moreover, just prior to the sale to New Wave/Chao, in 2014 and 2015, Sina repurchased almost $1 billion worth of shares as the price of shares were in decline.

58. The Company permitted Chao and New Wave to purchase these shares despite a "poison pill" provision designed to prevent any shareholder from owning more than 10% of the Company. The Company waived the "poison pill", which would have enabled it to protect other shareholders from the value dilution caused by Chao's discounted purchase of shares.

59. These transactions represented an enormous windfall for Chao while reducing the value of public shareholders' holdings by nearly $1 billion.

## III. THE PROXY FIGHT

60. For years, analysts had recognized that Sina's share price had a "holding company discount" (or "Holdco Discount"), which means that Sina's market cap as implied by its share price was significantly lower than the total net value of its underlying assets, subsidiaries, and investments. Analysts attributed this discount to risk as a result of, among other things, Sina's poor corporate governance, lack of transparency and investor engagement.

61. For example, a May 12, 2017 TH Data Capital report noted that Sina's underlying asset value was approximately 30% higher than its market cap implied by its current stock price. A May 26, 2017 Jefferies report similarly stated: "We apply a holding company discount of 30%."

62. On two occasions (once in 2016 and again in 2017), following investor frustration at the unrealized value of their investments, Sina made minor distributions of Weibo shares to shareholders. Despite analysts recognizing this as one of many ways Sina management could "unlock shareholder value" – with one Morningstar analyst stating on May 29, 2017, "We think Sina has the ability to distribute more Weibo shares to its shareholders without losing control of Weibo", Sina took no further action for its investors.

63. On September 20, 2017, Sina's fourth largest shareholder at 3.5%, Connecticut-based hedge fund Aristeia Capital LLC ("Ariseia"), began a proxy battle with Sina by proposing the addition of two independent directors to Sina's board and proposals to unlock shareholder value.

64. Aristeia alleged that the two transactions in 2009 and 2015 between Sina and Chao represented enormous windfalls for Chao, which it calculated, had reduced the value of public shareholders' holdings by nearly $1 billion.

65. Aristeia further alleged that Sina's shares traded at a very substantial discount to the net asset value ("NAV") of Sina's holdings (in other words, Sina's market capitalization was far smaller than the value of its holdings). Aristeia noted that Sina's stake in Weibo alone was, at that time, worth considerably more than Sina's market capitalization, stated its belief that Sina was "the most heavily discounted U.S.-listed holding company in existence", estimating Sina's NAV to be at least $13.5 billion, while its then-current market capitalization was only $8.2 billion. It

estimated that Sina was trading at a $5.3 billion discount to its NAV, representing a 39% discount, despite owning primarily cash and other investments that are easily valued.

66. Aristeia suggested a number of different and alternative transactions which it contended would "unlock" value for Sina and also sought to effect a change of control of the Board, by introducing new independent directors.

67. Arguing for the election of new independent directors, Aristeia stated that each of Sina's directors is long−tenured and has close historical ties to the Company, ensuring none are truly independent. Since Chao became CEO in 2006, Sina's Board withered from 10 directors to only five. Because of Sina's classified Board structure and governing documents, only one director stood for re-election annually, and Chao had a permanent seat that was never subject to shareholder vote.

68. The market viewed Aristeia's challenge favorably. As a September 19, 2017 MCM Partners Equity Research report subtitled "Skeptical activist attention can cure management's indifference" stated: "Aristeia Capital launched a public campaign to shake up Sina's board in an effort to unlock value in the company, offering an array of strategies to narrow the gap between market and intrinsic value" and that "despite a growing gap, management appears to be doing little beyond distributing a small portion of its stake in Weibo." A September 22, 2017, JP Morgan report stated, "we believe the proposal resonates with a prevailing investor concern of a widening gap between Sina sub value and holding value of liquid assets", estimating that Sina was trading at a 33% discount to NAV and attributing the gap to, in part, "investor concern over Sina's corporate governance."

69. In response to this public intervention, Sina's Board formed a Strategic Evaluation Sub-Committee ("SESC") to consider Aristeia's complaints and proposals.

70. Chao was one of three director members on that committee, alongside Defendants Y. Zhang and S. Zhang, with B. Zhang also attending.

71. The SESC determined that Aristeia's proposals were not in the Company's interests and the proposed additional directors were not suitable. The Board adopted the determination of the SESC and recommended that shareholders vote against the Aristeia proposals.

72. In response, Institutional Shareholder Services ("ISS") – a leading independent proxy advisory firm whose recommendations influence institutional investors – stated:

> Even so, beyond initial impressions, an examination of the arguments reveals compelling reasons for shareholders to seek change at the company. Among the most obvious is ***the rather large valuation discount, the sheer size of which seems to indicate more than a mere holding company discount***, especially considering that the company is not a complex conglomerate. The market is perceiving significant risk somewhere within the business, and is currently assigning a high cost of equity as a result, ***assigning greater value to the company due to its current level of disclosure and shareholder engagement***. The recipe for addressing SINA's valuation discount in a way that ultimately promotes long−term value likely incorporates a shoring up of the non−Weibo business, possibly through growth investment, as well as proof of its durability. ***Increasing shareholder engagement and disclosure would support the market in assigning value appropriately by better understanding the company's investment portfolio***, its plans to drive value through organic and/or acquisition growth, and how execution of these plans will enhance and/or transform of the core business.

73. ISS also stated: "Adding at least one new independent director to the board should, at the very least, further equip the company to make progress in the categories of disclosure and shareholder engagement."

74. On October 23, 2017, Glass Lewis – another major proxy advisory firm that provides voting recommendations to institutional investors – sent an email to B. Zhang and others stating that Glass Lewis endorsed both of Aristeia 's nominees as well as Aristeia's case for change. In so doing, Glass Lewis concluded: "We believe the Dissident presents a number of compelling ideas to address the Company's NAV discount ... We find that the incumbent board has failed present a persuasive case ..."

75. On November 3, 2017, Sina held its 2017 Annual General Meeting of Shareholders ("AGM"). A majority of unaffiliated shareholders supported Aristeia's nominee Thomas Manning. However, Chao's vote of his recently acquired shares proved determinative, and the final vote was 45% for Mr. Manning and 55% against. If Chao had abstained, Mr. Manning would have been elected to the Board of Directors. The shareholders ultimately adopted the Board's recommendation.

## IV. CHAO'S FURTHER CONSOLIDATION OF POWER WHICH CONTINUES TO DEPRESS SINA'S SHARE PRICE

76. Unbeknownst to Sina shareholders, within hours of the initial approach by Aristeia, Sina Defendants began considering how the Company could increase Chao's voting power and control the Company at any EGM.

77. On or about July 24, 2017, Sina's outside counsel at Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") wrote to the Company's Cayman Island counsel at Maples Group ("Maples" or "Caymen Island Counsel") asking on behalf of the Company what could be done to protect the interests of the Company against Aristeia:

> SINA received the attached letter from an activist shareholder, Aristeia … a few hours ago…The letter contains a proposal to nominate three new directors and change the board size. Before deciding on a strategy… the company wants to explore any possible options available to it under the Cayman Islands law ... In particular , [ it ] has [the] following questions.
>
> * * *
>
> [T]he company's board has the power to issue preference shares or attach to certain shares such preferred or other special rights, whether in regard to dividend, voting, return of capital or otherwise. The company wants to know to what extent the board is able to exercise this power. For example ... whether ... [the] Articles ... limit [the] power of the board? Whether the board has the power to issue new shares to certain shareholders with super voting rights ...

78. On July 24, 2017, the advice of Cayman Island Counsel is relayed back, warning: "Actually Issuing shares to defeat a potential hostile bidder is problematical and not really done…"

79. Skadden responded on behalf of Sina, "... let's assume the new issuance of shares with special rights is unrelated to the current situation. The company wants to know what kind of special rights can be attached to newly issued shares under the articles ..."

80. On July 25, 2017, Caymen Island Counsel responded:

> [T]he directors may only exercise the powers granted to them for a ***proper purpose***. In the case of the issuance of shares, as mentioned by Greg, ***issuing shares to defeat a hostile bidder would not be considered to be for a proper purpose***. Likewise, ***issuing shares to entrench the existing directors would also not be for a proper purpose***. Issuing shares with special rights for these purposes would, in our view, be susceptible to challenge before the Cayman court.
>
> ***Directors also need to act in accordance with their fiduciary duties***, particularly to ensure that ***any issue of shares with special rights is in the best interests of the Company, which can be equated with <u>the interests of the shareholders as a whole</u>***.

81. Skadden asked: "Regardless of the current situation, what special rights can be attached to newly issued shares? ... can holders of new shares be entitled to appoint a certain number of directors ...? Also, can new shares have super voting power?"

82. Caymen Island Counsel explained:

> [I]t would be permissible for the directors to issue new shares which have super voting power...***In theory***, therefore, it would be possible for the directors to issue shares to a shareholder to give it sufficient voting power to pass a special resolution, which would in turn enable it to amend or override the articles ...
>
> * * *
>
> ***As always, the issue of such shares by the directors would be subject to their <u>fiduciary duties, including the duty to act in the best interests of the Company,</u> and to exercise their powers for a proper purpose***. ***<u>Such an issue of shares would be susceptible to challenge if the directors cannot demonstrate that these criteria have been satisfied</u>***.

83. The Company's Caymen Island Counsel advised that while they "lean toward the view" that Class A Preference Shares with super-voting rights could be issued if done so pursuant to certain qualifications/limitations, even then if a disgruntled shareholder challenged the issuance

of Class A shares on the basis that shareholder/class consent is required for such an issuance a court may agree.

84. The next day, July 26, 2017, a Board meeting was held, in which B. Zhang, Skadden and Caymen Island Counsel also attended. B. Zhang reported the receipt of the Aristeia letter. Thereafter, Caymen Island Counsel explained that directors must exercise their powers for "***proper purpose***" under the Company's articles. Chao acknowledged that they "... ***must act in the best interests of the Company***."

