UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE SINA CORPORATION SECURITIES LITIGATION | Case No. 1:25-cv-07820-CM<br>**Oral Argument Requested** |

**DEFENDANT SINA CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Fax: (212) 735-2000

*Counsel for Sina Corporation*

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ ii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF FACTS ........ 4

A. The Company ........ 4

B. In July 2020, the Buyer Group Submits a Going-Private Proposal, the Special Committee Negotiates an Increased Price, and the Board Determines the Merger Is Fair ........ 5

C. Sina Issues a Comprehensive Proxy Statement ........ 8

D. In December 2020, Shareholders Overwhelmingly Approve the Merger ........ 9

ARGUMENT ........ 10

I. PLAINTIFFS' CLAIMS ARE TIME-BARRED ........ 11

II. PLAINTIFFS FAIL TO PLEAD ACTIONABLE MISREPRESENTATIONS ........ 13

A. There Was No Material Misrepresentation Regarding Sina's Valuation ........ 14

B. There Was No Material Misrepresentation Regarding the Merger Process ........ 15

III. PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER ........ 18

A. Plaintiffs Fail to Plead Motive and Opportunity to Commit Fraud ........ 19

B. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness ........ 20

IV. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ........ 21

A. Plaintiffs Fail to Allege the Proxy Caused Sellers Any Loss ........ 21

B. Plaintiffs Fail to Allege the Proxy Caused Tenderers Any Loss ........ 23

V. PLAINTIFFS DO NOT ADEQUATELY PLEAD RELIANCE FOR TENDERERS ........ 24

VI. SCHEME LIABILITY IS NOT ADEQUATELY PLED ........ 25

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

Page

**CASES**

*In re Adient plc Securities Litigation*,
No. 18-CV-9116 (RA), 2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020), *aff'd sub nom. Bristol County Retirement System v. Adient PLC*, No. 18-CV-9116 (RA), No. 20-3846-cv, 2022 WL 2824260 (2d Cir. July 20, 2022) ....................20

*In re Aegean Marine Petroleum Network, Inc. Securities Litigation*,
529 F. Supp. 3d 111 (S.D.N.Y. 2021) ....................19

*Altimeo Asset Management v. Qihoo 360 Technology Co.*,
663 F. Supp. 3d 334 (S.D.N.Y. 2023) ....................23, 24

*Arco Capital Corp. v. Deutsche Bank AG*,
986 F. Supp. 2d 296 (S.D.N.Y. 2013) ....................12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ....................4

*Barrett v. PJT Partners Inc.*,
No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sep. 8, 2017) ....................20

*Bettis v. Aixtron SE*,
No. 16 Civ. 00025 (CM), 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) ....................14, 16

*City of Pontiac General Employees' Retirement System v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011) ....................12

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ....................18, 20

*Elliott Associates, L.P. v. Hayes*,
141 F. Supp. 2d 344 (S.D.N.Y. 2000), *aff'd*, 26 F. App'x 83 (2d Cir. 2002) ....................20

*Fisher v. Kanas*,
467 F. Supp. 2d 275 (E.D.N.Y. 2006) ....................23

*Fogel v. Wal-Mart de México SAB de CV*,
No. 13 Civ. 2282 (KPF), 2017 WL 751155 (S.D.N.Y. Feb. 27, 2017), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018) ....................12

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
639 F. App'x 664 (2d Cir. 2016) ....................12

*Gray v. Wesco Aircraft Holdings, Inc.*,
847 F. App'x 35 (2d Cir. 2021) ....................................................................22

*Haideri v. Jumei International Holding Ltd.*,
No. 20-cv-02751-EMC, 2021 WL 4170791 (N.D. Cal. Sep. 14, 2021).................... 19, 23

*In re Jumei International Holding Ltd. Securities Litigation*,
No. 14cv9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ..............................................1

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) .......................................................................... 19, 20

*In re Keyspan Corp. Securities Litigation*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003)............................................................ 14, 15, 16

*Klock v. Lehman Brothers Kuhn Loeb Inc.*,
584 F. Supp. 210 (S.D.N.Y. 1984).........................................................................11

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ...................................................................................21

*In re Lululemon Securities Litigation*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)....................17

*Maso Capital Investments Ltd. v. E-House (China) Holdings Ltd.*,
No. 22-355, 2024 WL 2890968 (2d Cir. June 10, 2024) ......................................... 15, 25

*Menaldi v. Och-Ziff Capital Management Group LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016) .......................................................................25

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010) ........................................................................................ 11, 12

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005).........................4

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015) ..................................................................................... 14, 15, 17

*In re Philip Morris International Inc. Securities Litigation*,
89 F.4th 408 (2d Cir. 2023) ..................................................................................10

*Point12 Diversified Fund, LP v. TMC The Metals Co.*,
No. 21-CV-5991(EK)(PK), 2025 WL 1920340 (E.D.N.Y. July 11, 2025) .......................14

*In re Shanda Games Ltd. Securities Litigation*,
128 F.4th 26 (2d Cir. 2025)..................................................................14, 15, 20, 23, 24

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) ........................................................................................24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ........................................................................................18

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016) ..........................................................................15

*Union Central Life Insurance Co. v. Credit Suisse Securities (USA), LLC*,
No. 11 Civ. 2327(GBD), 2014 WL 7179989 (S.D.N.Y. Dec. 10, 2014) ..........................25

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ............................................................................24

**STATUTES**

15 U.S.C. § 78u-4(b) ....................................................................................1, 18

28 U.S.C. § 1658(b)(1)....................................................................................11

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 5.04 (2024)....................................................20

Defendant Sina Corporation ("Sina" or the "Company") respectfully submits this memorandum of law in support of its motion to dismiss the Amended Class Action Complaint (ECF No. 80)[1] (the "Complaint" or "AC") pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) and Section 101(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).[2]

## PRELIMINARY STATEMENT

This case is an untimely and improper attempt to recast a shareholder appraisal suit as a federal securities class action and should be dismissed. Plaintiffs are former investors in Sina, the first Chinese internet company to list on the Nasdaq. In 2021, Sina was taken private by a Buyer Group led by Sina's CEO and Chairman, Charles Guowei Chao (the "Merger"). The going-private price represented a 28.6% premium over Sina's recent trading price, and the deal was approved by (i) a Special Committee of independent directors represented by independent legal counsel and financial advisors and (ii) approximately 75.3% of non-Buyer Group shares that voted at the extraordinary general meeting. Certain shareholders dissented and sought an appraisal of their shares in the Cayman Islands (where Sina is incorporated). Plaintiffs did not.

Instead, four-and-a-half years after the Merger, Plaintiffs commenced this putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging Defendants misrepresented that the Merger was "fair." Relying entirely on hindsight, Plaintiffs claim the Merger price was too low because Sina had a minority investment

---

1 A true and correct copy of the AC is attached as Exhibit A to the Declaration of Michael C. Griffin, dated May 15, 2026. All internal quotation marks and citations are omitted, and all emphases in quotations are added, unless otherwise indicated.

