**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: SINA CORPORATION SECURITIES LITIGATION | Case No: 1:25-cv-07820-CM<br><br>CLASS ACTION |
| THIS DOCUMENT RELATES TO:<br><br>KEVIN LU, Individually and on behalf of others similarly situated. *v*. SINA CORPORATION, *et al*., Case No: 1:25-cv-07820-CM | |

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANT SINA CORPORATION'S MOTION TO DISMISS**
**PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS


PRELIMINARY STATEMENT .......... 1

FACTUAL ALLEGATIONS .......... 4

I. SINA'S HISTORY OF BENEFITING CHAO AT THE EXPENSE OF SHAREHOLDERS .......... 4

II. SINA'S HOLDCO DISCOUNT AND THE PROXY FIGHT TO UNLOCK SHAREHOLDER VALUE .......... 4

III. SINA CONSOLIDATES CHAO'S POWER TO THE DETRIMENT OF SHAREHOLDERS .......... 5

IV. SINA'S UNDISCLOSED INVESTMENT IN TUSIMPLE BECOMES EXTREMELY VALUABLE .......... 6

A. Sina Invests Heavily in TuSimple with Chao and B. Zhang Joining TuSimple's Board of Directors .......... 6

B. Sina's Investment in TuSimple Becomes Worth Billions Leading to Chao's Scheme to Purchase Sina .......... 6

V. THE SCHEME TO STEAL SHAREHOLDER VALUE THROUGH MERGER .. 7

A. Chao's Offer to Purchase Sina .......... 7

B. Defendants Collude to Prevent Price Discovery and Consummate The Merger on Terms Favorable to Chao .......... 8

1. Sina Defendants Craft the Terms of The Merger Agreement to Foreclose Any Possibility of Price Discovery .......... 8

2. Defendants Eliminate The Majority Of The Minority Requirement .......... 9

C. Defendants Undervalue Sina and TuSimple and Delay Financial Results .......... 10

VI. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS .......... 11

VII. THE MERGER AND TUSIMPLE IPO .......... 12

ARGUMENT .......... 12

I. PLAINTIFFS' CLAIMS ARE TIMELY .......... 13

II. PLAINTIFFS ADEQUATELY PLEAD ACTIONABLE MISSTATEMENTS .. 14

A. Sina's Statements Concerning the Value of TuSimple, the Holdco Discount and Merger's Fairness Are Actionable ..................................... 15

B. Statements Concerning Chao's Voting Power Are Actionable ................ 18

C. Plaintiffs Adequately Plead Merger Process Misstatements .................... 19

III. PLAINTIFFS HAVE ALLEGED A STRONG INFERENCE OF SCIENTER .... 20

A. Plaintiffs Adequately Allege Motive and Opportunity ............................. 20

B. Plaintiffs Adequately Allege Severe Recklessness .................................. 21

IV. PLAINTIFFS ADEQUATELY ALLEGE RELIANCE FOR TENDERERS ....... 22

V. PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION .......................... 22

A. Plaintiffs Adequately Allege Loss Causation Based on Appraisal Rights As Well As Other Theories ..................................................................... 23

B. Plaintiffs Adequately Allege Loss Causation Based on Fair Value ......... 24

CONCLUSION ........................................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................17, 18

*Acito v. IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995)....................25

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)....................24

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
663 F. Supp. 3d 334 (S.D.N.Y. 2023).................... *passim*

*Arco Cap. Corp. v. Deutsche Bank AG*,
986 F. Supp. 2d 296 (S.D.N.Y. 2013)....................14

*Baum v. Harman Int'l Indus., Inc.*,
575 F. Supp. 3d 289 (D. Conn. 2021)....................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................12

*Berger v. Apple REIT Ten, Inc.*,
563 F. App'x 81 (2d Cir. 2014)....................14

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
480 F.2d 341 (2d Cir. 1973)....................18

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011)....................13, 21

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)....................14

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)....................22

*ECA & Local 134 IBEW Jt. Pension Trust of Chi.*,
553 F.3d 187 (2d Cir. 2009)....................20

*Erickson v. Jernigan Cap., Inc.*,
2022 WL 3028627 (S.D.N.Y. Aug. 1, 2022)....................24

*Fogel v. Wal-Mart de Méx. SAB de CV*,
2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)....14

*Ganino v. Citizens Utils. Co.*,
228 F.3d 154 (2d Cir. 2000)....20

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
639 F. App'x 664 (2d Cir. 2016)....14

*Gray v. Wesco Aircraft Holdings, Inc.*,
454 F. Supp. 3d 366 (S.D.N.Y. 2020)....24

*Gray v. Wesco Aircraft Holdings, Inc.*,
847 F. App'x 35 (2d Cir. 2021)....24, 25

*Herbst v. Int'l Tel. & Tel. Corp.*,
495 F.2d 1308 (2d Cir. 1974)....17

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020)....18

*In re MCI Worldcom, Inc. Sec. Litig.*,
93 F. Supp. 2d 276 (E.D.N.Y. 2000)....20

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)....12

*In Re Shanda Games Ltd. Sec. Litig.*,
128 F.4th 26 (2d Cir.),
*cert. denied sub nom.*,
*Shanda Games Ltd. v. Monk*, 146 S. Ct. 366, 223 L. Ed. 2d 196 (2025).... *passim*

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....15

*Kirschner v. KPMG LLP*,
938 N.E.2d 941 (N.Y. 2010)....21

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)....15

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020)....18

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27, 44 (2011)....14

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)....13

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)....13

*Mills v. Elec. Auto-Lite Co.*,
396 U.S. 375 (1970)....24

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....12, 21

*ODS Cap. LLC v. JA Solar Holdings Co.*,
2020 WL 7028639 (S.D.N.Y. Nov. 30, 2020)....18

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014)....21

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)....13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....20

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)....15, 17

*Wilson v. Great Am. Indus.*,
979 F.2d 924 (2d Cir. 1992)....24

**Statutes**

PSLRA....12, 13

**Rules**

Fed. R. Civ. P. 9(b)....12

**Other Authorities**

17 C.F.R. § 240.10b-5....14

## PRELIMINARY STATEMENT

Between 2018 and June 2020, Sina invested heavily – over $165 million – in TuSimple Holdings, Inc. ("TuSimple"), a privately-owned autonomous trucking company based in San Diego, California. At 34.44%, Sina was by far TuSimple's largest investor. Moreover, Sina's Chief Executive Officer ("CEO") and Chairman of the Board of Directors – Defendant Charles Guowei Chao ("Chao") – and Sina's Chief Financial Officer ("CFO") – Defendant Bonnie Yi Zhang ("B. Zhang") – were members of TuSimple's Board of Directors. ***Despite this massive investment and deep involvement, Sina never once mentioned TuSimple in any SEC filing***.