85. On August 28, 2017, Chao and B. Zhang received a "highly confidential" email titled "Aristeia Capital −− Board of Director Nominations" stating "[For your information] −− Cayman counsel's confirmation of the directors' ability to issue super−voting shares ***in the best interests of the company***. Thanks." Attached was a July 25, 2017 email from Sina's Cayman Island Counsel.

86. In September, Skadden prepared a PowerPoint presentation for the Board of Directors concerning their fiduciary duties in relation to the proxy battle, reiterating, "A director must exercise his powers for a proper purpose."

87. Within hours of the Aristeia proxy vote during the AGM on November 3, 2017, a Sina Board of Directors meeting was held (which was also attended by B. Zhang, Skadden and Caymen Island Counsel). After noting the voting during the AGM, the minutes state:

> The Directors noted that in an effort to win the shareholder support at the 2017 AGM, the Directors and the Company's officers had been forced to divert significant amount of time and attention from ***the Company's normal business operations and strategic planning ... the Company*** had to utilise significant amount of resources, to prepare proxy solicitation materials and engage in the proxy contest initiated by Aristeia.
>
> * * *
>
> [T]he Board has been considering constructive suggestions to further the Company's success and enhance shareholder value, the Directors noted that any

> future proxy contest initiated by any shareholder with potentially value destruction proposals could be extremely costly, time−consuming and disruptive, and may materially and adversely affect the Company's ability to execute its business strategies.
>
> * * *
>
> In light of the foregoing, the Directors [the board] would like to explore possible actions within the boundary of applicable laws and the Company's M&AA to protect the Company.

88. The Board then acknowledged that they understood that they could issue such shares and voting power only as fiduciaries for the Company and all shareholders because of the obvious reality that no shareholder (much less 2/3 of all shareholders) would have approved ceding all of their voting rights to Chao. The minutes from that meeting state:

> Maples, the Company's Cayman Islands counsel, advised the Board that any amendment of the Company's M&AA [Memorandum & Articles of Association] would require shareholder approval by a Special Resolution, which entail approval by no less than 2/3 of the shareholders attending a properly constituted shareholders meeting with a valid quorum. Following the above, the directors noted that over 85% of the Company's issued share capital is held publicly, making an amendment of the M&AA extremely difficult and uncertain.

89. Defendant S. Zhang testified that they issued the Class A Preference Shares to Chao rather than seek approval from shareholders because "there is a risk that it wouldn't get approved, and we don't want to take that risk."

90. The Board also acknowledged that the Class A Preference Shares were being issued to Chao in his role as "senior management" pursuant to the M&AA (and therefore, were subject to Chao's fiduciary obligations to the Company and all shareholders) and were subject to the limitations previously identified by the Company's Cayman Island and US counsel:

> The Directors then discussed the Company's proposed issuance of to−be−created Class A Preference Shares, 10,000 votes per share initially, to senior management pursuant to Article 3 of the M&AA, including the proposed terms of the Class A Preference shares as set forth in Exhibit B ... which reflects the Directors' previous discussions and comments from the Company's Cayman Islands and US ... counsels.

91. The Board continued to make clear – given the presence of Caymen Island Counsel at the Board meeting – that the Class A Preference Shares were being issued after thorough discussion and for the benefit of the Company and all shareholders rather than to convey a personal benefit/power on Chao. The minutes state that "The Directors had an extensive discussion ..." and had "... considerable thoughts [about the preference shares] ... [and] consulted legal counsels on corporate governance practices ..." and had "thorough deliberations."

92. On November 3, 2017, Sina's Board instructed its Audit Committee to consider a new proposal to issue 7,150 Class A Preference Shares to New Wave, for a nominal consideration of $1 per share, each of which would carry no economic rights but would carry 10,000 votes, the effect of which would be to significantly increase Chao's voting power from 11.1% to a clear majority of 55.5%, despite him having (at that time) only 11.1% of the economic interest in the Company.

93. On November 6, 2017, the Audit Committee, comprised of Defendants S. Zhang and Tsao, recommended that the proposal be approved. The Audit Committee's report recorded the Board's purpose for advancing this proposal (to prevent hostile takeovers), issuance of the Class A Preference Shares as well as the limited purpose for which those shares can be voted (for the benefit of all shareholders). The Audit Committee resolution similarly states that it was approving the issuance of the Class A Preference Shares only on the basis of the stated purpose and that it was done for the benefit of the Company and all shareholders:

> After the Board's thorough deliberations, the Board unanimously came to the conclusion that the actions suggested by Aristeia are risky and potentially ***value destructive***. If the nominees proposed by Aristeia are elected to the Board, ***the Company's*** ability to effectively and timely implement its current strategic plans ... may be significantly compromised. Therefore, the Committee Members and other members of the board believe that it is in ***the best interest of the Company and all of its shareholders*** to end the costly and disruptive proxy contest with Aristeia and avoid future proxy fights with other activist shareholders…

* * *

> Whereas, to ensure the continued execution of ***the Company's*** sound business strategies and development plans and avoid costly, time-consuming and disruptive proxy contests in the future, the Board believes that it would be in the best interest of ***the Company*** and ***all of its shareholders*** for the Company to issue certain Class A Preference Shares with rights and features that are deemed appropriate by the Board.

94. In short, the Sina Defendants knew the purpose and limitations of the Class A Preference Shares being issued. ***First***, they could only be issued for a "proper corporate purpose." ***Second***, they were issued only to protect the Company against hostile takeovers. ***Third***, they could not be issued to confer a personal benefit on any officer or director. ***Fourth***, the power to exercise this voting power was linked explicitly to Chao's role as an executive director and was therefore conferred on him in his capacity as a fiduciary. Indeed, it would be absurd to issue shares that can effectively do away with the EGM and any shareholder resolution for approximately $7,000.

95. However, when the Company publicly announced the issuance of the Class A Preference Shares on November 8, 2017, it did not identify any such limitations, instead asserting that the shares "are entitled to vote on all matters submitted to a general meeting of the Company."

96. The market reaction from this misinformation was as expected – alarm.

97. On November 9, 2017, the Wall Street Journal published an article titled "Sina Shows its Disregard for Shareholders" stating "Sina has stripped its shareholders—which include big mutual funds like Schroder and BlackRock, according to FactSet—of having any effective say in the company's running." The article explained that "[Sina] took away shareholders' rights without getting their consent…. Sina has clearly acted solely to entrench management's power. Investors who bought the stock hoping to put pressure on the company to improve its business have been left hanging—Sina's stock fell 13% Tuesday before recouping some of those losses Wednesday. Corporate democracy, meanwhile, has taken another hammer blow."

98. Analysts saw Sina's actions as a complete breakdown in corporate governance and a serious roadblock to investors realizing the value of their shares, which further increased the Holdco Discount.

99. A November 7, 2017 MCM Partners Equity Research report titled "Sina slams the door on minority investors" stated "we see the move to cement Chairman Chao's grip on the company as an appalling example of weak corporate governance, to an extent that some shareholders may question the board's fiduciary responsibilities, which appear to have been abandoned in approving the Class A share issue." The report also stated **"Shareholders twisting in the wind.** For shareholders, the outcome seems clear: no possible avenue to realize the value of Weibo shares held in Sina." The report concluded: "**Rating change**. Given the breakdown in corporate governance and an effective roadblock to realizing value on the balance sheet, we lower our rating on the stock to hold from buy."[5]

100. An April 17, 2018 Morningstar report noted that "the market values Sina at only 52% of the value of Sina's net asset value" and recognized "the holding-company discount and concerns over corporate governance."

101. A July 24, 2018 Morningstar report stated "the market values Sina at only 58% of the company's net asset value and "We think Sina should step up its efforts to eliminate the discount. These could include strengthening the non-Weibo business, repurchasing Sina shares, or spinning or splitting off Sina's Weibo stake to shareholders." Under the heading "Management", the report stated, "our stewardship rating is Poor."

---

[5] Emphasis in original.

102. A March 6, 2019 Morningstar report noted "Sina is Trading at 60% of Its Net Asset Value." A November 20, 2019 Huatai Research report stated "Sina is currently trading at a 46.5% discount to the market value of its Weibo shareholdings.

## V. SINA'S UNDISCLOSED INVESTMENT IN TUSIMPLE BECOMES EXTREMELY VALUABLE

### A. Sina Invests Heavily in TuSimple with Chao and B. Zhang Joining TuSimple's Board of Directors

103. Unbeknownst to shareholders, mere months after Chao received the Class A Preference Shares, he caused Sina to begin investing heavily in TuSimple, an autonomous trucking company based in San Diego, USA. These investments were made through SunDream Incorporated ("SunDream").

104. Not only did Chao and B. Zhang testify that they were well aware of Sina's investments in TuSimple, Chao testified that he took quite an interest in TuSimple "in terms of business development and especially technology development" and stating, "I fund[ed] them from the very beginning", investing in Series A, B, C and D rounds of financing. B. Zhang confirmed that Chao was "quite excited" about the investment.

105. As a result of Sina's investments, by June 2020, Sina owned approximately 34.44% of TuSimple, making Sina TuSimple's largest investor, owning more than twice as much as the next largest investors, which were TuSimple's founders. Sina made the following investments in TuSimple:

i. In 2018, Sina purchased $90 million in preference shares in TuSimple.

ii. In 2019, Sina invested an additional $60 million for the purchase of additional preference shares in TuSimple, including as part of TuSimple's Series D financing, which was completed in September 2019.

iii. In June 2020, Sina issued a convertible bond to TuSimple for $100 million.

106. Sina was not merely a passive investor. Chao's and B. Zhang were each members of TuSimple's Board of Directors. Chao was formally appointed on April 22, 2019. B. Zhang joined Chao on September 30, 2020.

107. As of the announcement of Sina Board's approval of the Merger Agreement on September 28, 2020, no Sina SEC filing ever mentioned TuSimple or Chao and B. Zhang's positions on TuSimple's Board of Directors.

### B. Sina's Investment in TuSimple Becomes Worth Billions Leading to Chao's Scheme to Purchase Sina

108. TuSimple completed its Series D financing in September 2019, during which TuSimple was valued at $1.2 billion or $8.11 per share.