2 Defendants Charles Guowei Chao, Bonnie Yi Zhang, Ter Fung Tsao, Yan Wang, Song-Yi Zhang, Yichen Zhang, and James Jianzhang Liang (collectively, the "Individual Defendants") have not been served. However, the Court can still dismiss the Amended Complaint in its entirety for failure to state a claim. *See, e.g.*, *In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *1 n.1, *6 (S.D.N.Y. Jan. 10, 2017).

in TuSimple Holdings, Inc. ("TuSimple"), an autonomous trucking company that went public at an $8.5 billion valuation ***after*** the Merger. Critically, the proxy materials for the Merger ("Proxy") disclosed Sina's 34.44% interest in TuSimple and the book value of that investment, which was used to value Sina for the Merger fairness opinion. Plaintiffs do not claim any of these disclosures were false; they just disagree with the use of book value as opposed to an estimated market value based on TuSimple's projected initial public offering ("IPO"). Plaintiffs similarly argue the HoldCo discount applied to Sina by Morgan Stanley Asia Limited ("MS Asia") in its Fairness Presentation (which also was disclosed) was too high. From these flawed premises, Plaintiffs conclude MS Asia's fairness opinion must have been "false." All these valuation claims fail as a matter of law because Plaintiffs' subjective disagreement with Defendants' choice of well-accepted valuation metrics is not securities fraud.

Plaintiffs also launch a broadside against the Merger process, including the Buyer Group's significant voting power, the lack of a majority-of-the-minority approval requirement, the absence of any superior alternative transactions, and the Special Committee's motives. This kitchen-sink approach suffers from various deficiencies, not least of which is that the Proxy ***disclosed*** all the relevant information. At bottom, Plaintiffs' desire for a higher going-private price does not state a claim for securities fraud. This case should be dismissed with prejudice for multiple independent reasons.

*First*, all of Plaintiffs' claims are time-barred under the Exchange Act's two-year statute of limitations. Plaintiffs' central claim based on the TuSimple investment had to be brought by April 16, 2023—two years after TuSimple's IPO, when the market value of Sina's stake became known. Plaintiffs' other claims are based on information disclosed in the Proxy itself and thus had to be brought by March 22, 2023—two years after the final Proxy. Yet, this action was not filed

until September 19, 2025 (ECF No. 1), more than two years after both limitations periods expired.

*Second*, Plaintiffs fail to plead any false or misleading statement. As previewed above (and detailed below), Plaintiffs' disagreement with the disclosed valuation inputs and complaints about the disclosed Merger process fail to state a claim for securities fraud as a matter of law. The Proxy statements addressing these issues are admittedly true and not remotely misleading. To the extent Plaintiffs also contend the Proxy concealed certain information—such as purported restrictions on the Buyer Group's voting shares and MS Asia's supposed bias—they allege no particularized facts supporting these claims.

*Third*, Plaintiffs fail to plead the requisite strong inference of scienter. They fail to allege that any member of the Special Committee had a motive to defraud because none stood to realize any concrete benefit from a lower Merger price. Indeed, Plaintiffs admit the Special Committee engaged in actions that are inconsistent with the alleged fraud by hiring independent financial and legal advisors, conducting negotiations, and securing a price increase. The Buyer Group's state of mind cannot be imputed to Sina as it was not acting on behalf of Sina in the Merger and related negotiations, and even so, it disclosed that its interests differed from other shareholders' interests.

*Fourth*, Plaintiffs fail to plead loss causation, both for shareholders who sold before the Merger ("Sellers") and for those who tendered their shares in the Merger ("Tenderers"). As to the Sellers, Plaintiffs allege no corrective disclosure before the Merger closed. Their theory that the public stock price would have been higher (by some unspecified amount) had the Proxy made different disclosures is pure speculation. Plaintiffs do not even try to plead loss causation for the Tenderers and no cognizable theory exists. The Merger price that the Tenderers received was finalized weeks before the Proxy, precluding any argument that the Proxy's disclosures caused the Merger price to be lower than it otherwise would have been. The Tenderers also cannot invoke

the lost-appraisal-rights theory without, at a minimum, some nexus between the Proxy and the shareholder's decision to forgo an appraisal—which is not alleged. And any argument that Tenderers would have sold their shares on the open market absent the alleged misstatements is an impermissible "deferred sale" claim.

*Fifth*, Plaintiffs fail to plead reliance for the Tenderers. The *Affiliated Ute* presumption of reliance on omissions is unavailable because Plaintiffs' claims are based on affirmative alleged misstatements, and the fraud-on-the-market presumption is equally inapplicable because the Tenderers did not sell their shares at a market-set price. Unable to rely on either presumption, Plaintiffs have to plead actual, individualized reliance, which they do not even attempt to do.

*Sixth*, the scheme liability claim under Rules 10b-5(a) and (c) is impermissibly derivative of the misstatement claims under Rule 10b-5(b). Plaintiffs also fail to allege any scheme.

## STATEMENT OF FACTS[3]

### A. The Company

Incorporated in 1997 and headquartered in Beijing, China, Sina is a Cayman Islands exempted limited company. (AC ¶¶ 5, 29, 42.) In 2000, Sina became the first Chinese internet company to list on the Nasdaq by listing through a Variable Interest Entity ("VIE") structure, the regulatory mechanism by which foreign capital is permitted, indirectly, to participate in sectors that are otherwise restricted from foreign ownership in China.[4] (*Id.* ¶ 43.)

---

[3] The facts set forth herein are drawn from the allegations in the AC and documents incorporated into the AC by reference, matters of which judicial notice may be taken, and documents integral to the complaint. *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005). The Court may also consider "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[4] Sina's reliance on the VIE structure was not merely a corporate formality—it reflected the heavily regulated nature of the media sector in China. Internet and media content licenses are controlled by the Chinese government, and direct foreign ownership of media companies is prohibited. (AC ¶ 43.) This regulatory reality made any change-of-control transaction

Sina's principal business is its online media "Portal" operation, which provides news and other content to Chinese users, together with a wholly owned online micro-lending business. (*Id.* ¶ 44.) Sina also holds a controlling interest in Weibo Corporation ("Weibo"), a leading Chinese micro-blogging platform akin to Twitter/X. (*Id.* ¶ 46.) Weibo became the primary driver of Sina's financial performance, accounting for over 77% of Sina's consolidated revenue by 2020. (*Id.* ¶ 204.) In addition to its controlling stake in Weibo, Sina holds a portfolio of long-term investments across a variety of sectors. (Ex. D, MS Asia's Fairness Presentation at 32-33.) One such investment was TuSimple, a privately-owned autonomous trucking company, in which Sina held an approximate 34.44% stake at the time of the Merger. (AC ¶ 6.)