In June 2020, Sina's investment in TuSimple skyrocketed. TuSimple was finalizing a critically important partnership agreement with a major US truck manufacturer. Projections as well valuations conducted by Morgan Stanley & Co. LLC ("MS&Co.") for TuSimple's Series E financing and imminent IPO valued the company ***upwards of $7 billion***. There was one hurdle standing in the way of TuSimple's IPO and Sina's massive payout. TuSimple and MS&Co. determined that as a result of U.S. foreign investment regulations the IPO could not proceed while TuSimple's largest investor – Sina – remained a publicly traded company.

Defendants immediately implemented a scheme to steal the undisclosed value of TuSimple and Sina. On July 6, 2020, one business day after TuSimple's Board approved the manufacturing partnership, Chao made an offer to take Sina private by acquiring all outstanding ordinary shares for $41 per share, well below the fair and true value of the shares. Sina told investors that it created a "Special Committee" to evaluate whether Chao's offer or any "alternative transaction" is "fair to and in the best interests of…the Company's shareholders other than [Chao]" (the "Minority Shareholders"). In truth, the Special Committee was beholden to Chao and sought to ensure that the go-private merger was approved and at the lowest price possible. The Special Committee (purportedly acting on behalf of Minority Shareholders) demanded that the valuation firm –

Morgan Stanley Asia Limited. ("MSAL") – massively ***reduce*** its valuation for TuSimple to a range of the company's "book value" of ***$186 million*** and ***$288 million*** despite recognizing more recent valuations of TuSimple as high as ***$7 billion***. As an August 31, 2020 Morgan Stanley Asia email states: "…***[the Special Committee] has called three times since Friday…TuSimple – [they] think[] it should be carried at book value which I disagreed given…its latest valuation and IPO in 2021 Q1 in the range of $3.5 – 7.0Bn***".[1]

To ensure that Minority Shareholders did not learn the true value of their Sina shares, Defendants colluded to prevent any realistic and fair opportunity for alternative bidders to pursue a potential deal or for there to be any type of "market check" or "price discovery."

To start, Defendants repeatedly told investors that Chao could and would vote his 58% voting power to approve his offer as well as veto any competing offer or alternative transaction and used this purported veto power as a reason to not conduct any price discovery that would reveal the true value of Sina, which MSAL described as a "treasure trove" in which the "break-up" value of the Company massively outstripped Chao's offer. Chao admitted in the Caymen Action that he was "effectively signaling here [his] intention to control the process such that it's a binary process. Either there's a sale to [Chao] or there's no transaction" and "***It's not a deal for creating…the best price for all the shareholder***s."

Defendants never told shareholders that Chao's shares were issued to him in his fiduciary capacity and with the express limitation that they could only be voted for the "best interest of all shareholders" and could not be voted for Chao's personal benefit.

Having ignored their obligation to determine whether Chao's offer or any alternative transaction was fair to and in the best interests of the Minority Shareholders, Defendants filed

[1] Unless otherwise noted, all emphasis has been added.

several proxy statements falsely stating, *inter alia*, that: (i) TuSimple's value was between the company's ***$186 million "book value" and $288 million***, (ii) other alternative transactions (*i.e.* break-up basis) were not superior to the proposed Merger, (iii) that a sufficient price discovery process was conducted to ensure that the offer price was fair, (iv) the offer price was fair, and (iii) it was in the best interest of the Minority Shareholders to vote in favor of the Merger.

On December 23, 2020, Sina held an extraordinary general meeting ("EGM"), at which the Merger was approved. Later that very same day, TuSimple confidentially filed with the SEC its draft Form S-1 for its IPO. The TuSimple IPO was completed on April 15, 2021, ***with a value of $8.5 billion***. With a 34.44% interest, Sina's ownership alone was worth over $2.9 billion.

Certain Minority Shareholders who dissented from the Merger filed a Section 238 shareholder appraisal action captioned (the "Cayman Action"). On November 21, 2025, the court issued an order, holding that the fair value of the shares was $105.26 per share, drastically surpassing the Merger price of $43.30. *See* Declaration of Michael J. Wernke, Ex. 1.

The adequacy of Plaintiffs' allegations of the elements of Section 10(b) – falsity, scienter, reliance and loss causation – cannot seriously be disputed. These issues have either been directly addressed in the Caymen Action or by the Second Circuit in similar cases. *See In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 55 (2d Cir.) ("*Shanda*"), *cert. denied sub nom. Shanda Games Ltd. v. Monk*, 146 S. Ct. 366, 223 L. Ed. 2d 196 (2025); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 359 (S.D.N.Y. 2023) ("*Qihoo*").

Defendants' assertion that the statute of limitations began to run following TuSimple's IPO is frivolous. The mere fact that TuSimple was valued at $8.5 billion sometime after the Merger in no way alerted Sina investors that the earlier valuation opinions in the Proxies were false, much less that Defendants were intentionally misleading Sina shareholders. It was not until the Caymen

Action in 2025 that an investor could have possibly learned, *inter alia*, (i) that Chao and B. Zeng were members of TuSimple's Board and Sina knew of the higher valuations, (ii) that Chao was prohibited from voting his Preference Shares for his personal interest, or (iii) that the Special Committee sought to reduce the value of Sina and prevented any price discovery.