109. In March 2020, TuSimple engaged Morgan Stanley USA as the placement agent for its Series E fundraising.

110. By June 15, 2020, Morgan Stanley USA was valuing TuSimple at over $2 billion for its Series E financing. A June 15, 2020, Morgan Stanley USA memo seeking formal internal approval to conduct the Series E financing states: "TuSimple completed its series D round raising $148 [million] in September 2019 at [an approximately] $1.1 [billion] post−money valuation. [The] Company is now targeting to raise $300−500 [million] at a $2 [billion] [plus] valuation to fund its R&D activities and build out of its Autonomous Freight Network."

111. Morgan Stanley USA's mid-June financial projections for the Series E financing show significant revenue and income growth projected for 2023 and 2024, which was dependent upon production of a purpose−built autonomous truck for which TuSimple needed an original equipment manufacturer ("OEM"). TuSimple and Morgan Stanley USA knew that the OEM was going to be the major US truck manufacturer Navistar. The two companies were finalizing a strategic investment and joint development partnership.

112. The partnership agreement was of vital importance to TuSimple, which needed an OEM to take TuSimple's technology to market. Under the terms of the deal, TuSimple and Navistar agreed to collaborate on the development and manufacture of a purpose−built class 8 truck with level 4 autonomous capability, meaning it is capable of driving without human input.

113. TuSimple held a board meeting on July 3, 2020. At this meeting the Navistar collaboration was approved.[6]

114. Chao testified that he understood that the deal with Navistar was vitally important for TuSimple.

115. With the deal with Navistar in place, TuSimple and Morgan Stanley USA expected the Series E financing to be the last round of private financing before an IPO. On June 23, 2020, a senior member of the Morgan Stanley USA team, Pamela Roxas, sent an internal email to the TuSimple team stating, "Messaging to date is that we expect this to be last private round before IPO. Internally, we are starting to have IPO timeline conversations with company."

116. Chao testified that he understood the IPO was "inevitable" for TuSimple given it had never produced any revenues. Without an IPO it would fail as a business. Similarly, the Cayman Island Court determined: "The Court does not find that there was an appreciable 'non-IPO scenario' for TuSimple on the facts."[7]

117. As discussed in detail below, by the end of July 2020 ***Morgan Stanly USA was valuing TuSimple as high as $7 billion for its upcoming IPO***.

[6] The agreement with Navistar was signed on July 10, 2020, and was announced to TuSimple investors on July 15, 2020.

[7] During the Caymen Island Action, Professor Bilge Yilmaz provided empirical evidence that over the period from 2013 to 2021, only 7.6% of IPOs that had filed their S−1 forms were withdrawn. *See also* Jarrod Humphrey, *Beyond the IPO horizon: Understanding the determinants and consequences of IPO withdrawal*, Journal of Business Venturing Insights 21, at 3 (2024) (following the enactment of the JOBS Act in 2012, from 2013 onwards 93.53% of companies that filed an S-1 registration statement completed their IPOs).

118. However, there was one hurdle to TuSimple's IPO. TuSimple and Morgan Stanley USA, formed the view that the IPO could not proceed if Sina – its largest investor – remained a listed company.

119. Certain investments that involve the acquisition of, or investment in, a U.S. business may be subject to review and approval by the Committee on Foreign Investment in the United States ("CFIUS"). CFIUS is a committee comprised of multiple U.S. government agencies, led by the Department of the Treasury, authorized to review and investigate certain transactions in which a foreign person acquires an interest in a U.S. business (including certain minority investments) in order to determine the effect of such transactions on the national security of the United States. Investments that result in control of a U.S. business by a foreign person are subject to CFIUS jurisdiction.

120. Significant CFIUS reform legislation, which was fully implemented through regulations that became effective on February 13, 2020, significantly expanded the scope of CFIUS's jurisdiction to investments that do not result in control of a U.S. business by a foreign person but afford certain foreign investors certain information or governance rights in a U.S. business that has a nexus to "critical technologies," "critical infrastructure" and/or "sensitive personal data."

121. Any review and approval of an investment or transaction by CFIUS would have significant and outsized impacts on TuSimple's operations.

122. As the Caymen Island Court found: "The evidence shows that the management of TuSimple and its advisers, Morgan Stanley USA, had formed the view that the TuSimple IPO could not have proceeded at a time when Sina remained a listed company. Once the Sina transaction completed they wished to then reduce 'Chinese ownership' in TuSimple."

123. Thereafter, the timing of TuSimple's IPO moved in lock step with Sina's go-private Merger.

124. This was possible for several reasons. Chao and B. Zhang were officers and directors of Sina, owners of New Wave and also members of the Board of Directors of TuSimple. Moreover, Morgan Stanley USA was running TuSimple's IPO, Morgan Stanley Asia was engaged to conduct the valuation of Sina for the proposed Merger, and Morgan Stanley was also pitching to provide assistance with the financing arrangements for New Wave for the proposed Merger. The deal team for the New Wave financing and the deal team for the TuSimple IPO had an overlap of at least two people.

125. Morgan Stanley was very aware of its multiple roles in the Merger and the TuSimple IPO and sought to please Sina in hopes of future work. For example, emails introduced in the Caymen Island Action show Morgan Stanley contemplating that if they lowball the cost for the Sina Merger, then they may get additional work from TuSimple and Weibo.

126. A number of events further demonstrate the connection between the TuSimple IPO and the Sina go-private Merger.

127. On July 6, 2020 – just one business day after the TuSimple Board (of which Chao was a member) approved the Navistar partnership – Chao, through New Wave, sent a letter to the Sina Board proposing to take Sina private by acquiring all the outstanding ordinary shares of Sina not already owned by New Wave for $41 per share in cash.

128. On August 31, 2020 Morgan Stanley USA formally sought internal approval to proceed with the TuSimple IPO underwriting. Discussing the confidential filing of the initial S-1 form, the memo stated: "Filing Status: Confidential filing submission on [September 11, 2020], "public filing expected [on November 20, 2020].

129. That same day (August 31, 2020), B. Zhang spoke to Morgan Stanley Asia, informing them that the then current timeline for signing the Merger Agreement was also "mid−September"

130. Ultimately, the Merger Agreement was approved by shareholders at the EGM at 9:00 a.m. on December 23, 2020 in Beijing. Later on December 23, 2020 (+13 hours, New York time), TuSimple confidentially filed with the SEC its draft Form S-1 relating to its proposed IPO.

131. The Caymen Island Court found: "[T]he completion of the IPO for TuSimple was connected to the merger transaction by Sina." Among the facts that the Court found demonstrated the connection were the following:

i. "The EGM at which the Sina merger was approved took place at 9am on 23 December 2020 in Beijing"

ii. "Later on 23 December 2020 (+13 hours, New York time), TuSimple confidentially filed with the SEC its draft Form S-1 relating to its proposed IPO"

iii. "The confidential filing of the draft Form S-1 was ratified by the board of directors of TuSimple on 22 January 2021"

iv. "TuSimple became a US company in February 2021"

v. "The Merger was not completed until 21 March 2021"

vi. "TuSimple publicly filed with the SEC its Form S-1 relating to its proposed IPO on 23 March 2021 following completion of the Merger. The TuSimple IPO was launched and completed on 15 April 2021."

132. TuSimple's value at the time of the IPO was $8.5 billion.

## VI. THE SCHEME TO STEAL SHAREHOLDER VALUE THROUGH PRIVATIZATION

### A. Sina Is Significantly Underpriced as A Result of Defendants' Actions and Concealment of Material Information

133. As of July 2020, Sina shares were massively underpriced.

134. ***First***, because of Sina's poor corporate governance, including the market's belief that Chao could vote his Class A Preference Shares for any purpose and could effectively control

any shareholder vote, the market applied a significant Holdco Discount to Sina shares. Although Sina Defendants could have addressed the Holdco Discount and unlocked value for Sina shareholders, they chose not to. Sina Defendants also knew that having created the Holdco Discount – *i.e.* Sina is valued by the market at less than the sum of its parts – Chao could take that significant value for himself as a windfall if he took the Company private. B. Zhang testified that Sina's Holdco Discount would disappear when it became a private company.

135. ***Second***, Sina shareholders were unaware of Sina's 34.44% interest in TuSimple, which was valued at upwards of $7 billion.

**B. Chao's Offer to Purchase Sina**

136. On July 6, 2020 – one business day after the TuSimple Board approved the Navistar partnership – Sina announced that Chao, through New Wave, sent a letter to the Sina Board containing a proposal, whereby it offered to acquire all outstanding ordinary shares of Sina not already owned by New Wave for $41 per share in cash.

137. The letter, which was signed by Chao and included in Sina's SEC filing that day falsely asserted that Chao was permitted to vote his Class A Preference Shares for his own personal interest – to approve his offer as well as prevent any superior third party offer that may come along, even if it is better for the Company and all shareholders. As Chao's submission in the Caymen Island Action admitted: "Given my controlling position in respect to the Company [SINA] by reason of the super−voting powers attached to New Wave's shares, New Wave could veto any other offer that may come along." The letter made Chao's intention clear:

> The Buyer currently beneficially owns Ordinary Shares and Class A Preference Shares of the Company representing approximately 58% of the aggregate voting power in the Company.
>
> * * *

> In considering the proposed Acquisition, you should be aware that we are interested only in acquiring the outstanding Ordinary Shares that the Buyer does not already own, and that we do not intend to sell our stake in the Company to any third party.

138. Chao testified that when he made his offer, he understood that his economic incentive to pay as little as possible for Sina was ***not*** in the interest of all other shareholders, but was in conflict with the interests of all other shareholders to obtain the highest possible price for their shares, either from Chao or a third party offer:

> Q. Well, let me put it this way. Your personal economic incentive was to pay as little as possible for SINA, and the special committee's duty was to ensure that shareholders not affiliated to New Wave got a fair price?
>
> A. Yes.