For years prior to the Merger, market analysts repeatedly reported that Sina's market capitalization traded at a substantial discount to the net asset value of its holdings—a phenomenon known as the "HoldCo Discount." (*Id.* ¶ 60.) As late as 2017, contemporaneous reports from TH Data Capital, Jefferies, JP Morgan, MCM Partners, Morningstar, and Huatai Research approximated the discount as 30-50% of net asset value. (*Id.* ¶¶ 61, 68, 99-102.) Institutional Shareholder Services ("ISS") also publicly identified the discount in 2017, observing that "[t]he market is perceiving significant risk somewhere within the business and is currently assigning a high cost of equity as a result." (*Id.* ¶ 72.)

### B. In July 2020, the Buyer Group Submits a Going-Private Proposal, the Special Committee Negotiates an Increased Price, and the Board Determines the Merger Is Fair

On July 6, 2020, Chao and three entities in which he holds a majority interest (New Wave MMXV Limited ("New Wave"), New Wave Holdings Limited, and New Wave Mergersub Limited) (collectively, the "Buyer Group") submitted to the Sina board of directors (the "Board")

involving Sina or Weibo extraordinarily difficult, if not impossible. (*See* Ex. C, Sina's Preliminary Proxy Statement at 50.)

a preliminary, non-binding proposal to acquire all outstanding ordinary shares not already owned by New Wave for $41 per share. (*Id.* ¶ 136.) The proposal letter was filed with the SEC the same day and expressly disclosed that the Buyer Group (i) "currently beneficially owns Ordinary Shares and Class A Preference Shares of the Company representing approximately 58% of the aggregate voting power"; (ii) was "interested only in acquiring the outstanding Ordinary Shares"; and (iii) did "not intend to sell [their] stake in the Company to any third party."[5] (*Id.* ¶ 137; Ex. E, Non-Binding Proposal Letter from New Wave.)

The Board responded to the Buyer Group's proposal by forming a Special Committee of three independent directors—Song-Yi Zhang, Yichen Zhang (no relation to Song-Yi), and Yan Wang[6]—with exclusive authority to, among other things, "negotiate the Proposed Transaction or any alternative transaction," "retain any legal counsel, financial advisor, and other consultants and agents," and "reject the Proposal or any alternative transaction." (AC ¶ 147; Ex. C at 16.) The Special Committee "explicitly confirmed that none of them ha[d] any conflict of interest in relation to the Proposed Transaction and committed that each of them w[ould] act in the best interests of the Company and the Unaffiliated Security Holders." (*Id.* at 17.) It also retained Gibson, Dunn & Crutcher LLP ("Gibson Dunn") as independent legal counsel and MS Asia as independent financial advisor. (*Id.*; *see also* AC ¶ 152.)

---

[5] In November 2017, in response to a proxy campaign by Aristeia Capital LLC, Sina's Board issued 7,150 Class A Preference Shares to New Wave, each carrying 10,000 votes. (AC ¶¶ 63, 92.) At the time, this increased Chao's aggregate voting power at Sina to approximately 55.5%. (*Id.* ¶ 92.) Sina disclosed the issuance, the voting rights, and all conditions associated with the Class A Preference Shares in its November 8, 2017 Form 6-K. (Ex. J, Sina Press Release.) None of those conditions restricted how the shares could be voted at any general shareholder meeting. (*Id.*; AC ¶ 95.)

[6] Each Special Committee member is an experienced, independent businessperson who joined the Sina Board years before Charles Chao became CEO in 2006: Song-Yi Zhang served as a director since 2004, Yichen Zhang since 2002, and Yan Wang since 2003. (AC ¶¶ 33-35.)

Over several weeks, the Special Committee prevailed upon the Buyer Group to increase its offer from $41.00 to $43.30 per ordinary share—a 28.6% premium over Sina's volume-weighted average traded price over the three months before the Buyer Group's proposal. (*See* AC ¶¶ 184, 231; *see also* Ex. C at 21-23.) MS Asia further determined that the offer was higher than the leveraged recapitalization analysis valuation range, near the top of the leveraged buyout valuation range, and within the per-share valuation ranges produced by the precedent take-private transactions and sum-of-the-parts analyses. (Ex. C at 41-43.) No alternative proposals emerged during this period—unsurprising given the substantial regulatory constraints on any change-of-control transaction involving Sina or Weibo. (*Id.* at 27, 50.)

On September 28, 2020, MS Asia rendered its fairness opinion and an accompanying presentation (the "Fairness Opinion"), concluding that the $43.30 per share merger consideration was fair to the holders of ordinary shares other than the Buyer Group. (AC ¶ 241.) With that support, and in consultation with its legal counsel, the Special Committee unanimously determined that the Merger was "fair to and in the best interests of the Company and the Unaffiliated Security Holders" and recommended that the Board authorize and approve the Merger Agreement. (*Id.* ¶ 215; Ex. C at 24.) The Board (with Chao abstaining) thereupon adopted resolutions approving the Merger Agreement and recommending that shareholders vote in its favor. (AC ¶ 216; Ex. C at iii.) The Merger Agreement was executed that same day and filed with the SEC. (AC ¶ 216.) The Merger Agreement also preserved the Special Committee's ability to consider unsolicited proposals: although the Company agreed not to solicit competing bids, a "fiduciary out" provision permitted the Special Committee to furnish information to, negotiate with, and ultimately accept a Superior Proposal—and to terminate the Merger Agreement in connection therewith—consistent with the Special Committee's fiduciary obligations. (*Id.* ¶¶ 172, 235.)

### C. Sina Issues a Comprehensive Proxy Statement

On October 13, 2020, after the Merger Agreement was executed, Sina filed with the SEC a Schedule 13E-3 containing the Preliminary Proxy Statement (the "Proxy"), and four additional amended proxy statements were filed through March 22, 2021. (*Id.* ¶¶ 224, 243.) The Proxy disclosed in detail the numerous safeguards adopted to ensure procedural fairness to shareholders not affiliated with the Buyer Group, including that "the consideration and negotiation of the Merger Agreement was conducted entirely under the control and supervision of the Special Committee," "no limitations were placed on the Special Committee's authority," "all of the members of the Special Committee during the entire process were and are independent directors and free from any affiliation with any member of the Buyer Group," and "the Buyer Group did not participate in or have any influence over the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee." (Ex. C at 27, 34.)