## FACTUAL ALLEGATIONS

### I. SINA'S HISTORY OF BENEFITING CHAO AT THE EXPENSE OF SHAREHOLDERS

Based in Beijing, China, and incorporated under the laws of the Cayman Islands, Sina is a media technology company and the parent company of Weibo Corporation ("Weibo"), a Chinese platform that is similar to Twitter. Between 2006 and 2017, Sina's Board of Directors consolidated Chao's power and granted him personal benefits. Following Chao's appointment, the Board withered from ten members to only five. ¶53 Sina also sold 16.6 million shares to Chao delaying his payment until after the shares rose significantly in value, resulting in an enormous windfall for Chao while reducing the value shareholders' holdings by nearly $1 billion. ¶¶54-59

### II. SINA'S HOLDCO DISCOUNT AND THE PROXY FIGHT TO UNLOCK SHAREHOLDER VALUE

For years, analysts recognized that Sina's market cap as implied by its share price was significantly lower than the total net value of its underlying assets. They attributed this loss in shareholder value to Sina's poor corporate governance, lack of transparency and investor engagement and referred to the valuation gap as the "holding company discount" (or "Holdco Discount") and expressed frustration at Sina's refusal to unlock value for shareholders. ¶¶60-62

On September 20, 2017, Sina's fourth largest shareholder began a proxy battle with Sina by proposing the addition of two independent directors to Sina's board and proposals to unlock shareholder value. ¶¶63-67 Despite the market viewing the challenge favorably ¶¶68, 72-74, Sina was able to defeat it, with Chao's recently acquired shares proving determinative. ¶75

## III. SINA CONSOLIDATES CHAO'S POWER TO THE DETRIMENT OF SHAREHOLDERS

Unbeknownst to Sina shareholders, within hours of the initial approach by Aristeia, Sina Defendants began considering how the Company could increase Chao's voting power. ¶76 Sina's Caymen Island Counsel repeatedly advised Sina that shares could only be issued for a "proper purpose" and not to entrench the existing directors. ¶80 Caymen Counsel also warned:

> ***Directors also need to act in accordance with their fiduciary duties***, particularly to ensure that ***any issue of shares with special rights is in the best interests of the Company, which can be equated with the interests of the shareholders as a whole***.

*Id*. Caymen Counsel warned that even with the limitations a court challenge could be successful. ¶¶81-83 In the following weeks, Caymen Island Counsel repeated these warnings and Chao personally acknowledged that he and the other directors "…must act in the best interests of the Company." ¶¶84-86

Undeterred, the Board held a meeting to issue Chao "Class A Preference Shares" with super-voting power. The meeting minutes expressly acknowledging that the Board understood that they could issue such shares and voting power only as fiduciaries for the Company and all shareholders because of the obvious reality that no shareholder (much less 2/3 of all shareholders) would have approved ceding all of their voting rights to Chao. ¶¶87-89 The Board also acknowledged that the Class A Preference Shares were being issued to Chao in his role as "senior management" pursuant to the M&AA (therefore, the shares were subject to Chao's fiduciary obligations). ¶¶90-91

As a result, on November 6, 2017, Sina issued 7,150 Class A Preference shares to Chao's entity New Wave for a nominal consideration of $1 per share, increasing Chao's voting power from 11.1% to a clear majority of 55.5%, again stating that the shares were issued "***in the best interest of the Company*** and ***all of its shareholders***." ¶¶92-93

## IV. SINA'S UNDISCLOSED INVESTMENT IN TUSIMPLE BECOMES EXTREMELY VALUABLE

### A. Sina Invests Heavily in TuSimple with Chao and B. Zhang Joining TuSimple's Board of Directors

In 2018, mere months after Chao received his Preference Shares, Sina began investing heavily in TuSimple, an autonomous trucking company based in the USA. ¶103 Chao was personally and deeply involved in the investment. ¶104 By June 2020, Sina invested over $250 million and owned 34.44% of TuSimple, making Sina TuSimple's largest investor, owning more than twice as much as TuSimple's founders. ¶105 Chao and B. Zhang were also members of TuSimple's Board, appointed on April 22, 2019 and September 30, 2020, respectively. ¶106

Despite this years-long involvement, as of the announcement of Sina Board's approval of the Merger Agreement on September 28, 2020, ***no Sina SEC filing ever mentioned TuSimple or Chao and B. Zhang's positions on TuSimple's Board of Directors***. ¶107

### B. Sina's Investment in TuSimple Becomes Worth Billions Leading to Chao's Scheme to Purchase Sina

TuSimple completed its Series D financing in September 2019, with a valuation of $1.2 billion. ¶108 In March 2020, TuSimple engaged MS&Co. as the placement agent for its Series E fundraising. ¶109 By June 15, 2020, MS&Co. was valuing TuSimple at over $2 billion. ¶110 At the same time, TuSimple was finalizing a partnership agreement with the major US truck manufacturer Navistar International Corporation ("Navistar"), which would take TuSimple's technology to market, thereby exponentially increasing the value of TuSimple and allowing TuSimple to imminently conduct an IPO. ¶¶110-15 Projections at this time showed massive revenue and income growth for TuSimple in 2023 and 2024. ¶111 Chao, a member of TuSimple's Board, testified that he understood that the deal with Navistar was vitally important for TuSimple and that the resulting IPO was "inevitable." ¶114, 116 The TuSimple Board approved the

partnership on July 3, 2020. ¶113 By the end of July 2020 ***MS&Co. was valuing TuSimple as high as $7 billion for its IPO***. ¶117

There was one hurdle to TuSimple's IPO. TuSimple and MS&Co. concluded that because of regulations concerning foreign investment in certain U.S. businesses the IPO could not proceed if Sina – TuSimple's largest investor – remained a listed company. ¶¶118-22

Thereafter, Defendants schemed so that the timing of TuSimple's IPO moved in lock step with Sina's go-private Merger. This was possible for several reasons. Chao and B. Zhang were officers and directors of Sina, owners of New Wave and also members of the TuSimple Board. Morgan Stanley entities were involved in every transaction. MS&Co. was running TuSimple's IPO, MSAL was valuing Sina for the Merger, and Morgan Stanley was also engaged by New Wave for the Buyer Group. Moreover, at least two Morgan Stanley members overlapped between the teams. ¶124 Indeed, emails introduced in the Caymen Action show Morgan Stanley discussing the work for the Sina Merger and TuSimple as connected. ¶125 Internal documents demonstrate how information moved between the Sina Merger team and the TuSimple team, allowing TuSimple to hold off on its IPO until immediately after Sina was taken private. ¶¶126-132 Notably, in valuing Sina's investment in TuSimple, MSAL acknowledged that they knew that MS&Co. was valuing TuSimple "***in the range of $3.5 – 7.0Bn***." ¶192

## V. THE SCHEME TO STEAL SHAREHOLDER VALUE THROUGH MERGER

### A. Chao's Offer to Purchase Sina

On July 6, 2020 – one business day after the TuSimple Board approved the Navistar partnership – Sina announced that Chao, through New Wave, offered to acquire all outstanding ordinary shares of Sina for $41 per share in cash. ¶136 Chao's offer letter, falsely asserted that Chao was permitted to vote his Preference Shares for his own personal interest – to approve his

offer as well as prevent any superior third party offer that may come along, even if it is better for the Company and all shareholders. ¶137