139. Chao admitted that his express intention was ***not*** to act in the interest of the Company or all the shareholders (which violated the purpose and condition for which his Class A shares were issued):

> You have to understand the pre−condition of this deal. When proposed this deal, it was never meant to be comparison to other alternatives for the companies. ***It's not a deal for creating −− like we are soliciting deals to, let 's say −− let's sell in the best price for the company and let's, you know, get the best price for all the shareholder***s. I intended, as I said in my offer, and I also explain in my statement, it was very clear that it was only intended I want to buy this company. And I explained in my statement why I was the only one who could do that.

140. As the Proxy Statement later acknowledged under the heading "Position of the Buyer Group as to the Fairness of the Merger":

> Members of the Buyer Group have interests in the Merger that are different from, and/or in addition to, those of the other shareholders of the Company by virtue of their continuing interests in the Surviving Company after the completion of the Merger.

141. The Cayman Island Court held: "The Court finds that Mr. Chao's primary purpose in the process was to sanction an acquisition of the Company by him alone. As he said in evidence:

'It's not a normal privatisation. It was intended to be the majority shareholder take over the company in the first place'."

142. Chao testified that he was signaling to the market that a sale to New Wave was the only possible transaction form the outset.

> Q. And looking back to the offer letter -- proposal, back on, the paragraph we were looking at item 6, the last sentence that I read to you, in that sentence you, as New Wave, are effectively signalling here your intention to control the process such that it's a binary process. Either there's a sale to New Wave or there's no transaction?
>
> A. That's correct.

143. Chao also candidly testified that his intent was to signal to shareholders that he would thwart any other deal even if better for shareholders:

> Q. So you, as far as you were concerned, were the only possible buyer?
>
> A. Yes.
>
> Q. And looking back to the offer letter –– proposal, back on {E/432/2}, the paragraph we were looking at item 6, the last sentence that I read to you, in that sentence you, as New Wave, are effectively signalling here your intention to control the process such that it's a binary process. Either there's a sale to New Wave or there's no transaction?
>
> A. That's correct.

144. Chao testified that his intention from the start was to foreclose any competitive bid and the Company's ability to seek another transaction: "***It was never my intention to compete with anybody, because there could never be a competitor in a bid like this. That was my intention****, is take the company private. ...* ***But it's not my intention it was -- I don't think they have flexibility, I mean, to seek another transaction****.*"

145. Chao also admitted that his intention in crafting his offer letter and the conditions of the offer was to foreclose any other viable offers so that there could be no price discovery or market checks that could reveal the true value of the Company. The Caymen Island Court found

"As a consequence, [Chao] said, it '*really doesn't matter*' whether there was a market check, or other processes to facilitate price discovery."[8] Chao testified:

> Q. Would you agree this. Would you agree that it's critical that in the process that surrounds a privatisation transaction like this, where the buyer, yourself, has a large degree of control over the target company, that the process around that is robust and eliminates conflicts of interest and facilitates a proper price discovery for the shares?
>
> A. It really doesn't matter if my offer is the only choice for the company for privatisation.
>
> Q. So that doesn't matter, right?
>
> A. It really doesn't matter.
>
> * * *
>
> A. When I said I'm the only who could do it, there are two aspects of what I meant. One is there could be no alternative transactions…Secondly, because I control the vote, I have majority of the vote, that's why I had ability to realise this deal.

146. Chao's true intention to prevent any price discovery was laid bare when directly questioned by the Caymen Island Court:

> JUSTICE PARKER: The reality of this deal, as was made clear by your indicative offer, was that you didn't intend to sell to anyone else.
>
> A. Yes.
>
> JUSTICE PARKER: You wanted to buy the rest of the shares in the company.
>
> A. Yes.
>
> * * *
>
> JUSTICE PARKER: In fact, this is the important point that I need to just make sure is what you're saying, in practice, there was no other show in town. It was only you.
>
> A. Yes.
>
> JUSTICE PARKER: And that accorded with your intention.

---

[8] Emphasis in original.

A. Yes.

JUSTICE PARKER: So there was no point in soliciting other bids or other buyers –

A. Exactly, exactly.

### C. Formation of The Special Committee

147. On the same day as the announcement of Chao's offer, July 6, 2020, the Company announced that the Board had formed a Special Committee, consisting of three Directors, S. Zhang, Y. Zhang and Wang to evaluate and consider the proposal.

148. The Special Committee had the specific responsibility of acting in "the best interests of the Company's shareholders other than New Wave." The Board minutes establishing the Special Committee state:

> It was resolved that the Board hereby delegates to the Special Committee all such powers and authority as may be necessary or advisable to permit the Special Committee to effectively assist the Board in ***determining whether the Proposal or any Alternative Transaction is fair to and in the best interests of the Company's shareholders in general, and the Company's shareholders other than New Wave in particular*** (the 'Minority Shareholders')...

149. However, each of the members of the Special Committee had long-standing professional or private loyalty to Chao. As the Caymen Island Court found: "it is clear from their evidence that ***having granted [Chao] voting control of Sina in 2017*** and acknowledging his importance to the Weibo business, which had created a lot of value for shareholders, ***they wanted to incentivise and keep him.***"

150. B. Zhang testified that she understood at the time that the Special Committee's duty, to look after the interests of the public shareholders, the minority shareholders, was in conflict with New Wave's interest in paying the lowest price the buyer could pay.

151. B. Zhang's own interest in consummating the Merger was substantial. She owned 2% of New Wave. Therefore, if the Merger was approved, her interest would increase from having

a 2% interest in New Wave's 14% interest in Sina to having a 2% interest in 100% of Sina. Thus, she stood to make hundreds of millions of dollars (or more) as a result of the Merger.

152. B. Zhang never disclosed her own conflict of interest – being an owner of the acquirer New Wave as well as CFO of the target Sina – to the Sina Board of Directors, Special Committee, Morgan Stanley Asia or the Special Committee's counsel Gibson Dunn & Crutcher LLP ("Gibson Dunn").

### D. Defendants Collude to Prevent Price Discovery and Consummate The Merger on Terms Favorable to New Wave

153. Once Chao made it clear that he did not intend to sell his stake in the Company to any third party it was – as the Caymen Island Court found – effectively "game over" for all practical purposes.

154. The Special Committee and Morgan Stanley Asia did not even attempt to conduct any price discovery to ensure the Minority Shareholders obtained a fair price. No offers were obtained. There was no pre-signing "market check." There was no post-signing "go-shop." They even eliminated the standard "majority of the minority" ("MOTM") provision designed specifically to protect Minority Shareholders.

#### 1. Sina Defendants Craft the Terms of The Merger Agreement to Foreclose Any Possibility of Price Discovery

155. Pursuant to the terms of its creation, the Special Committee had an obligation to "determine[e] whether the Proposal or any Alternative Transaction is fair to and in the best interests of…the Company's shareholders other than New Wave…"

156. There are several processes a company can implement to ensure shareholders receive the highest value in response to a proposed merger. Examples of such processes include: (i) a pre-signing "market check", (ii) pursuit of alternative transactions to unlock shareholder value, and (iii) a post-signing "go-shop" provision. Here, the Special Committee did nothing.

Instead, Defendants actively schemed to prevent any type of price discovery that would have revealed the inadequacy of Chao's proposal.

157. In a pre-signing market check, the selling company (or its representative) may approach certain companies to gauge their interest levels in an acquisition or other alternative transactions for the shareholders' benefit. A pre-signing market check may also be unsolicited when potential acquirors privately approach the company to indicate potential interest in an acquisition or other alternative transaction.

158. A post-signing market check enables other potential acquirors to make bids after the execution of a definitive merger agreement. Post-signing market checks can be categorized as active or passive.

159. The merger agreement in an active market check contains a "go-shop provision." This permits the seller to actively solicit alternative bidders. The merger agreement in a passive market check contains a "no-shop provision." This prohibits the selling company from actively seeking out new bidders but allows the board of directors to consider unsolicited bids. If the board of directors conclude that the new unsolicited bid provides better value to shareholders, it can change its recommendation or terminate the merger agreement with the initial bidder in order to execute an agreement with the new bidder.

160. Merger agreements also traditionally contain a "fiduciary out" provision. A fiduciary out is a crucial provision in public company merger agreements allowing the target board to terminate a deal or change its recommendation if a superior offer arises or to fulfill its fiduciary duties, ensuring maximum value for shareholders. It acts as a necessary exception to "no-shop" clauses, preventing directors from being locked into a deal that is no longer in the best interest of shareholders.

161. As the Special Committee was negotiating the merger agreement and interacting with Morgan Stanley Asia, the Sina Defendants made every effort to foreclose any type of market check, price discovery or anything that could prevent the merger from happening at a favorable price to Chao.

162. Specifically, despite Sina Defendants knowing that Chao's Class A Preference Shares could only be voted for the best interest of the Company and all shareholders – not in his own self-interest to reduce the valuation of the Company or foreclose other offers or price discovery, the Special Committee evaluated Chao's proposal as if he ***could*** vote the Class A Preference Shares for any purpose. This was a clear violation of the Special Committee's mandate to act in the interests of the Minority Shareholders.

163. As S. Zhang testified: "We knew from the time of receiving the offer that any such market check or like go-shop would need the cooperation of – or support of Mr Chao, and he had already stated in his offer letter that he was not interested in selling his stake." On July 14, 2020, Tang emailed S. Zhang stating, in part, "As for market check/go-shop, I again don't think it's relevant here. Charles' stake has a blocking vote, so no other offer can go through if he blocks; therefore, we will receive no real or serious outside offers."

164. On August 14, 2020, the Special Committee held a meeting also attended by Morgan Stanley Asia and Gibson Dunn, at which they discussed he advantages of conducing a pre−signing "market check" and a post signing "go−shop." It was also explained to the Special Committee that there was a general market practice of pre-signing market check and post-signing go-shop in Cayman companies.

165. Internal Morgan Stanley messages introduced in the Caymen Island Action demonstrate that Morgan Stanley struggled to come up with a valuation that supported the Merger

price, describing Sina as a "treasure trove" and being concerned about reputational issues for Morgan Stanley.