The Proxy also acknowledged the absence of a majority-of-the-minority ("MOTM") approval requirement, explaining that "approval of the Merger Agreement is not subject to the authorization and approval of holders of a majority of the Company's outstanding Shares unaffiliated with the Buyer Group," and noting that a MOTM requirement "is not customary in going-private transactions involving Cayman Islands companies," like Sina. (AC ¶ 233; Ex. C at 30.) The Proxy further warned that the Buyer Group's 61.2% voting power "may have deterred, and may continue to deter, other potentially interested parties from proposing to acquire the Company at a price per Share that is higher than US$43.30." (AC ¶ 233.) As Plaintiffs acknowledge, the Proxy disclosed the Special Committee's determination that "potential alternatives were either not viable or not on-the-whole superior to the proposed Merger," given the Buyer Group's voting power and stated intention not to "sell its equity stake in the Company to a third party or to support any alternative transaction." (*Id.* ¶ 239.)

The Proxy also included MS Asia's Fairness Opinion, which fully disclosed MS Asia's valuation process. With respect to the HoldCo Discount, MS Asia explained that the 30%-45% discount range was derived from three independent inputs: (i) Sina's actual historical trading discount relative to the net asset value of its identifiable assets, including the value of the Weibo shares it held; (ii) the discounts cited by certain large brokers covering Sina; and (iii) the implied holding company discounts of other conglomerate and comparable holding-company structures. (*Id.* ¶ 227; Ex. C at 43; Ex. D at 34-35.) The existence and magnitude of Sina's HoldCo Discount were not novel observations. Aristeia had also publicly acknowledged the HoldCo Discount nearly three years earlier and specifically proposed transactions to "unlock" shareholder value by reducing it. (*See* AC ¶¶ 63, 66; *see also* Ex. F, Oct. 23, 2017 Business Wire Article.)

MS Asia's Fairness Opinion also disclosed a valuation range for TuSimple of $186 million (book value as of June 30, 2020) to $288 million (the September 2019 Series D round valuation reduced by a 30% liquidity discount). (AC ¶ 225.) The inputs and the discount were stated in the disclosure. (Ex. D at 32.) Tellingly, the AC challenges only the SEC filings regarding Sina's purportedly undisclosed investment in TuSimple—not the broader public record, as press coverage and analyst commentary contemporaneously reported Sina's position in TuSimple.[7] (AC ¶ 107.)

**D. In December 2020, Shareholders Overwhelmingly Approve the Merger**

Armed with these disclosures, Sina's shareholders voted on the proposed transaction. At an extraordinary general meeting on December 23, 2020, approximately 93.6% of votes cast

[7] Mr. Chao also identified the TuSimple investment in an August 19, 2019 earnings call, stating that Sina "increased our investment in automobile autonomous driving company called TuSimple this quarter—in the second quarter by almost USD 90 million." (Ex. L, Sina's 2019 Q2 Earnings Call Transcript.) Sina's 20-F for fiscal year 2019 likewise disclosed the investment, describing $90M and $60M investments in preference shares of "a private company, which primarily focus[es] on developing artificial intelligence of automobile[s]." (Ex. K, Sina's 2019 Annual Report at F-31.)

approved the Merger. (*Id.* ¶¶ 217, 219.) Although the Merger was not subject to a MOTM condition, it nevertheless received overwhelming shareholder support, including approximately 75.3% of shares ***not held*** by the Buyer Group.

In January 2021, certain shareholders delivered notices of dissent and threatened to pursue an appraisal proceeding in the Cayman Islands, seeking a determination of the fair value of those dissenting shareholders' shares under Section 238 of the Cayman Islands Companies Act. (*Id.* ¶ 221.) Ultimately, the appraisal action ***focused solely on valuation***; the court's task was to determine the fair value of dissenters' shares under Cayman law, not to adjudicate claims of fraud. *See In the Matter of Sina Corporation*, Cause No. FSD 128 of 2021 (RPJ) (the "Cayman Action"). The court's findings addressed matters such as Mr. Chao's stated purpose in pursuing the transaction and the effectiveness of the Special Committee's price discovery, including the market check and go-shop processes. (*See* AC ¶¶ 141-42, 174-77.) Notwithstanding the threat of an appraisal action, the Merger closed on March 22, 2021, and trading of Sina's shares on the Nasdaq was suspended that same day. (*Id.* ¶ 222.)

## **ARGUMENT**

To state a claim under Section 10(b), Plaintiffs must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023). Failure to allege any one of these elements independently warrants dismissal. *Id.* Plaintiffs' claims are subject to heightened pleading requirements under Rule 9(b) and the PSLRA, which require that Plaintiffs plead the circumstances constituting the fraud with particularity. *Id.* at 416-17.

## I. PLAINTIFFS' CLAIMS ARE TIME-BARRED

Securities fraud claims under Section 10(b) of the Exchange Act must be brought within two years after Plaintiffs discover or should have discovered the facts constituting the alleged violation.[8] 28 U.S.C. § 1658(b)(1); *Merck & Co. v. Reynolds*, 559 U.S. 633, 637 (2010).

The AC itself confirms that Plaintiffs had (or should have had) the information on which they now rely no later than April 16, 2021,[9] yet this action was not filed until September 19, 2025—more than two years and five months after the limitations period ***expired***.[10] Plaintiffs frame their case as an integrated scheme to undervalue Sina and deliver the Merger at an artificially depressed price of $43.30, thereby stealing the undisclosed value of TuSimple. (AC ¶ 9.) But, by Plaintiffs' own account, the alleged fraud was exposed when TuSimple completed its IPO. The AC expressly concedes that "the TuSimple IPO was completed on April 15, 2021, with a value of $8.5 billion[,]" making Sina's interest "worth over $2.4 billion, which is approximately $2.1 billion more than represented to shareholders." (*Id.* ¶ 23.) That admission is fatal. TuSimple's Final Form S-1 disclosed the information Plaintiffs claim was concealed—the value of Sina's ownership in TuSimple.[11] (*See* Ex. G, TuSimple Prospectus at 153-54.) The two-year clock

---

8 Plaintiffs' Section 20(a) control-person claims are derivative of the Section 10(b) claim, share its limitations period, and are equally time-barred. *See Klock v. Lehman Bros. Kuhn Loeb, Inc.*, 584 F. Supp. 210, 216 (S.D.N.Y. 1984).

9 The first element of the statute of limitations—that the alleged loss was complete and measurable—is undisputed. Every Class member's alleged injury occurred no later than March 22, 2021, when the Merger closed and Sina's shares were permanently suspended from trading. (AC ¶¶ 2, 222.)

10 Sina also adopts and incorporates by reference the statute of limitations arguments in Morgan Stanley & Co. LLC and MS Asia's Memorandum of Law in Support of Their Motion to Dismiss ("MS Brief"), including that Plaintiffs' commencement of the Section 1782 proceedings demonstrates sufficient knowledge to timely assert the claims at issue here but that they failed to do so.