Chao testified that when he made his offer, he understood that his economic incentive to pay as little as possible for Sina was in conflict with the interest of all other shareholders; stating the his intent was ***not* "*let's sell in the best price for the company and let's, you know, get the best price for all the shareholder*s."** ¶¶138-39 Chao has also testified that his intention was to (i) cast his proposal as the only option; (ii) express his ability to thwart any better deal for shareholders; and (iii) foreclose any other viable offers so that there could be no "market check" or "price discovery" that could reveal the true value of the Company. ¶¶141-46

**B. Defendants Collude to Prevent Price Discovery and Consummate The Merger on Terms Favorable to Chao**

The Company told investors that the Board had formed a Special Committee to act in the interest of Minority Shareholders and consider Chao's proposal and alternative transactions. ¶148 However, the Special Committee consisted of the same individuals that had approved Chao's $1 billion stock sale windfall and granted Chao voting control of Sina for a paltry $1 per share.

Once Chao made it clear that he did not intend to sell his stake in the Company to any third party it was – as the Caymen Island Court found – effectively "game over" with respect to getting any price discovery or any competing offers for the Company. ¶153

**1. Sina Defendants Craft the Terms of The Merger Agreement to Foreclose Any Possibility of Price Discovery**

There are several processes a company can implement to ensure shareholders receive the highest value in response to a proposed merger. Examples include: (i) a pre-signing "market check", (ii) pursuit of alternative transactions to unlock shareholder value, and (iii) a post-signing "go-shop" provision. The Special Committee did nothing. Instead, Defendants schemed to prevent any price discovery that would have revealed the inadequacy of Chao's proposal. ¶¶155-61

Despite MSAL explaining that a pre-signing market check and post-signing go-shop was advantageous to shareholders and common practice (¶164) the Special Committee evaluated Chao's proposal as if he ***could*** vote his Preference Shares for any purpose – a clear violation of the Special Committee's mandate to act in the interests of the Minority Shareholders. ¶162 Chao and B. Zhang similarly repeated the false voting power premise. ¶¶167-68 As a result, the members of the Special Committee have admitted that they treated the process as if a "market check" and other price discovery were not "relevant." ¶163

As the Caymen Court recognized, no pre-market check or post-signing go-shop was conducted by the Special Committee or MSAL. ¶¶169-170 While the Merger Agreement technically contained a "fiduciary out" provision that allowed the Company to consider non-solicited offers, it could only consider such an offer if it was "reasonably capable of being completed on the terms proposed" which the Special Committee claimed to be impossible because of Chao's purported power to use his shares to veto any better offer. ¶¶171-73 In short, the Sina Defendants structured the Merger Agreement to effectively prohibit consideration of any bids at all, even significantly higher unsolicited bids. *Id*. As the Caymen Court found, the Special Committee failed to "***put in place a process that was effective in producing price discovery***" and "***[T]he Merger Price should not be relied upon to assess fair value***…***The proposition that the Merger Price can be relied on to assess fair value was simply not tested***." ¶¶174-77

**2. Defendants Eliminate The Majority Of The Minority Requirement**

With the Buyer Group's purported 61% voting power, the traditional "Majority of the Minority" ("MOTM") requirement became essential. Under MOTM, a proposal (*i.e.* the Merger) could only pass if a majority of the unaffiliated shares ***issued*** (not just those present and voting) voted in favor of it. ¶178 The Special Committee's counsel Gibson Dunn proposed a MOTM provision. ¶179 Chao testified that he understood at the time that the MOTM was a "big point."

¶181 Despite the critical significance of the MOTM provision, the Special Committee gave up this right of the Minority Shareholders for a mere 5.6% increase in the offer price. The Caymen Court found that "this may fairly be said to be a relatively small price to pay to avoid such a circumstance." ¶184 If included in the Merger Agreement, the MOTM provision would have prevented the Merger from being voted through. ¶182

**C. Defendants Undervalue Sina and TuSimple and Delay Financial Results**

By July 2020, TuSimple and MS&Co. were valuing the company between $3.5 billion and $7 billion. Chao testified he was aware of this fact and he and B. Zhang, both directors of TuSimple, received documents regarding the IPO. ¶¶185-89 Defendants colluded to suppress the valuation of Sina's 34.44% investment in TuSimple. On August 31, 2020 MS&Co. formally sought internal approval to proceed with the IPO underwriting. ¶191 On the same day, an internal MSAL email states: *"…**Sandra[Special Committee] has called three times since Friday**…**TuSimple – she thinks it should be carried at book value which I disagreed given we are already conservatively valuing this at latest round of valuation [$1.2 billion] despite market rumour on its latest valuation and IPO in 2021 Q1 in the range of $3.5 – 7.0Bn**."* ¶192

Aside from TuSimple, Defendants knew that Sina's true value was worth much more than Chao's offer. Internal MSAL emails describe Sina as a "treasure trove," acknowledging that the offer price was below Sina's value on a "break-up" basis, only worked if a Holdco Discount was applied, and was concerned about reputational issues if they went ahead with the undervaluation. ¶¶165-66 Importantly, as Defendants have acknowledged, ***if the Merger went forward the Holdco Discount would disappear*** (¶134) – constituting a windfall to the Buyer Group. Nevertheless, the Special Committee instructed MSAL to not consider the break-up value of Sina. ¶166

Sina's subsidiary, Weibo was set to report its positive Q2 2020 results in August. However, CFO B. Zhang, who was responsible for the financial reporting, told MSAL that Chao and the

Buyer Group requested to delay the release until after the Merger Agreement is signed because they knew that the results for both would be "quite good." ¶209 Despite MSAL recognizing such a delay conflicted with standard practice, the Special Committee agreed to delay the disclosure to the detriment of Minority Shareholders. ¶204-214. B. Zhang never disclosed that she, in fact, was a silent member of the Buyer Group, which directly conflicted with her disclosed role. ¶152

## VI. DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

Sina filed preliminary, amended and final Proxy Statements on October 13, November 9, December 8, 2020 and March 22, 2021. As discussed in more detail *infra*, in each, Defendants made the following false and misleading statements:

- TuSimple was valued between a "book value" of $186 million and $288 million. ¶225 This statement was false and misleading because of Defendants' failure to disclose their knowledge of more recent financial projections and valuations of TuSimple as high as $7 billion. With a 34.44% interest, Sina's ownership alone was worth over $2.4 billion;

- A 30%-45% Holdco Discount was applied to Sina's valuation. ¶227 This statement was false and misleading because Defendants failed to disclose that this discount was of Defendants' own making and which would disappear once the Merger was completed;

- The Buyer Group has the power to vote 61.2% in support of the Merger as well as to prevent any alternative transaction. ¶¶231, 233, 239 These statements were false and misleading because of Defendants' failure to disclose that Chao was prohibited from voting the Preference Shares for his personal interests;

- The Proxies represented that "[T]he Special Committee and the Board believed that ***sufficient procedural safeguards were and are present to ensure that the Merger is procedurally fair*** to the Unaffiliated Security Holders." ¶235 These statements were false and misleading because Defendants schemed to prevent any price discovery and such process was not "procedurally fair" to shareholders.