166. However, on August 19, 2020, the Special Committee met with Morgan Stanley Asia, telling them ***not to consider the break-up value of Sina in the valuation***, falsely asserting that Chao could use his Class A Preference Shares to block it. An August 19, 2020 internal Morgan Stanley Asia document states: "We are in good shape on SINA. We had an extensive preview meeting with the special committee today. Largely on the same page. Much of the analysis under the existing Holdco structure ... supports the offer price. ***The offer price falls short on a break−up basis (eg spin−off or sale of Weibo) but it's not actionable because Charles [Chao] will vote against and/or regulatory constraints prevent a change of control at Weibo. The special committee is able to rule out those options on basis they are not actionable***."

167. On August 20, 2020 Morgan Stanley Aisa wrote to B. Zhang on behalf of the Special Committee specifically in relation to New Wave's "feedback on possible transaction alternatives. As discussed, we would appreciate the Buyer's consideration of these alternatives*"* and whether they would be supportive of them. The alternatives identified were:

i. *"*a potential transaction involving a sale of Weibo's controlling stake held by SINA to a third party at an acceptable valuation? This could include, for example, a potential sale to Alibaba, or if it does not exercise its right of first offer, to a third party who may be acceptable to the relevant regulators".

ii. "a distribution in specie of all or substantially all of the Weibo shares held by SINA to SINA's shareholders in connection with (or as an alternative to) the potential going private transaction? We noticed that certain distributions of Weibo shares held by SINA to SINA's shareholders were carried out in 2016 and 2017*"*.

168. B. Zhang, having obtained Chao's instructions, sent New Wave's response, again asserting that Chao could vote his Class A Preference Shares to block other transactions that would unlock shareholder value: "Thank you for your inquiries. We appreciate your thoughts but New Wave as the controlling shareholders of Sina considers Weibo as a vital piece of assets in Sina's

integrated business operations and has no intention to acquire Sina without Weibo or break Sina into pieces." Chao testified and confirmed: "That was a true statement. That was exactly the right reply she should have given Morgan Stanley."

169. Through these communications, the Sina Defendants eliminated even the threat of pre-signing competition to Chao's bid. The Caymen Island Court found:

> ***As to alternative transactions such as a reverse merger or an in-specie dividend distribution of Sina's holdings in Weibo to Sina shareholders***…The Court finds that ***they were looked at by the Special Committee with Gibson Dunn and Morgan Stanley Asia but not pursued***

170. Sina Defendants also eliminated any possibility of a post-signing price discovery through a go-shop provision. As the Caymen Island Court observed: "Despite the view that it was a 'non-starter' ***the Special Committee did consider, with Gibson Dunn, conducting a "go-shop" process in respect of the merger transaction, but they knew from the Merger offer letter that Mr. Chao had no interest in selling his stake, so it was not going to be practical given the 61.1% voting power that the Buyer group had***."

171. Instead of a standard "go-shop" provision, the Board agreed to a "no-shop" provision. In essence, the Company could not actively solicit any competing offers.

172. While the Merger Agreement technically contained a "fiduciary out" provision that allowed the Company to consider non-solicited offers, the Board agreed to a provision that they mandated that they could only consider such offers if it was a "superior proposal." The definition of "superior proposal" required it to be one that was "reasonably capable of being completed on the terms proposed" by "taking into account", among other things, "likelihood of consummation."

173. Because of Chao's purported voting power and his statement that he would vote against any other proposal or transaction other than his own no other proposal could ever be "reasonably capable of being completed." Thus, the Sina Defendants structured the Merger

Agreement to effectively prohibit consideration of any bids at all, even significantly higher unsolicited bids. Thus, the "fiduciary out" provision had no practical significance because Chao could always veto.

174. The Caymen Island Court found:

> The so-called 'fiduciary out' provision did not make up for the fact that ***there was no robust market check with outreach to all logical buyers. The Court finds that the prospects of any unsolicited bid were effectively stifled by Mr. Chao's stated intention to veto any alternative transaction***.
>
> * * *
>
> The Court also agrees with the Dissenters' case ***that a fair reading of the 'no shop' and 'fiduciary out' provisions in the Merger Agreement together resulted in the Special Committee only being permitted to even speak to a third party (who made or was likely to make an unsolicited alternative offer ) if it determined that it would amount to a 'superior proposal'***.

175. The Caymen Island Court concluded:

> The upshot of an examination of the evidence is that ***there was no 'go shop', no pursuit of alternative transactions, or pre market checks, and no third parties submitting an offer, despite knowledge of the New Wave offer being in the market for a number of months***.
>
> * * *
>
> [The Court] accepts the Dissenters' case that ***the Special Committee was unable to put in place a process that was effective in producing price discovery***.

176. The Caymen Island Court also stated:

> The Court does not accept that it was realistic to suppose that the Special Committee, even if they had concluded that there was a superior proposal, would have being likely to change the recommendation in support for the merger and /or terminate the merger agreement and cause the Company to enter into a new agreement.

177. The Caymen Island Court concluded: "***[T]he Merger Price should not be relied upon to assess fair value*** for the Dissenters' shares. ***The proposition that the Merger Price can be relied on to assess fair value was simply not tested***."

### 2. Defendants Eliminate The Majority Of The Minority Requirement

178. With New Wave's purported 61% voting power at the EGM, the only practical barrier to shareholder approval of the Merger was a traditional "Majority of the Minority" ("MOTM") requirement. Under MOTM, a proposal (*i.e.* the Merger) could only pass if a majority of the unaffiliated shares issued voted in favor of it. A MOTM condition protects minority shareholders because in a privatization position it submits the controlling buyer's offer effectively to a market check.

179. The original version of the Merger Agreement conspicuously did not contain a MOTM requirement. In an August 30, 2020 draft of the Merger Agreement, the Special Committee's counsel Gibson Dunn proposed a MOTM provision such that a majority of the minority of the shares in ***issue*** (not voting) had to vote in favor of the Merger. That is, it required the majority approval of the outstanding unaffiliated shareholders (not just those present and voting) to approve the Merger.

180. A MOTM requirement was a particularly significant requirement for the proposed merger. With Minority Shareholders being misled that Chao could vote his Class A Preference Shares for any purpose, and that any alternative transaction, market check and go-shop were not pursued, a MOTM requirement would have been the only way that Minority Shareholders could believe that the Merger was not a foregone conclusion and that their participation in the vote could matter. Without the MOTM provision, 80.5% of unaffiliated voters would need to attend and vote against the Merger to defeat the proposal.

181. Chao testified that he understood at the time that the reason for the MOTM provision was that shareholders could block the Merger if they thought the price was too low. And Chao understood that this was a "big point."

182. If included in the Merger Agreement, the MOTM provision could have prevented the Merger from being voted through. At the EGM on December 23, 2020, only approximately 40% of the unaffiliated shares voted in favor of the Merger.

183. Unaware of B. Zhang's conflict of interest as an owner of New Wave, Sina's attorneys advised B. Zhang that an MOTM clause might be helpful for the Sina board to defend against future lawsuits from public shareholders, but it would reduce deal certainty on the transaction.

184. Despite the critical significance of the MOTM provision suggested by Gibson Dunn, the Special Committee gave up this right of the Minority Shareholders for a mere 5.6% increase in the offer price. The Caymen Island Court found that "this may fairly be said to be a relatively small price to pay to avoid such a circumstance."

## E. Defendants' Scheme to Conceal The True and Fair Value of Sina Shares and Depress The Valuation

### 1. Defendants Undervalue Sina's Investment In TuSimple

185. By July 2020, TuSimple was targeting its US IPO for the first quarter of 2021 at a valuation between $3.5 billion and $7 billion.

186. On or about July 29, 2020, TuSimple sent Chao (who had been a Director of TuSimple since April 2019) a questionnaire to be completed by each director and executive officer of TuSimple, stating "The Company is soliciting certain information from you that is required to be disclosed in the Company's proposed Registration Statement on Form S-1…to be filed with the [SEC]", requesting that the completed questionnaire be returned to the IPO attorneys "no later than August 3, 2020." The questionnaire was completed. A similar document was sent to SunDream Inc., of which Chao was the sole director. This questionnaire was also completed and returned.

187. Chao testified that he recalled receiving questionnaires about the TuSimple IPO. B. Zhang sent an email on August 20, 2020, discussing the questionnaires for Chao and SunDream.

188. On August 17, 2020, TuSimple's plan for a US IPO at a valuation up to $7 billion leaked into the market. An August 17, 2020 article titled "Robotruck firm TuSimple seeks IPO valuation of up to $7 billion" states: "Details: Based on both Beijing and San Diego, TuSimple is planning to file IPO paperwork for a US IPO in the first quarter of 2021 at a valuation between $3.5 billion and $7 billion, Chinese media reported citing persons familiar with the matter."

189. Chao testified that he was aware of this reporting at the time.

190. With information about TuSimple's value of upwards of $7 billion beginning to seep into the market, Defendants were pushing the IPO forward while also depressing the Merger valuation of TuSimple.

191. On August 31, 2020 Morgan Stanley USA formally sought internal approval to proceed with the TuSimple IPO underwriting. The memo states, in part: "Requested [underwriting] Approval": "Approval to confidentially submit the initial S−1 filing for the TuSimple IPO with Morgan Stanley as Lead−Left bookrunne[r]." Discussing the transaction structure, the memo states: "Transaction Type: IPO"; "Form of Offering: SEC registered on form S−1"; "Filing Status: Confidential filing submission on [September 11, 2020], "public filing expected [on November 20, 2020].

192. The same day, an August 31, 2020 internal Morgan Stanley Asia email states: *"…**Sandra[Special Committee] has called three times since Friday***…Long story short, sounds lie the SC[Special Committee] thinks our range is too wide and has been sent to pass along some messages around valuation…***TuSimple – she thinks it should be carried at book value which I***

***disagreed given we are already conservatively valuing this at latest round of valuation despite market rumour on its latest valuation and IPO in 2021 Q1 in the range of $3.5 – 7.0Bn***".

193. Yichen Zhang testified that it was he who had instructed Sandra Zhang that Morgan Stanley Asia's valuation was too high.