11 Sina's investments in TuSimple were made through Sun Dream Incorporated. (*Id.* ¶ 103.)

therefore began no later than April 16, 2021,[12] and expired April 16, 2023.[13] *See Fogel v. Wal-Mart de Méx. SAB de CV*, No. 13 Civ. 2282 (KPF), 2017 WL 751155, at *8-9 (S.D.N.Y. Feb. 27, 2017) (statute of limitations began to run when news article exposed defendant's alleged bribery), *aff'd sub nom. Fogel v. Vega*, 759 F. App'x 18 (2d Cir. 2018).

Plaintiffs cannot avoid this result by pointing to discovery from the Cayman Action. The standard is not whether Plaintiffs possessed every piece of evidence now in their pleading; it is whether they had "sufficient information" to plead the alleged violation. *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). By April 16, 2021, the public record supplied exactly that. Where the factual predicate for a federal securities claim is publicly available, the limitations clock runs from that public availability—not from the date a related proceeding later produces additional corroborating detail. *See Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 666-67 (2d Cir. 2016) (Section 10(b) claims untimely where substantial information "was either known or freely available to investors" earlier, though additional facts were discovered through later Chapter 11 investigation); *see also Arco Cap. Corp.*

[12] Even before the IPO, there were public indications of TuSimple's market value. The Amended Complaint cites an August 17, 2020 article that reported TuSimple was planning an IPO with a valuation ranging from $3.5 to $7 billion. (AC ¶ 188.) These earlier public disclosures also functioned as storm warnings that would have alerted any reasonably diligent investor that TuSimple's market value was higher than the $186 to $288 million book value used in the Merger and disclosed in the Proxy. *See Merck & Co.*, 559 U.S. at 653.

[13] Plaintiffs' remaining theories of fraud were equally discoverable from public filings well before April 16, 2021. The July 6, 2020 proposal letter, filed with the SEC the same day on Form 6-K, disclosed the Buyer Group's voting power, intent to vote for the Merger, and refusal of a third-party sale. (AC ¶ 137; Ex. E.) Morgan Stanley USA's role as underwriter of TuSimple's IPO was disclosed in TuSimple's publicly filed Form S-1 on March 23, 2021 (*see* AC ¶¶ 38, 131(vi)), and the Proxy Materials separately disclosed MS Asia's role—a separate corporate entity—as the Special Committee's financial advisor (*id.* ¶ 235). And Plaintiffs' challenges to the Special Committee and MS Asia's process (*see id.* ¶ 154) are either legal conclusions or restate facts disclosed in the Proxy Materials, including the absence of a MOTM condition, the Buyer Group's refusal to support an alternative transaction, and the consideration and rejection of alternatives (*see, e.g.*, *id.* ¶ 239).

*v. Deutsche Bank AG*, 986 F. Supp. 2d 296, 303 (S.D.N.Y. 2013) (Section 10(b) claim untimely because reasonable investor would have investigated potential claims earlier in pattern of defaults).

Plaintiffs' original complaint, filed on September 19, 2025, confirms the point. Without the benefit of the Cayman Action discovery, Plaintiffs alleged fundamentally the same theory now advanced in more detail in the Amended Complaint. The original complaint's allegations—that Defendants "knowingly concealed" the value of Sina's TuSimple stake (Ex. B, Original Complaint (ECF No. 1) ¶ 40), that they "grossly shortchange[d]" minority shareholders (*id.* ¶ 41), that TuSimple's pre-IPO Series E round valued it "approximately double the high-end valuation . . . relied on by Morgan Stanley" (*id.* ¶ 42), that TuSimple was "much further along in its efforts to conduct an IPO than what was publicly disclosed" (*id.* ¶ 43), and that two sets of management projections existed in December 2020 and January 2021 (*id.* ¶¶ 44-45)—are drawn from TuSimple's final IPO prospectus filed with the SEC on April 16, 2021. The IPO crystallized TuSimple's actual market value at $8.5 billion. (AC ¶ 23.) Any investor with the IPO valuation and a calculator could derive Sina's share. (*See* Ex. G at 153-54.) That the Cayman discovery later furnished purportedly corroborating testimony and documents does not restart a limitations period that had already begun to run.

## II. PLAINTIFFS FAIL TO PLEAD ACTIONABLE MISREPRESENTATIONS

Plaintiffs allege that several statements made by Sina in its Proxy were "materially false and misleading," but their disagreement with disclosed valuation inputs and complaints about the disclosed Merger process do not give rise to a claim for securities fraud.[14] (AC ¶¶ 224-44.)

---

14 Sina adopts the arguments in the MS Brief by reference regarding Plaintiffs' allegations that MS Asia's statements in its Fairness Opinion are misleading and does not separately address those statements here. (AC ¶¶ 225-28, 241-42.)

### A. There Was No Material Misrepresentation Regarding Sina's Valuation

Contrary to Plaintiffs' allegations, Sina made no misstatements regarding its valuation in the Merger. Specifically, Plaintiffs challenge several statements in Sina's Proxy because they claim that Defendants "concealed the true value of the Company's investment in TuSimple at the time of the Merger" and "manipulated and inflated the Holdco Discount." (AC ¶¶ 232, 238.) As above, *supra* at 9, MS Asia's Fairness Opinion disclosed TuSimple's valuation range. (AC ¶¶ 13, 225.) Plaintiffs cannot premise fraud claims based on the concealment of facts that were actually disclosed. *See Bettis v. Aixtron SE*, No. 16 Civ. 00025 (CM), 2016 WL 7468194, at *10 (S.D.N.Y. Dec. 20, 2016) ("[N]o duty to disclose information that is 'equally available, widely reported, or so basic that any investor could be expected to know it'"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.").

The Proxy likewise disclosed the use of TuSimple's "book value" and the rationale for applying a HoldCo Discount (*see supra* at 9), and Plaintiffs do not allege that any accounting principles were violated. *See Point12 Diversified Fund, LP v. TMC The Metals Co.*, No. 21-CV-5991(EK)(PK), 2025 WL 1920340, at *18 (E.D.N.Y. July 11, 2025) ("Accounting decisions often involve subjective judgments."). Companies may "choose any accepted accounting method" and plaintiffs cannot show falsity "merely by showing that other *reasonable* alternative views exist." *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 45 (2d Cir. 2025); *see also Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015) (securities laws do "not allow investors to second-guess inherently subjective and uncertain assessments").[15] The

[15] The August 31, 2020 email cited in the AC (AC ¶ 192) where an analyst "disagreed" with using book value would establish, at most, a reasonable professional disagreement about best valuation methodology, not a violation of the securities laws.

AC alleges nothing more than a subjective disagreement with the valuation methodology and HoldCo Discount used, which is insufficient to state a claim. *See Shanda Games*, 128 F.4th at 44.