- The Proxies represented that the Special Committee and Board "***belie[ve] that the Merger is financially more favorable to the Unaffiliated Security Holders than any other alternative reasonably available***" ¶231 and is "***fair to, and in the best interests of, the Company and the Unaffiliated Security Holders***." ¶237 These statements were false and misleading because Defendants failed to disclose the information discussed above.

## VII. THE MERGER AND TUSIMPLE IPO

On December 23, 2020, the Company held an EGM at which the shareholders voted on and approved the Merger. ¶¶217-19. On the same day as the EGM, December 23, 2020, TuSimple filed its 209-page ***confidential*** S−1 registration statement with the SEC. The first page states that the approximate date of the proposed IPO is: "As soon as practicable after the effective date of this Registration Statement." ¶¶130, 202 The Sina Merger was completed on March 21, 2021. ¶¶131 TuSimple ***publicly*** filed with the SEC its Form S-1 relating to its proposed IPO on March 23 2021. *Id*. The TuSimple IPO was completed on April 15, 2021, ***with a value of $8.5 billion***. *Id.* ***Sina's 34.44% interest was worth $2.4 billion***. The Caymen Island Court found: "[T]he completion of the IPO for TuSimple was connected to the merger transaction by Sina." ¶131

Certain Minority Shareholder who dissented from the Merger filed a Section 238 shareholder appraisal action captioned *In the Matter of the Companies Act (2021 Revision); In the Matter of Sina Corp.,* Cause No. FSD 128 of 2021 (RPJ) (Grand Court, F.S.D., Cayman Islands). On November 21, 2025, the court issued an order, holding that the fair value of the shares was ***$105.26 per share***, drastically surpassing the Merger price of $43.30. *See* Wernke Decl., Ex. 1.

## ARGUMENT

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead a "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). The Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is appropriate only where

"[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014).

## I. PLAINTIFFS' CLAIMS ARE TIMELY

"[T]he [two-year] limitations period does not begin to run until the plaintiff…discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (quoting 28 U.S.C. § 1658(b)(1)). "Until the plaintiff has uncovered — or a reasonably diligent plaintiff would have uncovered — enough information about the defendant's knowledge or intent to satisfy [the PSLRA's] pleading standard, he has not 'discovered' the fact of scienter, and the [two-year] statute of limitations cannot begin to run." *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). "The lapse of a limitations period is an affirmative defense that a defendant must plead and prove." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Sina incorrectly asserts that the completion of TuSimple's IPO on April 15, 2021 with a valuation of $8.5 billion provided Plaintiffs with all the information necessary to plead their fraud claims. MTD at 11. The IPO does not reveal anything about whether the earlier filed Proxies by Sina undervalued TuSimple at the time, much less whether Defendants made those statements with scienter. Tellingly, Sina does not even discuss the element of scienter. This is fatal.

It was not until the proceedings in the Caymen Action in February and March 2025, that Plaintiffs (or any reasonably diligent plaintiff) could have possibly uncovered information about Defendants' knowledge or intent sufficient to satisfy the rigorous PSLRA pleading standards for fraud. The Cayman Action revealed for the first time (among many things) (i) Chao and B. Zheng were directors of TuSimple; (ii) TuSimple was being valued between $2 billion and $7 billion as early as June 2020, (iii) that Chao's could not vote his Preference Shares for his personal benefit;

and (iv) that Defendants schemed to prevent price discovery. *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 84 (S.D.N.Y. 2022) (article did not begin limitations period where "the article did not reference any individual defendant, and did not discuss the allegedly false and misleading marketing statements").[2]

Defendants baselessly assert that Plaintiffs' original complaint was drafted without the benefit of the discovery the Caymen Action. This is false. The February and March 2025 proceedings were the basis of the original complaint, proving that Plaintiffs' claims are timely.

## II. PLAINTIFFS ADEQUATELY PLEAD ACTIONABLE MISSTATEMENTS[3]

A statement is actionable if it, "viewed as a whole, would have misled a reasonable investor." *Berger v. Apple REIT Ten, Inc*., 563 F. App'x 81, 83 (2d Cir. 2014). "Disclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

> The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. Statements of literal truth can become, through their context and manner of presentation, devices which mislead investors.

---

[2] The cases cited by Defendants are inapposite as underlying misconduct was disclosed. *Fogel v. Wal-Mart de Méx. SAB de CV*, 2017 WL 751155, at *8-9 (S.D.N.Y. Feb. 27, 2017); *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 666-67 (2d Cir. 2016); *Arco Cap. Corp. v. Deutsche Bank AG*, 986 F. Supp. 2d 296, 303 (S.D.N.Y. 2013).

[3] Although Chao and B. Zheng were not members of the Special Committee, they are "makers" of the statements in the Proxies. Chao was Chairman of the Board and signed each Proxy. *See* Qihoo, 663 F. Supp. 3d at 358 ("Zhou is properly pled as accountable for these statements. Although some purported to reflect the opinion of the special committee, of which Zhou was not a member, all were made in proxy materials that Zhou signed"). B. Zheng testified that she reviewed the Proxies before filing. ¶224

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted). Moreover, "[i]t is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell ***the whole truth***." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

Statements of opinion are actionable if (1) "'the speaker did not hold the belief she professed[,]'" (2) "'the supporting fact[s] she supplied were untrue[,]'" or (3) "the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).