194. ***Despite internally admitting that "book value" was not a proper metric for valuing TuSimple given its latest valuation of upwards of $7 billion, Morgan Stanley Asia Fairness Presentation filed by Sina on October 13, 2020 stated that TuSimple's value was between the company's $186 million "book value" as of June 30, 2020 and $288 million, which was the $1.2 billion valuation from September 2019 at a 30% "liquidity discount***."

195. On November 27, 2020, the TuSimple Board of Directors formally approved the Series E financing.

196. A December 9, 2020, Morgan Stanley USA memo regarding the Series E financing identified a $2.2 billion pre-money valuation for TuSimple.

197. B. Zehng received notice of a TuSimple Board of Directors meeting scheduled for 2:00 pm on December 24, 2020, the purpose of which was to approve the IPO and confidential filing of the S-1.

198. By December 16, 2020, two additional TuSimple IPO questionnaires were sent to B. Zhang (who had been a director since at least September 30, 2020) as well as Chao. Moreover, a set of questionnaires were sent to Chao, and were also attached to emails sent by B. Zheng prior to December 21, 2020.

199. By December 21, 2020, Morgan Stanley's USA's valuation of TuSimple for the Series E financing increased to $2.6 billion

200. At some point prior to the EGM on December 23, 2020, Morgan Stanley USA concluded that TuSimple could achieve an IPO valuation in the range of $5 billion to $7 billion. An internal Morgan Stanley US memo, dated December 23, 2020 titled, "Preliminary IPO Valuation and Sizing Considerations" states under the heading "Executive Summary": "Based on current considerations, TuSimple could achieve an IPO valuation in the range of $5−7 [billion] on a fully distributed basis."

201. TuSimple held a Board of Directors meeting on December 23, 2020, at which the IPO and the confidential filing of the S-1 statement were approved.

202. On the same day as the EGM, December 23, 2020, TuSimple filed its 209-page confidential S−1 registration statement with the SEC. The first page states that the approximate date of the proposed IPO is: "As soon as practicable after the effective date of this Registration Statement."

203. The TuSimple IPO was completed on April 15, 2021, ***with a value of $8.5 billion***.[9]

**2. Defendants Delay Release of Weibo's Q2 2020 Financial Results**

204. Weibo's financial results were critically important to Sina's value. Over 77% of Sina's consolidated revenue in 2020 was derived from Weibo.

205. B. Zhang testified that Weibo's CFO reported directly to her.

206. Despite B. Zhang's conflict of interest as an owner of New Wave, she testified that she was the person who was approving the financial results and projections to Morgan Stanley Asia for purposes of valuing Sina for the Merger.

[9] Pursuant to TuSimple's IPO, 33,783,783 shares of TuSimple Class A common stock were offered at a price of $40.00 per share.

207. Weibo's Q2 2020 ended on June 30, 2020, beating analysts' expectations on revenue as well as earnings. This was very significant for Weibo (and Sina) because Weibo's Q1 2020 financial results were disappointing. Thus, the Q2 2020 results, if disclosed to the market would be materially positive news, counteracting market pessimism following the Q1 2020 results.

208. The Q2 2020 results were sent to B. Zhang on July 8, 2020 and were known or knowable to the extensive financial team earlier.

209. On or about August 31, 2020, B. Zhang spoke to Morgan Stanley Asia, stating that Chao/New Wave want Sina to delay the release of Weibo's and Sina's Q2 2020 financial results until after the Merger Agreement is signed because they knew that the results for both would be "quite good." As discussed in an August 31, 2020 email from Morgan Stanley Asia to the Special Committee: "By way of an update here −− Rich and Frank just spoke with Bonnie, please see below a few key points conveyed/discussed…Buyer consortium wants to sign the agreement ahead of Q2 results release for both Weibo and SINA (suspect their Q2 results may be quite good then) −− this point is to be discussed with Gibson."

210. On September 1, 2020, Morgan Stanley Asia sent another email to the Special Committee and Gibson Dunn: "Morgan Stanley writes to confirm that we spoke to Bonnie Zhang on Monday, August 31 ... to communicate the ... request for the buyer to consider .... One other topic that came up was the timing of the second quarter earnings release in relation to the potential signing of a merger agreement. The buyer is working under the assumption that the merger agreement will be signed prior to the second quarter earnings release. We indicated that we will seek both [Gibson Dunn] and the Special Committee's input on the proposed sequence."

211. New Wave's request was extremely unusual. Sina's and Weibo's Q2 2019 financial results had been released in August 2019. The Buyer Group was requesting that public disclosure

be delayed over a month, until the end of Q3 2020. New Wave wanted the positive Q2 results delayed because the offer price had already been announced and any subsequent good news could be a basis for Special Committee revisiting the price (or shareholders demanding that they revisit the price).

212. Both Morgan Stanley Asia and Gibson Dunn recognized that delaying the financial results was highly unusual. Gibson Dunn responded to the September 1, 2020 email, "When will the second quarter earnings be released? Based on our experience, a merger agreement generally gets signed after earnings release, not before. That is because the [special committee] would like to see whether the actual numbers are in line with the projections provided." Morgan Stanley Asia agreed, "Yes we agree with you and that's why we flagged it as a potential issue that we need to discuss on our side. Her strawman timing is signing of merger agreement in 'mid−September and 2nd quarter earnings release end of September'. Exact dates ... [to be confirmed]."

213. This highly unusual request by the Buyer Group at the very least was something that the Special Committee, which was required to act in the interest of the Minority Shareholders, could have demanded a higher price or some other concession from the Buyer. However, the Special Committee did neither. Instead, it acquiesced to the Buyer's demand, requiring nothing in return for the Minority Shareholders.

214. The Caymen Island Court concluded that, at the very least, this "was a flaw in the process because the ***Special Committee*** had the results and could have insisted ***that the merger agreement could not be concluded until after they were released to the market***, which might have given them some leverage to seek to negotiate a higher price on the back of stronger than expected results."

**F. September 28, 2020, Merger Agreement Announcement**

215. On September 28, 2020, the Special Committee recommended that the Company enter into the Merger Agreement with New Wave. The final price at which the deal was agreed was $43.30 in cash per ordinary share.

216. The Sina Board approved the Merger Agreement at a Board meeting that same day (September 28, 2020) and the Merger Agreement was entered into. The Merger Agreement was filed with the SEC the same day.

**G. The EGM**

217. On December 23, 2020, the Company held an EGM at which the shareholders voted, amongst other things, on the proposal to approve the previously announced Merger Agreement.

218. Defendants' scheme to deter participation at the EGM by suggesting the Merger was a forgone conclusion worked. Approximately 22 million shares were not present.

219. Of the shareholders present and voting in person or by proxy at the meeting, 81% approved the deal representing 93.6% of the votes cast

220. On January 12, 2021, pursuant to Section 238(4) of the Companies Act, the Company sent a written notice to each of those shareholders that were dissenting from the Merger informing them of the authorization of the Merger by the shareholders at the EGM.

221. Prior to completion of the Merger, between January 13 and 21, 2021, each of the Dissenters delivered a notice of dissent pursuant to Section 238(5) of the Act to the Company. By doing so, the Dissenters gave notice of their intention to reject the merger price and demanded payment to them by the Company of the fair value of their shares under Section 238(5) of the Act.

222. On March 22, 2021, New Wave having waived all closing conditions, the Company announced the completion of the deal whereby, among other things, the trading of the Company's shares on the NASDAQ was suspended on March 22, 2021

223. As a result of the Merger, the Company became wholly owned by the New Wave, which is wholly owned and controlled by Chao.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

224. On October 13, 2020, Sina filed with the SEC a Schedule 13E-3 containing the Preliminary Proxy Statement in connection with the Merger. Defendants Chao and S. Zhang signed the Preliminary Proxy Statement and Defendant B. Zhang testified that she reviewed the Preliminary Proxy Statement before it was filed. Included in the Preliminary Proxy Statement was Morgan Stanley Asia's Fairness Presentation.

225. The Fairness Presentation stated that TuSimple's value was between the company's $186 million "book value" as of June 30, 2020 and $288 million, which was the $1.2 billion valuation from September 2019 at a 30% "liquidity discount."

226. The statements referenced in ¶225 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) Defendants concealed the true value of the Company's investment in TuSimple at the time of the Merger; and (ii) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

227. The Fairness Presentation also applied a "HoldCo Discount" between 30% and 45%, which constituted between $1.59 billion and $1.71 billion in value.

228. The statements referenced in ¶227 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) the Holdco Discount was created and/or inflated by Defendants' fraudulent scheme and was not a valid reduction in the true and fair value of Sina; (ii) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

229. The Preliminary Proxy Statement opened with a letter signed by Defendants Chao and S. Zhang, stating:

> The Merger cannot be completed unless the Merger Agreement, the Plan of Merger and the consummation of the Transactions, including the Merger, are authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company passed by an affirmative vote of holders of Shares representing at least two-thirds of the voting power of the outstanding Shares present and voting in person or by proxy as a single class at the extraordinary general meeting or any adjournment or postponement thereof. As of the date of the accompanying proxy statement, the Buyer Group beneficially owns in the aggregate 8,850,075 Ordinary Shares and 7,150 Class A Preference Share, which collectively represent approximately 14.8% of the Company's total issued and outstanding Shares and ***approximately 61.2% of the voting power of the total issued and outstanding Shares as of the date of the accompanying proxy statement, all of which will be voted in favor of the authorization and approval of the Merger Agreement, the Plan of Merger and the consummation of the Transactions, including the Merger***. Accordingly, based on Shares expected to be issued and outstanding on, the record date for voting Shares at the extraordinary general meeting (the "Share Record Date"), and assuming that members of the Buyer Group vote all their Shares in favor of the special resolutions, Shares owned by the Unaffiliated Security Holders equal to approximately 5.6%[10] of the voting power of the entire issued and outstanding Shares as of the Share Record Date must be voted in favor of the special resolutions to be proposed at the extraordinary general meeting for them to be approved, assuming all shareholders of the

---

[10] The figure "5.6%" was blank in the Preliminary Proxy Statement filed on October 13, 2020 and the First Amended Proxy Statement filed on November 9, 2020, but was included in the Second Amended Proxy Statement filed on November 20, 2020, the Third Amended Proxy Statement filed on December 8, 2020, and the Final Amended Proxy Statement filed on March 22, 2021

> Company will be present and voting in person or by proxy at the extraordinary general meeting.[11]

230. The statements referenced in ¶229 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) the Class A Preference Shares could only be voted in the interest of all shareholders – which as a result of Defendants' fraud, the Merger was not – and Chao was prohibited from voting the Class A Preference Shares for his personal benefit; and (ii) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

231. The Preliminary Proxy Statement described the following factors, among others, that purportedly supported the recommendation that Sina shareholders vote in favor of the Merger and that the Merger was fair to Sina shareholders:

> SPECIAL FACTORS
>
> * * *
>
> Reasons for the Merger and Recommendation of the Special Committee and the Board
>
> * * *
>
> - the Special Committee's and the Board's knowledge of the Company's business, financial condition, results of operations, prospects and competitive position and their respective belief ***that the Merger is financially more favorable to the Unaffiliated Security Holders than any other alternative reasonably available to the Company and the Unaffiliated Security Holders***;
>
> * * *
>
> - the current and historical market prices of the Ordinary Shares, and ***the fact that the Per Share Merger Consideration of US$43.30 offered to***

[11] New Wave purported to have 60.4% of the vote, and 61.2% with the other Directors.