Plaintiffs also fault the Board's statement that it "expressly adopted" the analyses and opinions presented by MS Asia, among other factors, in reaching its determination as to the fairness of the Merger. (*See* AC ¶ 237.) As addressed more fully in the MS Brief, the Fairness Opinion is a statement of opinion, actionable only if (1) the speaker did not hold the professed belief, (2) the supporting facts supplied were untrue, or (3) the speaker "omit[ted] information whose omission ma[de] the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. at 185-86, 194). Plaintiffs plead no facts indicating that the Board or Special Committee did not genuinely believe the Merger was fair when the recommendation was made, or that the Fairness Opinion lacked reasonable basis or omitted information that rendered it misleading. *See Omnicare*, 575 U.S. at 186; *see also Tongue*, 816 F.3d at 210. In fact, the Proxy disclosed the specific factors that supported the determination, including the premium over the market price and MS Asia's financial analysis. (Ex. C at 25-29, F-2-F-4; *see also Keyspan*, 383 F. Supp. 2d at 377.)

Additionally, Plaintiffs do not allege that the factors listed in the Proxy were not actually considered by the Board or Special Committee, nor do they allege that those factors were inaccurate. *See Maso Cap. Invs. Ltd. v. E-House (China) Holdings Ltd.*, No. 22-355, 2024 WL 2890968, at *3 (2d Cir. June 10, 2024) (no liability where complaint "does not contain the requisite detail as to the who, what, when, where, and how"). Instead, the alleged omissions (AC ¶¶ 232, 238) are complaints about the Special Committee's choices and processes—not facts whose non-disclosure rendered the Fairness Opinion misleading.

### B. There Was No Material Misrepresentation Regarding the Merger Process

Plaintiffs' process-based challenges fail for similar reasons. First, Plaintiffs assert that

Defendants failed to disclose that the Buyer Group's "Class A Preference Shares could only be voted in the interest of all shareholders." (*See id.* ¶¶ 229-40.) Plaintiffs conflate the fiduciary limitations on the Board's power to ***issue shares***—which it accomplished back in November 2017—with a non-existent restriction on the voting power of those shares once issued. (*See supra* at 6 n.5.) The AC fails to allege ***any*** provision that restricted the Buyer Group's ability to vote the shares once issued. The AC's cited advice from Sina's Cayman Islands counsel that "directors must exercise their powers for 'proper purpose'" (AC ¶ 84) again relates to the ***issuance*** decision, not the scope of voting rights after issuance. And, although Plaintiffs claim the shares were issued to prevent hostile takeovers and "with the limited purpose for which those shares can be voted (for the benefit of all shareholders)," the language cited in the AC does not support this conclusion; it again describes the purpose of the ***issuance***, not limitations on future voting rights. (*Id.* ¶ 93.)[16]

Plaintiffs also complain that Sina failed to disclose that the Merger process or the "purported size" of the Buyer Group's voting power "prevented any market check or price discovery." (*Id.* ¶¶ 231-40.) But the Proxy disclosed the "potentially negative factors" arising from the Buyer Group's "voting power" that "may have deterred . . . other potentially interested parties." (*Id.* ¶ 233; Ex. C at 28-29.) Defendants cannot be liable for information they disclosed. *See Keyspan*, 383 F. Supp. 2d at 377. The press also publicly reported on the Buyer Group's controlling interest, further confirming that the voting power was exercised as disclosed and that these facts were not concealed from the market. *See Aixtron SE*, 2016 WL 7468194, at *10; *see also Keyspan*, 383 F. Supp. 2d at 377. For example, the AC quotes a 2017 Wall Street Journal article that specifically criticized the 2017 issuance of Class A Preference Shares to "entrench

[16] Plaintiffs point to Chao's testimony that he would use his voting power to "foreclose any competitive bid" (AC ¶¶ 142-44), but these statements confirm he exercised the full, unrestricted voting rights that the shares carried—exactly as disclosed in the Proxy.

management's power." (AC ¶ 97; Ex. H, Wall Street Journal Article.) Similarly, a 2017 MCM Partners Equity Research report cited in the AC opined that: "we see the move to cement Chairman Chao's grip . . . in approving the Class A share issue." (AC ¶ 99; Ex. I, MCM Partners Report.)

Plaintiffs allege that Sina did not disclose that the Special Committee was not "acting in the best interest" of shareholders. (AC ¶¶ 236, 238.) Specifically, Plaintiffs take issue with the Proxy's statement that "the Special Committee and the Board believed that sufficient procedural safeguards" existed surrounding the Merger, including the Special Committee's independence and ability to renegotiate the terms and recommend a different outcome (i.e., in the event of a superior proposal or intervening event), and the retention of outside advisors MS Asia and Gibson Dunn. (*See id.* ¶¶ 235, 237.) This alleged misstatement is an opinion statement, and Plaintiffs do not allege that the Special Committee did not genuinely hold this belief at the time it was made. *See Omnicare*, 575 U.S. at 186. Nor do Plaintiffs allege that it is objectively false that procedural safeguards ***were*** in place: the Special Committee was formed of three independent directors for the purpose of acting in "the best interests of the Company's shareholders in general" (*id.* ¶¶ 147-48); Gibson Dunn and MS Asia were retained as independent outside advisors (*see id.* ¶ 152); and the Committee had the authority to negotiate or even reject the Merger (*see id.* ¶ 235).

Plaintiffs also allege that Sina failed to disclose that the Merger was not financially superior to other reasonably available alternatives. (*Id.* ¶¶ 232, 240.) But to show that the challenged statements were false, Plaintiffs would need to allege that an actual viable alternative proposal existed and was rejected; they do not. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) ("[W]ithout *contemporaneous* falsity, there can be no fraud."), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). Their underlying theory—that the Special Committee should have tried

harder to find alternatives despite the disclosed constraints—is a subjective process challenge, not a disclosure claim cognizable under Section 10(b).

Additionally, Plaintiffs allege that the MOTM provision was given away "for insufficient consideration so as to prevent any roadblock to approval of the Merger and dissuade participation by Unaffiliated Shareholders." (AC ¶¶ 234, 236, 238.) But, the Proxy expressly addressed the absence of an MOTM provision, which is "not customary" in such transactions anyway. (*Supra* at 8; AC ¶ 233.) Plaintiffs' allegations regarding the MOTM provision are merely opinions about what they think the process *should have been*, and Plaintiffs fail to demonstrate how the alleged omissions render the challenged statements false or misleading.[17]

## III. PLAINTIFFS FAIL TO ALLEGE A STRONG INFERENCE OF SCIENTER

Plaintiffs' Section 10(b) claims also fail for the independent reason that Plaintiffs do not "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). This strong inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309 (2007). "[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Plaintiffs fail to make either showing here.