### A. Sina's Statements Concerning the Value of TuSimple, the Holdco Discount and Merger's Fairness Are Actionable

The Proxies (i) valued TuSimple between a "book value" of $186 million and $288 million, (ii) applied at 30%-45% Holdco Discount to Sina; and (iii) represented that based on "the Special Committee's and the Board" "belie[ve] that the Merger is financially more favorable to the Unaffiliated Security Holders than any other alternative reasonably available" ¶231 and is "fair to, and in the best interests of, the Company and the Unaffiliated Security Holders." ¶237

Sina's valuation statements are actionable because Plaintiffs have adequately alleged that Sina did not believe that (i) TuSimple's value was capped at $288 million; (ii) that the valuation of Sina should be discounted by 30%-45%; or (iii) that the Merger was fair and in the best interest of the Minority Shareholders.

Chao and B. Zhang were directors of TuSimple, caused Sina to invest over $250 million for a 34.44% ownership, and knew that TuSimple's internal projections and valuations for a Series E financing and IPO – each of which post-dated the valuation identified in the Proxies – valued the company between $2.2 and $7.0 billion. They also knew TuSimple needed to coordinate its IPO with the Sina Merger. Indeed, the explosion in projections and valuation of TuSimple were

the main catalyst for Chao's Merger proposal. Nevertheless, Sina never mentioned TuSimple in Sina's SEC filings prior to filing the Proxies and when MSAL valued TuSimple "conservatively" at $1.2 billion the Special Committee (purportedly representing the interests of the Minority Shareholders) instructed MSAL to ***lower*** it to "book value." Plaintiffs have adequately alleged that Sina did not truly believe that the value of TuSimple was no higher than $288 million, which was barely more than Sina invested for its 34.44% ownership. *Shanda*, 128 F.4th at 46 (plaintiff adequately alleged defendant did not believe projections when the company had information that did not align with the projections).

Similarly, Sina Defendants knew that the Holdco Discount was a result of their own poor corporate governance and fraudulent scheme and would disappear upon completion of the Merger. ¶134. MSAL recognized that Sina was a "treasure trove" and was going to assess the offer price on "break-up basis" but the Special Committee (again purportedly representing the interests of the Minority Shareholders) expressly instructed MSAL ***not*** to consider this higher valuation. ¶166 Sina Defendants similarly rejected any alternative transactions to unlock shareholder value (and reduce the Holdco Discount), asserting that Chao would veto such transaction. ¶¶166-68 Plaintiffs have adequately alleged that Sina did not believe that the fair value of Sina required a discount of upwards of 45%. *See Shanda*, 128 F.4th at 46. The Caymen Court held that the application of the Holdco Discount was improper, finding "none of the factors put forward which are said to explain a HoldCo discount is corroborated by empirical evidence or academic analysis" and value gaps attributable to governance shortcomings, opacity, or potential mismanagement cannot be deployed to reduce the consideration payable to minority shareholders. Wernke Decl. Ex. 1, at 218-19.

For the same reasons, Plaintiffs have adequately alleged that Sina Defendants did not believe their statements concerning the fairness of the Merger. Moreover, as discussed below, the

failure to disclose (i) the limitations on Chao's voting power, (ii) that Sina Defendants thwarted any attempt to conduct price discovery and (iii) Defendants delayed disclosure of Q2 2020 earnings (¶¶204-14) demonstrate that Sina Defendants did not believe the Merger was fair or in the best interests of the Minority Shareholders.

The statements are actionable even if Sina Defendants believed them. As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Sanofi*, 816 F.3d at 210 (quoting *Omnicare*, 575 U.S. at 188–89). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id*. (quoting *Omnicare*, 575 U.S. at 189); *see also Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

Here, Sina Defendants failed to disclose the concrete facts. These facts, had they been disclosed, would likely conflict with what a reasonable investor would take away from Sina's assertion that that TuSimple was worth ***at most only $286 million***, that the value of Sina should be discounted up to 45%, and that the Merger was "fair" to shareholders. *See Shanda*, 128 F.4th at 46 (fairness opinion based on false and misleading projections was also false and misleading); *Qihoo*, 663 F. Supp. 3d at 359 (opinion that merger was fair was false and misleading where the company "failed to disclose a concrete fact—the existence of ***a plan*** to relist Qihoo publicly, on a Chinese exchange, at a higher valuation").[4]

[4] *See also Herbst v. Int'l Tel. & Tel. Corp.*, 495 F.2d 1308, 1316 (2d Cir. 1974) (statement of "book value" of $18.4 million while technically true was misleading for failure to disclose a serious offer

### B. Statements Concerning Chao's Voting Power Are Actionable

The Proxies repeatedly represent that the Buyer Group has the power to vote 61.2% in support of the Merger as well as to prevent any alternative transaction. Sina made these factual representations as stand-alone statements of fact as well as factual statements supporting other factual and opinion statements within the Proxies, including that this purported power "may have deterred and may continue to deter" other parties from offering a higher price (¶233), rendered "potential alternatives…not viable" (¶239), and that Merger is fair and "financially more favorable to the Unaffiliated Security Holders than any other alternative…" ¶231

The factual statements are false and misleading because Chao was prohibited from voting his Preference Shares for such purposes. As for the opinions, "[a] statement structured, 'I believe that x is so because y has occurred,' contains the factual and falsifiable statement, 'y has occurred.'" *Abramson*, 965 F.3d at 175. This statement is potentially actionable if "y has in fact not occurred." *Id*.

Sina Defendants assert that there was no fiduciary limitation on how Chao could vote his Preference Shares, only on the Board's reason for issuing the shares. MTD at 16. ***First***, this factual dispute cannot be resolved on a motion to dismiss. ***Second***, it is facially absurd that the directors would be limited in the purpose of issuing the shares to a fellow director (and CEO) but that

---

to buy of only $5 million, which was "evidence that the interest was greatly overvalued on the books and that there was a likelihood that it might be sold at a substantial loss") (discussing Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 367-69 (2d Cir. 1973); *ODS Cap. LLC v. JA Solar Holdings Co*., 2020 WL 7028639, at *11 (S.D.N.Y. Nov. 30, 2020) (opinion statement actionable where defendant misrepresented and understated company's value to independent financial advisor); *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020 WL 1989424, at *10–11 (S.D.N.Y. Apr. 26, 2020) (opinion statement actionable where board chairman publicly stated that multiple used to calculate total enterprise value was "appropriate" and "reasonable," but privately stated appropriate multiple was higher); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 318 (S.D.N.Y. 2020) (opinion statements actionable where they omit material facts about the issuer's knowledge).

director (and CEO) could immediately vote those shares for any purpose. Indeed, the Caymen Court found that it "is obviously correct" that "the Preference Shares issued to Mr. Chao could only be used for a proper corporate purpose so that any voting power attached to them had to be exercised pursuant to his fiduciary obligations. He was not entitled to derive any personal benefit in breach of those obligations." Wernke Decl. Ex. 1, at 230.