> ***the Unaffiliated Security Holders representing a premium of approximately 18.1% to the closing price of the Ordinary Shares on July 2, 2020***, the last trading day prior to the Company's announcement of its receipt of the preliminary non- binding "going-private" proposal from New Wave on July 6, 2020, and premiums of approximately 23.6% and 28.6% to the volume-weighted average traded price of the Ordinary Shares during the last one month and three months, respectively, prior to and including July 2, 2020;
>
> * * *
>
> - ***the financial analysis reviewed by Morgan Stanley with the Special Committee, as well as the oral opinion of Morgan Stanley rendered to the Special Committee on September 28, 2020*** (which was subsequently confirmed in writing by delivery of Morgan Stanley's written opinion, dated September 28, 2020, to the Special Committee), ***as to the fairness, from a financial point of view, of the Per Share Merger Consideration to be received by holders of Ordinary Shares (other than the Buyer Group),*** as of the date thereof, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by Morgan Stanley in preparing its opinion (See "Special Factors—Opinion of the Special Committee's Financial Advisor" beginning on page 37 for additional information).
>
> * * *

232. The statements referenced in ¶231 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) Defendants concealed the true value of the Company's investment in TuSimple at the time of the Merger; (ii) Defendants' scheme manipulated and inflated the Holdco Discount; (iii) Defendants schemed to suppress the valuation of Sina and the ordinary shares; (iv) the process put in place by and conducted by Defendants prevented any market check or price discovery for the true and fair value of the ordinary shares; (v) the Class A Preference Shares could only be voted in the interest of all shareholders and Chao was prohibited from voting the Class A Preference Shares for his personal benefit and thereby was

not permitted to vote against alternative transactions; (vi) the analysis conducted by Morgan Stanley Asia was not independent and was manipulated in collusion with Sina Defendants; (vii) the Merger was not financially more favorable to the Unaffiliated Security Holders than any other alternative reasonably available to the Company and the Unaffiliated Security Holders; and (viii) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

233. The Preliminary Proxy Statement also stated:

> ***The Special Committee and the Board also considered a variety of potentially negative factors concerning the Merger Agreement and the Merger, including the following***, which are not listed in any relative order of importance":
>
> - ***approval of the Merger Agreement is not subject to the authorization and approval of holders of a majority of the Company's outstanding Shares unaffiliated with the Buyer Group*** and ***given that the Buyer Group holds approximately 61.2% of the voting power of the total issued and outstanding Shares as of the date of this proxy statement, the Buyer Group has the ability to substantially influence the outcome of the matters to be voted upon at the extraordinary general meeting unless the Unaffiliated Security Holders overwhelmingly vote against the proposal to authorize and approve the Merger Agreement***;
>
> * * *
>
> - ***the significant portion of the voting power of the Shares owned by the Buyer Group, and the Chairman's participation in the Buyer Group, may have deterred, and may continue to deter, other potentially interested parties from proposing to acquire the Company at a price per Share that is higher than US$43.30***;

234. The statements referenced in ¶233 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) Defendants schemed to give away the MOTM provision for insufficient consideration so as to prevent any roadblock to approval of the Merger

and dissuade participation by Unaffiliated Shareholders; (ii) the process put in place by and conducted by Defendants prevented any market check or price discovery for the true and fair value of the ordinary shares; (iii) the Class A Preference Shares could only be voted in the interest of all shareholders – which as a result of Defendants' fraud, the Merger was not – and Chao was prohibited from voting the Class A Preference Shares for his personal benefit, and thereby was not permitted to vote against alternative transactions; (iv) the purported size of the Buyer Group's voting power had prevented any market check or price discovery; and (v) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

235. The Preliminary Proxy Statement also stated:

> ***[T]he Special Committee and the Board believed that sufficient procedural safeguards were and are present to ensure that the Merger is procedurally fair to the Unaffiliated Security Holders and to permit the Special Committee and the Board to represent effectively the interests of such Unaffiliated Security Holders***, which procedural safeguards include the following, which are not listed in any relative order of importance:…
>
> - in considering the transaction with the Buyer Group, ***the Special Committee acted solely to represent the interests of the Unaffiliated Security Holders***, and the Special Committee had full control of the extensive negotiations with the Buyer Group and their advisors on behalf of the Unaffiliated Security Holders;
>
> * * *
>
> - ***the Special Committee was assisted in negotiations with the Buyer Group and in its evaluation of the Merger by Morgan Stanley as its financial advisor*** and Gibson Dunn as its legal advisor;
> - ***The Special Committee was empowered to, among other things, review, evaluate and negotiate the terms of the Merger and to recommend to the Board what action should be taken by the Company***, including not to engage in the Transactions, including the Merger;
> - ***the terms and conditions of the Merger Agreement were the product of extensive negotiations between the Special Committee and its***

***advisors, on the one hand, and the Buyer Group and their advisors, on the other hand***;

* * *

- ***the ability of the Special Committee to change, withhold, withdraw, qualify or modify its recommendation that the shareholders vote to approve the Merger Agreement in the event of a Superior Proposal*** or an Intervening Event;

- ***the ability of the Special Committee to evaluate bona fide, unsolicited alternative acquisition proposals that may arise between the date of the Merger Agreement and the date of the approval of the Merger by the Company's shareholders***, to furnish confidential information to and conduct negotiations with such third parties and, in certain circumstances, to terminate the Merger Agreement, subject to the payment to the Parent Parties of a termination fee, and accept a Superior Proposal, consistent with the Special Committee's fiduciary obligations;

236. The statements referenced in ¶235 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) the process put in place by and conducted by Defendants prevented any market check or price discovery for the true and fair value of the ordinary shares; (ii) the Special Committee was not acting in the best interest of the Unaffiliated Shareholder; (iii) Defendants schemed to give away the MOTM provision for insufficient consideration so as to prevent any roadblock to approval of the Merger and dissuade participation by Unaffiliated Shareholders; (iv) the Class A Preference Shares could only be voted in the interest of all shareholders – which as a result of Defendants' fraud, the Merger was not – and Chao was prohibited from voting the Class A Preference Shares for his personal benefit, and thereby was not permitted to vote against alternative transactions; (v) the purported size of the Buyer Group's voting power had prevented any market check or price discovery; (vi) the Special Committee could

never consider a Superior Proposal because of the Buyer Group's purported ability and affirmative statement that it would veto any such proposal; (vii) Morgan Stanley Defendants did not maintain their independence and participated in the scheme to undervalue Sina and the ordinary shares; (viii) the analysis conducted by Morgan Stanley Asia was not independent and was manipulated in collusion with Sina Defendants; and (ix) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

237. The Preliminary Proxy Statement further stated the Board, on behalf of Sina, considered, among other things, the factors described above and "expressly adopted" the determination that the Merger was "fair, and in the best interests of," Sina and its shareholders, stating:

> SPECIAL FACTORS
>
> * * *
>
> Reasons for the Merger and Recommendation of the Special Committee and the Board
>
> * * *
>
> ***In reaching its determination that the Merger Agreement, the Plan of Merger and the Transactions, including the Merger, are fair to, and in the best interests of, the Company and the Unaffiliated Security Holders*** and its decision to authorize and approve the Merger Agreement, the Plan of Merger and the Transactions, including the Merger, and recommend the authorization and approval of the Merger Agreement, the Plan of Merger and the Transactions, including the Merger, by the Company's shareholders, the Board, on behalf of the Company, ***considered the analysis and factors described above under this section and under "Special Factors—Background of the Merger" and expressly adopted such determination, recommendation and analysis***.