[17] Plaintiffs also criticize the timing of the release of Weibo's Q2 2020 financial results as further undermining the fairness of the Special Committee process. (*See* AC ¶¶ 210-14.) However, portions of the Fairness Opinion reflect that Q2 Weibo results were incorporated into the analysis. (Ex. D at 9.)

### A. Plaintiffs Fail to Plead Motive and Opportunity to Commit Fraud

To allege motive for Sina, Plaintiffs must plead particularized facts showing that someone whose intent can be imputed to Sina would realize "concrete benefits" from the alleged misstatements. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Allegations of "[m]otives that are generally possessed by most corporate directors and officers do not suffice." *Id.* Plaintiffs' insinuations here fall far short of this exacting standard.

The only individuals whose intent could even be arguably imputed to Sina are the Special Committee members, formed to act "in the best interests of the Company's shareholders" other than the Buyer Group. (AC ¶ 148.) Plaintiffs fail to allege that any member of the Special Committee had any motive to defraud. None was part of the Buyer Group, and none stood to realize any "concrete benefit" from a lower Merger price. *Kalnit*, 264 F.3d at 139. Plaintiffs do not allege that any of its members had an economic interest in the surviving entity. Moreover, Plaintiffs admit the Special Committee engaged in actions that are inconsistent with the alleged fraud. It retained independent advisors (AC ¶¶ 39, 152), conducted negotiations (*id.* ¶ 235), and secured a price increase from $41.00 to $43.30 per ordinary share (*see id.* ¶¶ 136, 215). Vague allegations of "long-standing professional or private loyalty to Chao" (*id.* ¶ 149) do not establish scienter absent some concrete benefit. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 171 (S.D.N.Y. 2021) ("[A]llegations of a close relationship fail to establish the kind of circumstantial evidence necessary to support [scienter.]").

The Buyer Group's state of mind cannot be imputed to Sina because the Buyer Group was not acting on Sina's behalf. *See, e.g.*, *Haideri v. Jumei Int'l Holding Ltd.*, No. 20-cv-02751-EMC, 2021 WL 4170791, at *19 (N.D. Cal. Sept. 14, 2021) (state of mind not imputed to company where party was "*on the other side* of a well-publicized transaction as an adverse party"). In any event, Plaintiffs do not adequately allege that the Buyer Group had motive to commit fraud either: the

desire of a buyer to obtain favorable terms through an arm's-length negotiation is common to all similarly situated persons and thus insufficient to allege scienter. *See Kalnit*, 264 F.3d at 141 ("[T]he desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired. Such generalized desires do not establish scienter."); *Elliott Assocs., L.P. v. Hayes*, 141 F. Supp. 2d 344, 359 (S.D.N.Y. 2000) ("[A]llegations of generic motivations typically held by similarly-positioned executives are insufficient to establish motive."), *aff'd*, 26 F. App'x 83 (2d Cir. 2002). Nor do Plaintiffs allege anyone in the Buyer Group engaged in any malfeasance. *Cf. Shanda Games*, 128 F.4th at 52 (allegation that member of buyer group personally manipulated the company's financial projections supported scienter).[18]

**B. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness**

Plaintiffs also fail to allege "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. To make this showing, Plaintiffs must plead particularized facts "show[ing] that defendants' conduct was 'highly unreasonable' and constituted 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *26 (S.D.N.Y. Apr. 2, 2020), *aff'd sub nom. Bristol Cnty. Ret. Sys. v. Adient PLC*, No. 18-CV-9116 (RA), No. 20-3846-cv, 2022 WL 2824260 (2d Cir. July 20, 2022). This standard requires allegations that Defendants had "facts at [their]

[18] Even if Plaintiffs could allege motive for the Buyer Group (which they cannot), the adverse interest exception would preclude such intent from being imputed to Sina. Under that doctrine, an agent's state of mind cannot be imputed to the principal when the agent's alleged fraud is committed against the principal rather than on its behalf. *See* Restatement (Third) of Agency § 5.04 (2024); *see also Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *9 (S.D.N.Y. Sept. 8, 2017) (adverse interest exception applied where agent's alleged securities fraud "committed for personal benefit" and company was allegedly defrauded). While the adverse interest exception did not apply in *Shanda Games* because the complaint "plausibly allege[d] that 'the fraud benefited Shanda by preserving capital,'" *Shanda Games*, 128 F.4th at 54 (emphasis removed), Plaintiffs make no such allegation here.

disposal contradicting material public statements, but then ignor[ed] such facts or proceed[ed] despite them." *Id.*

Plaintiffs allege no facts even suggesting the Special Committee acted recklessly. To the contrary, Plaintiffs admit the express purpose of the Special Committee was ensuring that shareholders not associated with the Buyer Group got a fair price. Plaintiffs acknowledge the Special Committee engaged independent outside advisors, achieved a price increase from $41 to $43.30 through its negotiations, and disclosed negative factors. (*See* AC ¶¶ 184, 233.) This course of conduct is fundamentally inconsistent with an inference of recklessness.

Again, the Buyer Group's state of mind cannot be imputed to Sina, and Plaintiffs also fail to allege the Buyer Group acted recklessly. The Buyer Group expressly disclosed that its interests differed from those of other shareholders and that it "attempted to negotiate a transaction that would be most favorable to the Buyer Group, rather than to the Unaffiliated Security Holders," but that it "believe[d] that the interests of the Unaffiliated Security Holders were represented by the Special Committee." (Ex. C at 32.) This demonstrates candor with other shareholders, not conscious misbehavior or recklessness.

## IV. PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

### A. Plaintiffs Fail to Allege the Proxy Caused Sellers Any Loss

Loss causation requires Plaintiffs to plead a "causal link between the alleged misconduct and the economic harm ultimately suffered." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). Sina holders who sold their shares between October 13, 2020 and March 22, 2021, cannot meet that standard.

First, Plaintiffs do not—and cannot—identify any disclosure during the Class Period that corrected any of the alleged misrepresentations to the market for the first time, and Plaintiffs do not identify a corresponding price reaction in the share price attributable to any such disclosure.[19]

Second, the theory that "the offer of $43.30 per ordinary share as consideration for the Merger was substantially below the true and fair value of Sina ordinary shares" (*see, e.g.*, AC ¶¶ 4, 226, 228, 230) and would have been higher absent the alleged Proxy misstatements is impermissibly speculative. Plaintiffs' theory here is even more speculative than the theory rejected by the Second Circuit in *Gray v. Wesco Aircraft Holdings, Inc.*, 847 F. App'x 35, 37 (2d Cir. 2021). In *Gray*, the Second Circuit affirmed dismissal of a Section 14(a) merger-proxy claim because the plaintiff's theory that his shares were worth more than the merger consideration—supported only by analyst estimates of what hypothetical bidders might have offered and by rejected internal "Initial Projections"—was deemed "speculative and conclusory" and could not satisfy the economic-loss element. *Id.* at 37. Plaintiffs here have even less to show. The AC identifies no competing bidder, no analyst price target above the $43.30 Merger price, no rejected internal projection implying a higher per-share value, and no superior alternative to the Merger consideration. Plaintiffs instead rest on a theory that relies on the speculative valuation of Sina's pre-IPO stake in TuSimple (*see* AC ¶¶ 6-7) and the assertion that the long-recognized HoldCo Discount should have been disregarded (*see, e.g., id.* ¶¶ 60-62, 100-02, 227-28). However, the AC itself acknowledges that "[t]he share prices of Sina and Weibo were in decline between 2018 and July 2020," with Sina trading at $36.67 on July 2, 2020—well below the $43.30 Merger price. (*Id.*