### C. Plaintiffs Adequately Plead Merger Process Misstatements

The Proxies represented that "[T]he Special Committee and the Board believed that sufficient procedural safeguards were and are present to ensure that the Merger is procedurally fair to the Unaffiliated Security Holders" based on the following factual representations (i) "the Special Committee acted ***solely*** to represent the interests of the Unaffiliated Security Holder; (ii) the ability of the Special Committee to change, withhold, withdraw, qualify or modify its recommendation that the shareholders vote to approve the Merger Agreement in the event of a Superior Proposal;" and (iii) "the ability of the Special Committee to evaluate bona fide, unsolicited alternative acquisition proposals." ¶235

These statements are false and misleading because Sina Defendants took numerous actions to prevent any price discovery process by: (i) misrepresenting Chao's voting power; (ii) conducting no "market check" or "go shop" process (iii) eliminating the MOTM provision; (iv) the definition of "Superior Proposal" prevented any consideration of such proposal; (v) repeatedly seeking to ***reduce*** the valuation of Sina, (vi) delayed the disclosure of the Q2 2020 financial results, and (vi) failing to disclose that CFO B. Zhang – who was purporting to act on behalf of Sina – was a member of the Buyer Group. In short, the Sina Defendants put in place "procedural safeguards" to ***prevent*** price discovery, which was procedurally unfair. As the Caymen Court found, the Special Committee failed to "***put in place a process that was effective in producing price discovery***" and "***The proposition that the Merger Price can be relied on to assess fair value was simply not***

***tested***." ¶¶174-77 The Caymen Court also concluded: The Court does not accept that it was realistic to suppose that the Special Committee, even if they had concluded that there was a superior proposal, would have being likely to change the recommendation in support for the merger." Wernke Decl. Ex. 1 at 100.[5]

## III. PLAINTIFFS HAVE ALLEGED A STRONG INFERENCE OF SCIENTER

"[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 198 (2d Cir. 2009). Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* At 324. Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* At 331.

### A. Plaintiffs Adequately Allege Motive and Opportunity

Chao and B. Zhang's conflicted roles, as both insiders and buyers, generate their specific motive. "[A]cquir[ing] a company for a significantly reduced price" constitutes a motive that

---

[5] Sina cites to press articles discussing the Buyer Group's purported power to control the vote as demonstrating that Defendants did not conceal the power from the market. MTD at 16-17. This misses the point. ***First***, it was false that Chao was permitted to vote his Preferred Shares as Sina claimed so the articles only confirm that the market was misled. ***Second***, the articles do not discuss that Sina Defendants prevented price discovery. ***Third***, even if they did, this is a "truth-on-the-market" defense for which defendants have a heavy burden and "is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint…" *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)

supports scienter. *In re MCI Worldcom, Inc. Sec. Litig.*, 93 F. Supp. 2d 276, 283-85 (E.D.N.Y. 2000); *see also Qihoo*, 2023 WL 2585942, at *27 n.24 ("economic self-interest in the Going-Private Merger" supported scienter). The Second Circuit in *Shanda* found motive sufficiently alleged in precisely the same circumstances: "[A]s members of the Buyer Group, deflating the value of [Sina]'s shares saved [Chao and B. Zhang] money because it reduced significantly "the amount of money [they] needed to spend to acquire [Sina]." *Shanda*, 128 F.4th at 52.

Sina asserts that the Chao and B. Zheng's motive cannot be imputed to Sina under the "adverse interest exception." MTD at n.18. The adverse interest exception is the "most narrow of exceptions" requiring that "the fraud is committed against a [principal]." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 166 (2d Cir. 2014) (internal quotation marks and citations omitted). Sina does not even identify any purported fraud against the Company. As in *Shanda*, the less paid to purchase Sina from Minority Shareholders the more capital available for the Company; and the Merger would eliminate the Holdco Discount. ¶134 *Shanda*, 128 F.4th at 52. The Merger did not "harm[] the corporation," by wasting its assets or "outright theft." *Kirschner v. KPMG LLP*, 938 N.E.2d 941, 948, 952 (N.Y. 2010) (citation omitted). *See Qihoo*, 2023 WL 2585942, at *27 n.24 (rejecting AIE because "theory that [CEO-Acquirer] purported to act on behalf of [company's] interests…is patently plausible").

**B. Plaintiffs Adequately Allege Severe Recklessness**

Conscious misbehavior or recklessness can be pled when the defendant "should have known" facts revealing falsity. *Novak*, 216 F.3d at 308. A classic fact pattern giving rise to a strong inference of scienter is "where defendants . . . knew facts or had access to information suggesting that their public statements were not accurate…" *Employees' Ret. Sys.*, 794 F.3d at 306 (quotation marks omitted).

Plaintiffs allege that the Sina Defendants had access to all the undisclosed facts, including (i) the valuations of TuSimple, (ii) the limitations on Chao's Preference Shares, (iii) the communications to MSAL concerning valuation and the higher valuation of Sina on a "break-up" basis without the Holdco Discount, (iv) the lack of price discovery and (v) B. Zheng's undisclosed membership in the Buyer Group. This alone is sufficient to allege scienter.

Scienter is further supported by the following: (i) Sina's years-long concealment of its massive investment in TuSimple and its positions on TuSimple's Board, (ii) Chao's offer to buy Sina one day after approval of the TuSimple partnership, (iii) the Special Committee's repeated instructions to ***reduce*** the valuation of Sina's assets, (iv) Defendants decision to delay the Q2 financials, (v) B. Zheng's failure to disclose her membership in the Buyer Group and (vi) the coordination with the TuSimple IPO.[6]

## IV. PLAINTIFFS ADEQUATELY ALLEGE RELIANCE FOR TENDERERS

Defendants argue that "Plaintiffs do not adequately plead reliance for Tenderers." MTD at 24. While Defendants cite a footnote in *Qihoo*, they ignore the fact that the *Qihoo* held that where, as here, the Buyer Group need some Minority Shareholders to attain the two-thirds required for the Merger reliance had been adequately alleged for tenderers. *Qihoo*, 663 F. Supp. 3d at 366. Indeed, the Second Circuit has held that reliance is adequately alleged for tenderers even in a "freeze-out merger." *Shanda*, 128 F.4th at 55. Reliance is adequately alleged.