238. The statements referenced in ¶237 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's

shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: : (i) Defendants concealed the true value of the Company's investment in TuSimple at the time of the Merger; (ii) Defendants' scheme manipulated and inflated the Holdco Discount; (iii) Defendants schemed to suppress the valuation of Sina and the ordinary shares; (iv) the process put in place by and conducted by Defendants prevented any market check or price discovery for the true and fair value of the ordinary shares; (v) the Special Committee was not acting in the best interest of the Unaffiliated Shareholder; (vi) Defendants schemed to give away the MOTM provision for insufficient consideration so as to prevent any roadblock to approval of the Merger and dissuade participation by Unaffiliated Shareholders; (vii) the Class A Preference Shares could only be voted in the interest of all shareholders – which as a result of Defendants' fraud, the Merger was not – and Chao was prohibited from voting the Class A Preference Shares for his personal benefit, and thereby was not permitted to vote against alternative transactions; (viii) the purported size of the Buyer Group's voting power had prevented any market check or price discovery; (ix) the Special Committee could never consider a Superior Proposal because of the Buyer Group's purported ability and affirmative statement that it would veto any such proposal; (x) Morgan Stanley Defendants did not maintain their independence and participated in the scheme to undervalue Sina and the ordinary shares; (xi) the analysis conducted by Morgan Stanley Asia was not independent and was manipulated in collusion with Sina Defendants; (xii) the Merger was not fair, and was not in the best interests of the Unaffiliated Shareholders; and (xiii) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

239. The Preliminary Proxy Statement also stated:

> After considering the potential alternatives and consulting with its financial advisor and legal counsel, ***the Special Committee determined that the potential alternatives were either not viable or not on-the-whole superior to the proposed Merger, in light of the following factors***:
>
> (i) the fact that, since the announcement and public disclosure of the Company's receipt of the Proposal, no party other than the members of the Buyer Group has contacted the Company, the Special Committee or any of their counsels or advisors expressing an interest in exploring any alternative transaction with the Company;
>
> (ii) the fact that ***the Buyer Group holds approximately 61.2% of the aggregated voting power of the issued and outstanding Shares as of the date of this proxy statement, and that the Buyer Group has expressly stated that it has no intention to sell its equity stake in the Company to a third party or to support any alternative transaction to the Proposed Transaction***;
>
> (iii) the fact that the Company does not have sufficient cash flow from its own business operations to repay any substantial debt financing incurred by the Company for a potential leveraged recapitalization and would have to rely on significant cash dividends from Weibo. It was noted that Weibo has not historically declared or paid any dividends and upon inquiry by the Special Committee, Weibo has confirmed that it does not intend to change Weibo's dividend policy in the near to medium term. Therefore, the ability to sustain significant incremental debt financing by the Company is highly uncertain;
>
> (iv) any potential sale or distribution by way of dividend in specie of all or a significant portion of Weibo Stake by the Company or a potential sale of the Company to a third party would be subject to the approval and authorization of the Company's shareholders, which ***approval would not be feasible to obtain absent support of the Buyer Group***;

240. The statements referenced in ¶239 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) the process put in place by and conducted by Defendants prevented any market check or price discovery for the true and fair value of the ordinary shares; (ii) the Class A Preference Shares could only be voted in the interest of all

shareholders – which as a result of Defendants' fraud, the Merger was not – and Chao was prohibited from voting the Class A Preference Shares for his personal benefit, and thereby was not permitted to vote against alternative transactions; (iii) the purported size of the Buyer Group's voting power had prevented any market check or price discovery; (iv) the Special Committee could never consider a Superior Proposal because of the Buyer Group's purported ability and affirmative statement that it would veto any such proposal; and (v) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares..

241. Included with the Preliminary Proxy Statement at Anex F was Morgan Stanley Asia's "Fairness Opinion" signed by Managing Director Richard Wong. The Fairness Opinion stated: "we are of the opinion on the date hereof that the Per Share Merger Consideration to be received by the holders of the Ordinary Shares (other than Parent and its affiliates) pursuant to the Merger Agreement is fair from a financial point of view to such holders."

242. The statements referenced in ¶241 were materially false and misleading because they misrepresented and/or omitted material information that was necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Merger. Specifically, Defendants failed to disclose that: (i) Defendants concealed the true value of the Company's investment in TuSimple at the time of the Merger; (ii) Defendants' scheme manipulated and inflated the Holdco Discount; (iii) Defendants schemed to suppress the valuation of Sina and the ordinary shares; (iv) the process put in place by and conducted by Defendants prevented any market check or price discovery for the true and fair value of the ordinary shares; (v) the Special Committee was not acting in the best interest of the Unaffiliated Shareholder; (vi) Defendants schemed to give away the MOTM provision for insufficient consideration so as to

prevent any roadblock to approval of the Merger and dissuade participation by Unaffiliated Shareholders; (vii) the Class A Preference Shares could only be voted in the interest of all shareholders – which as a result of Defendants' fraud, the Merger was not – and Chao was prohibited from voting the Class A Preference Shares for his personal benefit, and thereby was not permitted to vote against alternative transactions; (viii) the purported size of the Buyer Group's voting power had prevented any market check or price discovery; (ix) the Special Committee could never consider a Superior Proposal because of the Buyer Group's purported ability and affirmative statement that it would veto any such proposal; (x) Morgan Stanley Defendants did not maintain their independence and participated in the scheme to undervalue Sina and the ordinary shares; (xi) the analysis conducted by Morgan Stanley Asia was not independent and was manipulated in collusion with Sina Defendants; (xii) Q2 earnings were delayed at the request of Buyer Group; (xiii) the Merger was not fair, and was not in the best interests of the Unaffiliated Shareholders; and (xiv) in turn, the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares.

243. The First Amended Proxy Statement filed on November 9, 2020, the Second Amended Proxy Statement filed on November 20, 2020, the Third Amended Proxy Statement filed on December 8, 2020, and the Final Amended Proxy Statement filed on March 22, 2021, all filed with the SEC on Schedule 13E-3 and signed by Defendants Chao and S. Zhang, included substantially similar language as described in ¶¶225, 227, 229, 231, 233, 235, 237, 239 and 241.

244. The statements referenced in ¶243 were materially false and misleading for the reasons discussed in ¶¶226, 228, 230, 232, 234, 236, 238, 240, 242.

## CLASS ACTION ALLEGATIONS

245. Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons and entities that sold

Sina ordinary shares, including those who sold into the Merger, between October 13, 2020 and March 22, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any Sina ordinary shares for which a petition was filed or for which appraisal rights were exercised and pursued pursuant to Cayman Law.

246. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Throughout the Class Period, ordinary shares of Sina actively traded on the NASDAQ under the ticker symbol "SINA." Millions of Sina shares were traded publicly during the Class Period on the NASDAQ. As of December 31, 2019, the Company had more than 68 million ordinary shares outstanding. Record owners and other members of the Class may be identified from records maintained by Sina or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

247. Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

248. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that conflict with those of the Class.

249. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a) whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c) whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of Sina;

d) whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of Sina;

e) whether the market price of Sina ordinary shares during the Class Period were artificially deflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f) the extent to which the members of the Class have sustained damages and the proper measure of damages.

250. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## ADDITIONAL SCIENTER ALLEGATIONS

251. During the Class Period, as alleged herein, Defendants acted with scienter in that Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

252. The Defendants permitted Sina to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially affected the value of the Company's ordinary shares.

253. As set forth herein, Defendants, by virtue of their receipt of information reflecting the true facts regarding Sina, their control over, receipt, and/or modification of Sina's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Sina, participated in the fraudulent scheme alleged herein.

254. The Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on sellers of Sina ordinary shares by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Sina's business, operations, and management and the intrinsic value of Sina ordinary shares and caused Plaintiffs and members of the Class to sell Sina ordinary shares at artificially deflated prices.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

255. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Sina who knew that the statement was false when made.

## LOSS CAUSATION

256. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially deflated the price of Sina's ordinary shares and operated a fraud or deceit on Class members by failing to disclose and misrepresenting the facts detailed herein. This course of conduct misled the Class members and caused them, in reliance on the misrepresentations and on the market price of Sina's ordinary shares during the Class Period, to sell their shares at a depressed price. As a result of their sale of Sina ordinary shares during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

257. Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

258. Plaintiffs are also entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b) the omissions and misrepresentations were material;

c) the Company's stock traded in an efficient market;

d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ordinary shares; and

e) Plaintiffs and other members of the Class sold Sina ordinary shares between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

259. At all relevant times, the market for Sina ordinary shares was efficient for the following reasons, among others:

a) as a regulated issuer, Sina filed periodic public reports with the SEC;

b) Sina regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

c) Sina was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

d) Sina ordinary shares actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "SINA."

As a result of the foregoing, the market for Sina ordinary shares promptly digested current information regarding Sina from publicly available sources and reflected such information in Sina's ordinary share price. Under these circumstances, all sellers of Sina ordinary shares during the Class Period suffered similar injury through their sale of Sina ordinary shares at artificially deflated prices and the presumption of reliance applies.

## CLAIMS FOR RELIEF

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

260. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

261. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

262. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially deflate and maintain the market price of Sina ordinary shares; and (iii) cause Plaintiffs and other Class members to sell Sina ordinary shares at artificially deflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

263. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Sina shares. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Sina's business.

264. By virtue of their positions, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

265. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Sina, the Individual Defendants had knowledge of the details of Sina's internal affairs.

266. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Sina. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Sina's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Sina ordinary shares was artificially deflated throughout the Class Period. In ignorance of the adverse facts concerning Sina's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class sold their Sina ordinary shares at artificially deflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

267. During the Class Period, Sina shares were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, sold Sina shares at prices artificially deflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have sold Sina ordinary shares, or if they had, would not have done so at the artificially suppressed prices.

268. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

269. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Sina shares during the Class Period.

**COUNT II**

**For Violations of Section 10(b) of the Exchange Act And Rule 10b-5(a) and (c) Against All Defendants**

270. Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

271. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

272. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially suppressed the price of Sina ordinary shares; and (iii) caused Plaintiffs and the Class to sell Sina ordinary shares at artificially deflated prices.

273. In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their sale of Sina ordinary shares, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

274. Plaintiffs and the Class reasonably relied upon the integrity of the market in which Sina ordinary shares traded.

275. During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have sold Sina ordinary shares, or if they had, would not have done so at the artificially suppressed prices.

276. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiffs and the Class suffered damages in connection with their sale of Sina ordinary shares during the Class Period.

277. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class for damages suffered in connection with their sale of Sina ordinary shares during the Class Period.

## COUNT III

### For Violations of Section 20(a) of the Exchange Act Against All Individual Defendants

278. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

279. The Individual Defendants acted as controlling persons of Sina within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Sina, Individual Defendants had the power and ability to control the actions of Sina and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

280. WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for relief and judgment as follows:

A. Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B. Awarding Plaintiffs and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

C. Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D. Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

281. Plaintiffs demand a trial by jury.

Dated: March 16, 2026

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjwernke@pomlaw.com

**POMERANTZ LLP**
Orly Guy
Eitan Lavie
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240

Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Lead Plaintiffs Meitav Mutual Funds Ltd. and Migdal Mutual Funds Ltd. for Plaintiff Kevin Lu and for the Class*