[19] The facts on which Plaintiffs rely were already public long before the Merger was consummated: the November 2017 issuance of the Class A Preference Shares to Chao was announced and publicly criticized (*see, e.g.*, AC ¶¶ 97-99); TuSimple's proposed valuation was a matter of public record (*id.* ¶ 188); and the HoldCo Discount had been the subject of analyst commentary since at least 2017 (*see, e.g.*, *id.* ¶¶ 61, 68, 74).

¶ 51.) Against that backdrop, the proposition that different proxy disclosures would have caused a higher open-market price is conjecture.

**B. Plaintiffs Fail to Allege the Proxy Caused Tenderers Any Loss**

Plaintiffs also do not—and cannot—allege loss causation for the Tenderers who held their shares through the Class Period and tendered them at the Merger price. As an initial matter, Tenderers cannot invoke the lost-appraisal-rights theory recognized in *Shanda Games*, 128 F.4th at 58-59, without, at a minimum, some nexus between the proxy and the shareholder's decision—yet the AC does not allege that any named Plaintiff read the Proxy, considered exercising appraisal rights under Cayman law, or took any step toward dissenting. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 373 n.21 (S.D.N.Y. 2023) (no loss causation where complaint did "not allege that, but for the proxy's misstatements, all tenderer shareholders—or Lead Plaintiffs, specifically—would have exercised their appraisal rights"); *see also Fisher v. Kanas*, 467 F. Supp. 2d 275, 283 (E.D.N.Y. 2006) (no loss causation absent allegation shareholders "would have voted differently").

Any argument that Tenderers would have sold their shares on the open market at a higher price absent the alleged misstatements is an impermissible "deferred sale" claim. *Shanda Games*, 128 F.4th at 59 n.21 (*citing Gurley v. Documation Inc*., 674 F.2d 253, 257 (4th Cir. 1982)). And, any theory that Tenderers would have voted down the Merger or demanded a higher renegotiated price is equally unavailing. *See Qihoo*, 663 F. Supp. 3d at 368 (such theories "rel[y] on a chain of inferences far too speculative and distended"); *see also Jumei*, 2021 WL 4170791, at *23-24 (rejecting speculative theory that disclosure would have led arbitrageurs to force the share price above the buyer's offer). As Plaintiffs concede, 80.5% of unaffiliated shareholders would have had to vote against the Merger to block approval, a very unlikely outcome. (AC ¶ 180.)

Finally, the Merger price was negotiated and fixed in the September 28, 2020 Merger Agreement—two weeks before the Proxy was filed. Because the price was locked in before any allegedly misleading disclosure reached the market, the Proxy could not have "caused" the Tenderers to receive a lower price. *See Shanda Games*, 128 F.4th at 66 n.3 (Jacobs, J., dissenting).

## V. PLAINTIFFS DO NOT ADEQUATELY PLEAD RELIANCE FOR TENDERERS

Even if the Tenderers could establish loss causation (which they cannot), their claims independently fail because they have not adequately pled reliance. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008). Neither presumption of reliance applies here. The presumption recognized in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) is unavailable because Plaintiffs' claims are not principally grounded in omissions; rather, the AC primarily challenges affirmative statements regarding the Buyer Group's voting power, the Special Committee's process, and the Fairness Opinion. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017) (rejecting application of *Affiliated Ute* where plaintiffs primarily alleged misstatements). The fraud-on-the-market presumption established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) is equally inapplicable because the Tenderers did not purchase shares on the open market at a market-set price: they tendered at a fixed Merger price of $43.30 per share, negotiated privately between the Buyer Group and the Special Committee and set *above* the prevailing market price. *See Qihoo*, 663 F. Supp. 3d at 366 n.18 (no fraud-on-the-market presumption in going-private merger with privately negotiated, above-market price) (collecting cases).

In the absence of either presumption, Plaintiffs must plead actual, individualized reliance—yet the AC contains no allegation that any named Plaintiff read the Proxy Statement, much less that any Plaintiff's decision to tender was influenced by the challenged disclosures. Accordingly, this deficiency is fatal to the Tenderers' claims.

## VI. SCHEME LIABILITY IS NOT ADEQUATELY PLED

Finally, Plaintiffs' scheme liability claim under Rules 10b-5(a) and (c) is impermissibly derivative of the misstatement claims. A scheme claim cannot rest solely on the same alleged misstatements or omissions underlying a Rule 10b-5(b) claim. *See E-House*, 2024 WL 2890968, at *5 n.5 (rejecting scheme liability where the complaint "does not clearly identify any deceptive acts distinct from the alleged (inactionable) misstatements and omissions"); *see also Union Cent. Life Ins. Co. v. Credit Suisse Sec. (USA), LLC*, No. 11 Civ. 2327(GBD), 2014 WL 7179989, at *5-6 (S.D.N.Y. Dec. 10, 2014) (same). Here, the Amended Complaint's so-called "scheme" is a recasting of the theory that Defendants made materially misleading disclosures in the Proxy. The only conduct identified in support of those allegations is the same proxy disclosures, valuation decisions, and process failures that form the bases of Count I.

The claim also fails under Federal Rule of Civil Procedure 9(b), which requires plaintiffs to allege with particularity what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016). The Amended Complaint alleges no such particularized conduct apart from the proxy disclosures.

Plaintiffs likewise fail to plead a strong inference of scienter as to the scheme itself, as required by the PSLRA. The Amended Complaint does not allege particularized facts demonstrating that any Defendant engaged in the purported scheme with the intent to deceive, manipulate, or defraud, as opposed to simply making the disclosures Plaintiffs now challenge. *Id.*

## CONCLUSION

For the foregoing separate and independent reasons, the Amended Complaint should be dismissed in its entirety with prejudice.

Dated: New York, New York
May 15, 2026

Respectfully submitted,

*/s/ Michael C. Griffin*

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Scott D. Musoff
Robert A. Fumerton
Michael C. Griffin
One Manhattan West
New York, New York 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
scott.musoff@skadden.com
robert.fumerton@skadden.com
michael.griffin@skadden.com

*Counsel for Defendant Sina Corporation*