## V. PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

Plaintiffs meet their low burden of alleging "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

[6] Plaintiffs have also adequately alleged that Sina is liable for disseminating MSAL's false and misleading valuations in the Fairness Presentation. *See Lorenzo v. SEC*, 587 U.S. 71, 78 (2019).

### A. Plaintiffs Adequately Allege Loss Causation Based on Appraisal Rights As Well As Other Theories

The Second Circuit has held that loss causation is adequately alleged where a plaintiff "alleged that he suffered an economic loss when he accepted the tender price due to the misleading statements in the Proxies instead of receiving a higher value in an appraisal action." *Shanda*, 128 F.4th at 57. Relying on pre-*Shanda* district court decisions, Defendants incorrectly assert that *Shanda Games* is inapplicable as to ***Tenderers*** because "the AC does not allege that any named Plaintiff read the Proxy, considered exercising appraisal rights under Cayman law, or took any step toward dissenting." MTD at 23 The Court in *Shanda* expressly rejected this argument, stating (i) "is a question of transaction causation" (*i.e*. reliance), not loss causation, *Shanda* at 58; that even as to reliance, (ii) a tenderer need not allege "he made the decision about whether to tender or seek appraisal 'in reliance on either the contents of the proxy statements or the market price'" *id*. at 55, and (iii) "such a person may be presumed to rely on the market price as an accurate measure of his stock's value when deciding to tender" *id*; and (iv) allegations that the plaintiff did not receive "fair value" is equivalent to invoking their appraisal rights under Cayman Island Law. *Id*. at 58. In *Shanda*, the Second Circuit held loss causation existed even for tenderers in a "freeze out" merger. It is certainly sufficient here. As with Tenderers, loss causation for Sellers can be based on appraisal rights. In *Shanda*, the Second Circuit held this was sufficient even for Tenderers in a "freeze out" merger, and noted that ***additional*** theories are available to Sellers. *See Shanda*, 128 F.4th at 58 n.20.[7]

Alternatively, loss causation for Tenderers and Sellers could be based on the price that shares would have risen to if the truth was disclosed. *See Shanda*, 128 F.4th at 55 n.17 (holding as

---

[7] Several of Sina's loss causation arguments apply only in the situation of a "freeze-out" merger and are, therefore, inapplicable.

to reliance that "in an efficient market, had the Proxies disclosed that the merger price severely undervalued the ADS, investors interested in seeking appraisal would presumably have purchased shares for that purpose, thereby driving up the market price").[8]

**B. Plaintiffs Adequately Allege Loss Causation Based on Fair Value**

For both Tenderers and Sellers, loss causation can also be based on fair value of the shares. Sina challenges this theory only as to Sellers.

It is firmly established that plaintiffs defrauded into selling securities in a merger at artificially deflated prices are entitled to receive damages based on "the fairness of the terms of the merger at the time it was approved." *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 389 (1970). *See also Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-55 (1972) (the "correct measure of damages…is the difference between the fair value of all that the…seller received and the fair value of what he would have received" absent fraud); *Wilson v. Great Am. Indus*., 979 F.2d 924, 931-33 (2d Cir. 1992). *See also Erickson v. Jernigan Cap., Inc.*, 2022 WL 3028627 (S.D.N.Y. Aug. 1, 2022).[9]

Sina does not dispute this. Instead, it argue only as the Sellers that Plaintiffs' allegations that the $43.30 offer price was substantially below the true and fair value of Sina ordinary shares is "impermissibly speculative." MTD at 22. The single case upon which Sina relies – *Gray v. Wesco Aircraft Holdings, Inc.*, 847 F. App'x 35, 37 (2d Cir. 2021) ("*Gray Appeal*") – does not support its position. In *Gray v. Wesco Aircraft Holdings, Inc.*, the plaintiff alleged that a proxy that

[8] Defendants do not dispute that loss causation for Sellers may be based on the difference between the market price and deal price. *See Qihoo*, 663 F. Supp. 3d at 376.

[9] District Courts also consistently apply the fair value measure of damages to the element of loss causation in cases arising out of going-private transactions. Damages in this context "compares the value of what the plaintiff received and the fair value of the shares." *Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 299 (D. Conn. 2021).

had published two sets of projection was misleading because the updated projections were "illegitimate." 454 F. Supp. 3d 366, 376 (S.D.N.Y. 2020) ("*Gray*"). The District Court rejected the underlying allegation in full, *Gray*, at 400-01, as well as the resulting loss causation theory because the plaintiff provided no plausible basis to conclude that the earlier projections were more reliable. *Id.* at 403-07. In the *Gray Appeal*, the Second Circuit never disparaged the underlying "theory of economic loss is based on the difference between the…merger share price and what the complaint describes as 'the true value of [the] shares prior to the Merger.'" *Gray Appeal*, at *1. Rather, the Court evaluated whether there were any allegations to support that theory, before ultimately agreeing with the District Court that there were not. *Id.*

Here, Plaintiffs provide abundant support for the inference that the fair value of Sina's shares at the time of the Merger was significantly higher than the Merger price. This includes, *inter alia*: (i) multiple projections and valuations of TuSimlple as high as $7 billion that ***post-date*** the Proxy figures; (ii) admissions that Sina was a "treasure trove" and that its "break-up" value was well above the offer price; (iii) that the Holdco Discount would disappear upon the Merger; (vii) misrepresentations about Chao's voting power; (viii) Defendants failure to conduct any price discovery.[10]

## CONCLUSION

For the foregoing reasons, the Court should deny Sina's motion to dismiss. In the alternative, Plaintiffs respectfully request leave to amend in the event that the Court finds that the Complaint falls short of any applicable pleading standards. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).

---

[10] Contrary to Sina's assertion, even the court in *Gray* held that there is no requirement that "Plaintiff must plead the immediate availability of an alternative, more favorable transaction to the" merger. *Gray*, 454 F. Supp. 3d at 407.

Dated: July 14, 2026

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjwernke@pomlaw.com

**POMERANTZ LLP**
Orly Guy
Eitan Lavie
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Lead Plaintiffs Meitav Mutual Funds Ltd. and Migdal Mutual Funds Ltd. for Plaintiff Kevin Lu and for the Class*