**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: SINA CORPORATION SECURITIES LITIGATION

Case No: 1:25-cv-07820-CM

CLASS ACTION

THIS DOCUMENT RELATES TO:

KEVIN LU, Individually and on behalf of others similarly situated. *v*. SINA CORPORATION, *et al*., Case No: 1:25-cv-07820-CM

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MORGAN STANLEY & CO. LLC AND MORGAN STANLEY ASIA LIMITED SINA CORPORATION'S MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ... 1

FACTUAL ALLEGATIONS ... 4

I. SINA'S HISTORY OF BENEFITING CHAO AT THE EXPENSE OF SHAREHOLDERS ... 4

II. SINA'S UNDISCLOSED INVESTMENT IN TUSIMPLE BECOMES EXTREMELY VALUABLE ... 6

A. Sina Invests Heavily in TuSimple with Chao and B. Zhang Joining TuSimple's Board of Directors ... 6

B. Sina's Investment in TuSimple Becomes Worth Billions Leading to Chao's Scheme to Purchase Sina ... 6

III. THE SCHEME TO STEAL SHAREHOLDER VALUE THROUGH MERGER ... 7

A. Chao's Offer to Purchase Sina ... 7

B. Defendants Collude to Prevent Price Discovery and Consummate The Merger on Terms Favorable to Chao ... 8

1. Sina Defendants Craft the Terms of The Merger Agreement to Foreclose Any Possibility of Price Discovery ... 8

2. Defendants Eliminate The Majority Of The Minority Requirement ... 9

C. Defendants' Scheme to Conceal The True Value of Sina Shares and Depress The Valuation ... 10

1. Defendants Undervalue Sina and TuSimple ... 10

2. Defendants Delay Release of Weibo's Q2 2020 Financial Results ... 11

IV. MSAL'S FALSE AND MISLEADING CLASS PERIOD STATEMENTS ... 11

V. THE MERGER AND TUSIMPLE IPO ... 11

ARGUMENT ... 12

I. PLAINTIFFS' CLAIMS ARE TIMELY ... 13

II. PLAINTIFFS ADEQUATELY PLEAD SECTION 10(B) FALSE STATEMENT CLAIMS AGAINST MSA ........ 15

A. Plaintiffs Adequately Allege False and Misleading Statements ........ 15

B. Plaintiffs Adequately Allege Scienter ........ 19

III. PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY AGAINST MSAL AND MS&CO. ........ 22

IV. PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION AND CLASS STANDING ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................18

*Acito v. IMCERA Group, Inc.*,
47 F.3d 47 (2d Cir. 1995)....................26

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
663 F. Supp. 3d 334 (S.D.N.Y. 2023)....................3, 18, 24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................12

*Berger v. Apple REIT Ten, Inc.*,
563 F. App'x 81 (2d Cir. 2014) ....................15

*Berkshire Bank v. Lloyds Banking Grp. plc,*
2022 WL 569819 (2d Cir. Feb. 25, 2022)....................14

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
480 F.2d 341 (2d Cir. 1973)....................19

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
637 F.3d 169 (2d Cir. 2011)....................13

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022)....................14

S.E.C. v. Collins & Aikman Corp.,
524 F. Supp. 2d 477 (S.D.N.Y. 2007)....................23

*Curtis v. Aetna Life Ins. Co.*,
648 F. Supp. 3d 358 (D. Conn. 2023)....................25

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)....................24

*ECA & Local 134 IBEW Jt. Pension Trust of Chi.*,
553 F.3d 187 (2d Cir. 2009)....................19

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015)....................20

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
639 F. App'x 664 (2d Cir. 2016) ....................15

*Herbst v. Int'l Tel. & Tel. Corp.*,
495 F.2d 1308 (2d Cir. 1974)....................18

*In re Alstom SA Sec. Litig.*,
253 F.R.D. 266 (S.D.N.Y. 2008) ....................25

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010),
vacated and remanded, 689 F.3d 229 (2d Cir. 2012)....................25

*In re Carter-Wallace, Inc. Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000)....................19

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020)....................18

*In re Eletrobras Secs. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017)....................23

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
245 F.R.D. 147 (S.D.N.Y. 2007),
*rev'd on other grounds*, 574 F.3d 29 (2d Cir. 2009)....................25

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)....................12

*In Re Shanda Games Ltd. Sec. Litig.*,
128 F.4th 26 (2d Cir.),
*cert. denied sub nom.*,
*Shanda Games Ltd. v. Monk*, 146 S. Ct. 366, 223 L. Ed. 2d 196 (2025)....................3, 24

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)....................19

*Kleinman v. Elan Corp., plc*,
706 F.3d 145 (2d Cir. 2013)....................15

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
323 F.R.D. 145 (S.D.N.Y. 2017) ....................25

*Lickteig v. Cerberus Cap. Mgmt., L.P.*,
2020 WL 1989424 (S.D.N.Y. Apr. 26, 2020)....................18

*Lorenzo v. S.E.C.*,
587 U.S. 71 (2019)....................22

*Malouf v. SEC*,
933 F.3d 1248 (10th Cir. 2019) ....................23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)....................15

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)....................13

*Meyer v. JinkoSolar Holdings Co.*,
761 F.3d 245 (2d Cir. 2014)....................12

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)....................12, 19

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ....................22

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*,
775 F.3d 154 (2d Cir. 2014)....................25

*SEC v. Sason*,
433 F. Supp. 3d 496 (S.D.N.Y. 2020)....................22

*SEC v. Sequential Brands Grp., Inc.*,
2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021)....................23

*SEC v. Sugarman*,
2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020)....................4, 22, 23

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)....................13, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....................19

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)....................16, 17

*United States v. Finnerty*,
533 F.3d 143 (2d Cir. 2008)....................22

**Statutes**

PSLRA ....................12, 13

Securities Act ....................25

## Rules

Fed. R. Civ. P. 9(b) ....................................................................................................12

Rule 10b-5(a) and (c) ....................................................................................................23

## Other Authorities

17 C.F.R. § 240.10b-5(b) ....................................................................................................15

## PRELIMINARY STATEMENT

Between 2018 and June 2020, Sina Corporation ("Sina") invested heavily – over $250 million – in TuSimple Holdings, Inc. ("TuSimple"), a privately-owned autonomous trucking company based in San Diego, California. At 34.44%, Sina was by far TuSimple's largest investor. Moreover, Sina's Chief Executive Officer ("CEO") and Chairman of the Board of Directors – Defendant Charles Guowei Chao ("Chao") – and Sina's Chief Financial Officer ("CFO") – Defendant Bonnie Yi Zhang ("B. Zhang") – were members of TuSimple's Board of Directors. ***Despite this massive investment and deep involvement, Sina never mentioned TuSimple in any SEC filing***.

In June 2020, Sina's investment in TuSimple skyrocketed. TuSimple was finalizing a critically important partnership agreement with a major US truck manufacturer. Projections as well valuations conducted by Defendant Morgan Stanley & Co. LLC ("MS&Co.") for TuSimple's Series E financing and imminent IPO valued the company ***upwards of $7 billion***.

There was one hurdle standing in the way of TuSimple's IPO and the massive payout to both TuSimple and Sina. TuSimple and MS&Co. determined that as a result of U.S. foreign investment regulations the IPO could not proceed while TuSimple's largest investor – Sina – remained a publicly traded company.

The scheme to take Sina private before investors learned of the true value of TuSimple and the link to Sina began in earnest. To accomplish the scheme coordination would be necessary. Chao, privy to all of the non-public information as a member of TuSimple's Board, began the processes. On July 6, 2020, one business day after TuSimple's Board approved the manufacturing partnership, Chao made an offer to take Sina private by acquiring all outstanding ordinary shares for $41 per share, well below the fair and true value of the shares.

Sina purported to create a "Special Committee" to evaluate whether Chao's offer or any "alternative transaction" was "fair to and in the best interests of…the Company's shareholders other than [Chao]" (the "Minority Shareholders"). In truth, the Special Committee was beholden to Chao – having repeatedly increased his control over Sina and bestowed personal benefits upon him, including discounted stock sales worth $1 billion at the expense of shareholders. The Special Committee sought to ensure that the go-private merger was approved and at the lowest price possible. It hired Defendant Morgan Stanley Asia Limited ("MSAL") to conduct the valuation of Sina (and its asset, TuSimple). Two members of the team were members of MS&Co.'s TuSimple valuation team. Thereafter, the Special Committee (purportedly acting on behalf of Minority Shareholders) repeatedly demanded that MSAL massively ***reduce*** its valuation for TuSimple to a range of the company's "book value" of ***$186 million*** and ***$288 million***. MSAL "disagreed" with the proposed valuation. As an August 31, 2020 MSAL email states: "*…**[the Special Committee] has called three times since Friday**…**TuSimple – [they] think[] it should be carried at book value which I disagreed given…its latest valuation and IPO in 2021 Q1 in the range of $3.5 – 7.0Bn***".[1] Nevertheless, MSA acquiesced and valued TuSimple at "book value."

Even putting aside the investment in TuSimple, MSAL internally described Sina as a "treasure trove" that was massively undervalued, recognizing that the offered Merger price fell short of the value of the Company on a "break-up basis." In order to justify the low offer price, and at the insistence of Sina, MSAL applied a "Holdco Discount" of 30%-45% which significantly reduced the value of a Company's assets on the basis of the poor corporate governance and mismanagement created by Sina Defendants. As the Caymen Court has held, the entire application of the Holdco Discount was improper, finding that "none of the factors put forward which are said

[1] Unless otherwise noted, all emphasis has been added.

to explain a HoldCo discount is corroborated by empirical evidence or academic analysis" and "it would be wrong for the Company to benefit by way of a significant discount in relation to a fair value determination from its own 'corporate mismanagement.'" *See* Declaration of Michael J. Wernke, Ex. 1 at 218-19.

MSAL and MS&Co. worked with Sina Defendants to ensure that the Sina Merger and TuSimple IPO moved in tandem. For example, MS&Co. initially intended to make the first confidential TuSimple IPO filing simultaneously with the Sina Merger Agreement filing in mid-September. That was changed so that the confidential filing occurred ***the exact same day*** as the approval of the Merger at the undervalued price – December 23, 2020. The Sina Merger became final on March 21, 2021 and the TuSimple public IPO filing occurred on March 23, 2021. The TuSimple IPO was completed on April 15, 2021, ***with a value of $8.5 billion***. ***Sina's 34.44% interest was worth $2.4 billion***. The Caymen Court found: "[T]he completion of the IPO for TuSimple was connected to the merger transaction by Sina."

Certain shareholders dissented from the Merger and filed a Section 238 appraisal action captioned. On November 21, 2025, the Caymen Court issued an order, holding that the fair value of the shares was ***$105.26 per share***, drastically surpassing the Merger price of $43.30. *See* Wernke Decl., Ex. 1.

The adequacy of Plaintiffs' allegations against MSAL of the elements of Section 10(b) – falsity, scienter, reliance and loss causation – cannot seriously be disputed. These issues have either been directly addressed in the Caymen Action or by the Second Circuit in similar cases. *See In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 55 (2d Cir.) ("*Shanda*"), *cert. denied sub nom. Shanda Games Ltd. v. Monk*, 146 S. Ct. 366, 223 L. Ed. 2d 196 (2025); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 359 (S.D.N.Y. 2023) ("*Qihoo*").

Moreover, Plaintiffs have adequately alleged "scheme liability" as to MSAL and MS&Co. The placement of MS&Co. members on the MSAL Sina team and the secret coordination of the two transactions with knowledge that the TuSimple valuation provided for the Sina Merger was massively deficient alone is sufficient to plead scheme liability at this stage. This "course of conduct may not have been inherently unlawful, but it was deceptive." *SEC v. Sugarman*, 2020 WL 5819848, at *7 (S.D.N.Y. Sept. 30, 2020)

Defendants' assertion that the statute of limitations began to run following TuSimple's IPO is frivolous. The mere fact that TuSimple was valued at $8.5 billion sometime after the Merger in no way alerted Sina investors that the earlier valuation opinions in the Proxies were false, much less that Defendants were intentionally misleading Sina shareholders. It was not until the Caymen Action in 2025 that an investor could have possibly learned, *inter alia*, (i) that Defendants knew of the higher TuSimple valuations and "disagreed" with the valuation in the Fairness Presentation, (ii) Defendants viewed Sina as a "treasure trove" worth well more than the offer price on a "break-up" basis but applied the Holdco Discount at the insistence of Sina Defendants; or (iii) that the Special Committee sought to reduce the value of Sina and prevented any price discovery.

## <u>FACTUAL ALLEGATIONS</u>

### I. SINA'S HISTORY OF BENEFITING CHAO AT THE EXPENSE OF SHAREHOLDERS

Based in Beijing, China, and incorporated under the laws of the Cayman Islands, Sina is a media technology company and the parent company of Weibo Corporation ("Weibo"), a Chinese platform that is similar to Twitter. Between 2006 and 2017, Sina's Board of Directors consolidated Chao's power and granted him personal benefits. Following Chao's appointment, the Board withered from ten members to only five. ¶53 Sina also sold 16.6 million shares to Chao delaying

his payment until after the shares rose significantly in value, resulting in an enormous windfall for Chao while reducing the value shareholders' holdings by nearly $1 billion. ¶¶54-59

For years, analysts recognized that Sina's market cap as implied by its share price was significantly lower than the total net value of its underlying assets. They attributed this loss in shareholder value to Sina's poor corporate governance, lack of transparency and investor engagement and referred to the valuation gap as the "holding company discount" (or "Holdco Discount") and expressed frustration at Sina's refusal to unlock value for shareholders. ¶¶60-62

On September 20, 2017, Sina's fourth largest shareholder, Aristeia Capital LLC ("Ariseia"), began a proxy battle with Sina by proposing the addition of two independent directors to Sina's board and proposals to unlock shareholder value. ¶¶63-67 Despite the market viewing Aristeia' challenge favorably ¶¶68, 72-74, Sina fought Aristeia' proposal and was able to defeat it, with Chao's recently acquired shares proving determinative. ¶75

Unbeknownst to Sina shareholders, within hours of the initial approach by Aristeia, Sina Defendants began considering how the Company could increase Chao's voting power. ¶76 Ultimately, on November 6, 2017, Sina issued 7,150 Class A Preference shares to Chao's entity New Wave for a nominal consideration of $1 per share, increasing Chao's voting power from 11.1% to a clear majority of 55.5%.

As warned by Sina's Caymen Island Counsel and ask repeatedly acknowledged by the Board in its minutes related to the issuance, the issuance and voting of the shares were subject to the Board's and Chao's fiduciary obligations to investors and the shares could only be issued and voted for a "proper purpose," meaning "***in the best interest of the Company*** and ***all of its shareholders****,*" and not for Chao's personal interest. ¶¶80-93

## II. SINA'S UNDISCLOSED INVESTMENT IN TUSIMPLE BECOMES EXTREMELY VALUABLE

### A. Sina Invests Heavily in TuSimple with Chao and B. Zhang Joining TuSimple's Board of Directors

In 2018, mere months after Chao received his Preference Shares, Sina began investing heavily in TuSimple, an autonomous trucking company based in the USA. ¶103 Chao was personally and deeply involved in the investment. ¶104 By June 2020, Sina invested over $250 million and owned 34.44% of TuSimple, making Sina TuSimple's largest investor, owning more than twice as much as TuSimple's founders. ¶105 Chao and B. Zhang were also members of TuSimple's Board, appointed on April 22, 2019 and September 30, 2020, respectively. ¶106

Despite this years-long involvement, as of the announcement of Sina Board's approval of the Merger Agreement on September 28, 2020, ***no Sina SEC filing ever mentioned TuSimple or Chao and B. Zhang's positions on TuSimple's Board of Directors***. ¶107

### B. Sina's Investment in TuSimple Becomes Worth Billions Leading to Chao's Scheme to Purchase Sina

TuSimple completed its Series D financing in September 2019, with a valuation of $1.2 billion. ¶108 In March 2020, TuSimple engaged MS&Co. as the placement agent for its Series E fundraising. ¶109 By June 15, 2020, MS&Co. was valuing TuSimple at over $2 billion. ¶110 At the same time, TuSimple was finalizing a partnership agreement with the major US truck manufacturer Navistar International Corporation ("Navistar"), which would take TuSimple's technology to market, thereby exponentially increasing the value of TuSimple and allowing TuSimple to imminently conduct an IPO. ¶¶110-15 Projections at this time showed massive revenue and income growth for TuSimple in 2023 and 2024. ¶111 Chao, a member of TuSimple's Board, testified that he understood that the deal with Navistar was vitally important for TuSimple and that the resulting IPO was "inevitable." ¶114, 116 The TuSimple Board approved the

partnership on July 3, 2020. ¶113 By the end of July 2020 ***MS&Co. was valuing TuSimple as high as $7 billion for its IPO***. ¶117

There was one hurdle to TuSimple's IPO. TuSimple and MS&Co. concluded that because of regulations concerning foreign investment in certain U.S. businesses the IPO could not proceed if Sina – TuSimple's largest investor – remained a listed company. ¶¶118-22

Thereafter, Defendants schemed so that the timing of TuSimple's IPO moved in lock step with Sina's go-private Merger. This was possible for several reasons. Chao and B. Zhang were officers and directors of Sina, owners of New Wave and also members of the TuSimple Board. Morgan Stanley entities were involved in every transaction. MS&Co. was running TuSimple's IPO, MSAL was valuing Sina for the Merger, and Morgan Stanley was also engaged by New Wave for the Buyer Group. Moreover, at least two Morgan Stanley members overlapped between the teams. ¶124 Indeed, emails introduced in the Caymen Action show Morgan Stanley discussing the work for the Sina Merger and TuSimple as connected. ¶125 Internal documents demonstrate how information moved between the Sina Merger team and the TuSimple team, allowing TuSimple to hold off on its IPO until immediately after Sina was taken private. ¶¶126-132 Notably, in valuing Sina's investment in TuSimple, MSAL acknowledged that they knew that MS&Co. was valuing TuSimple "***in the range of $3.5 – 7.0Bn***." ¶192

## III. THE SCHEME TO STEAL SHAREHOLDER VALUE THROUGH MERGER

### A. Chao's Offer to Purchase Sina

On July 6, 2020 – one business day after the TuSimple Board approved the Navistar partnership – Sina announced that Chao, through New Wave, offered to acquire all outstanding ordinary shares of Sina for $41 per share in cash. ¶136 Chao's offer letter, falsely asserted that Chao was permitted to vote his Preference Shares for his own personal interest – to approve his

offer as well as prevent any superior third party offer that may come along, even if it is better for the Company and all shareholders. ¶137

Chao testified that when he made his offer, he understood that his economic incentive to pay as little as possible for Sina was in conflict with the interest of all other shareholders; stating the his intent was ***not* "*let's sell in the best price for the company and let's, you know, get the best price for all the shareholder***s." ¶¶138-39 Chao has also testified that his intention was to (i) cast his proposal as the only option; (ii) express his ability to thwart any better deal for shareholders; and (iii) foreclose any other viable offers so that there could be no "market check" or "price discovery" that could reveal the true value of the Company. ¶¶141-46

### B. Defendants Collude to Prevent Price Discovery and Consummate The Merger on Terms Favorable to Chao

The Company told investors that the Board had formed a Special Committee to act in the interest of Minority Shareholders and consider Chao's proposal and alternative transactions. ¶148 However, the Special Committee consisted of the same individuals that had approved Chao's $1 billion stock sale windfall and granted Chao voting control of Sina for a paltry $1 per share.

Once Chao made it clear that he did not intend to sell his stake in the Company to any third party it was – as the Caymen Island Court found – effectively "game over" with respect to getting any price discovery or any competing offers for the Company. ¶153

#### 1. Sina Defendants Craft the Terms of The Merger Agreement to Foreclose Any Possibility of Price Discovery

There are several processes a company can implement to ensure shareholders receive the highest value in response to a proposed merger. Examples include: (i) a pre-signing "market check", (ii) pursuit of alternative transactions to unlock shareholder value, and (iii) a post-signing "go-shop" provision. The Special Committee did nothing. Instead, Defendants schemed to prevent any price discovery that would have revealed the inadequacy of Chao's proposal. ¶¶155-61

Despite MSAL explaining that a pre-signing market check and post-signing go-shop was advantageous to shareholders and common practice (¶164) the Special Committee evaluated Chao's proposal as if he ***could*** vote his Preference Shares for any purpose – a clear violation of the Special Committee's mandate to act in the interests of the Minority Shareholders. ¶162 Chao and B. Zhang similarly repeated the false voting power premise. ¶¶167-68 As a result, the members of the Special Committee have admitted that they treated the process as if a "market check" and other price discovery were not "relevant." ¶163

As the Caymen Court recognized, no pre-market check or post-signing go-shop was conducted by the Special Committee or MSAL. ¶¶169-170 While the Merger Agreement technically contained a "fiduciary out" provision that allowed the Company to consider non-solicited offers, it could only consider such an offer if it was "reasonably capable of being completed on the terms proposed" which the Special Committee claimed to be impossible because of Chao's purported power to use his shares to veto any better offer. ¶¶171-73 In short, the Sina Defendants structured the Merger Agreement to effectively prohibit consideration of any bids at all, even significantly higher unsolicited bids. *Id*. As the Caymen Court found, the Special Committee failed to "***put in place a process that was effective in producing price discovery***" and "***[T]he Merger Price should not be relied upon to assess fair value***…***The proposition that the Merger Price can be relied on to assess fair value was simply not tested***." ¶¶174-77

**2. Defendants Eliminate The Majority Of The Minority Requirement**

With the Buyer Group's purported 61% voting power, the traditional "Majority of the Minority" ("MOTM") requirement became essential. Under MOTM, a proposal (*i.e.* the Merger) could only pass if a majority of the unaffiliated shares ***issued*** (not just those present and voting) voted in favor of it. ¶178 The Special Committee's counsel Gibson Dunn proposed a MOTM provision. ¶179 Chao testified that he understood at the time that the MOTM was a "big point."

¶181 Despite the critical significance of the MOTM provision, the Special Committee gave up this right of the Minority Shareholders for a mere 5.6% increase in the offer price. The Caymen Court found that "this may fairly be said to be a relatively small price to pay to avoid such a circumstance." ¶184 If included in the Merger Agreement, the MOTM provision would have prevented the Merger from being voted through. ¶182

### C. Defendants' Scheme to Conceal The True Value of Sina Shares and Depress The Valuation

#### 1. Defendants Undervalue Sina and TuSimple

By July 2020, TuSimple and MS&Co. were valuing the company between $3.5 billion and $7 billion. Chao testified he was aware of this fact and he and B. Zhang, both directors of TuSimple, received documents regarding the IPO. ¶¶185-89 Defendants colluded to suppress the valuation of Sina's 34.44% investment in TuSimple. On August 31, 2020 MS&Co. formally sought internal approval to proceed with the IPO underwriting. ¶191 On the same day, an internal MSAL email states: *"…**Sandra[Special Committee] has called three times since Friday**…**TuSimple – she thinks it should be carried at book value which I disagreed given we are already conservatively valuing this at latest round of valuation [$1.2 billion] despite market rumour on its latest valuation and IPO in 2021 Q1 in the range of $3.5 – 7.0Bn**."* ¶192

Aside from TuSimple, Defendants knew that Sina's true value was worth much more than Chao's offer. Internal MSAL emails describe Sina as a "treasure trove," acknowledging that the offer price was below Sina's value on a "break-up" basis, only worked if a Holdco Discount was applied, and was concerned about reputational issues if they went ahead with the undervaluation. ¶¶165-66 Importantly, as Defendants have acknowledged, ***if the Merger went forward the Holdco Discount would disappear*** (¶134) – constituting a windfall to the Buyer Group. Nevertheless, the Special Committee instructed MSAL to not consider the break-up value of Sina. ¶166

### 2. Defendants Delay Release of Weibo's Q2 2020 Financial Results

Sina's subsidiary, Weibo was set to report its positive Q2 2020 results in August. However, CFO B. Zhang, who was responsible for the financial reporting, told MSAL that Chao and the Buyer Group requested to delay the release until after the Merger Agreement is signed because they knew that the results for both would be "quite good." ¶209 Despite MSAL recognizing such a delay conflicted with standard practice, the Special Committee agreed to delay the disclosure to the detriment of Minority Shareholders. ¶204-214. B. Zhang never disclosed that she, in fact, was a silent member of the Buyer Group, which directly conflicted with her disclosed role. ¶152

## IV. MSAL'S FALSE AND MISLEADING CLASS PERIOD STATEMENTS

Sina filed preliminary, amended and final Proxy Statements on October 13, November 9, December 8, 2020 and March 22, 2021, attaching MSAL's Fairness Opinion and Presentation, which included the following false and misleading statements:

- TuSimple was valued between a "book value" of $186 million and $288 million. ¶225 This statement was false and misleading because of Defendants' failure to disclose their knowledge of more recent financial projections and valuations of TuSimple as high as $7 billion. With a 34.44% interest, Sina's ownership alone was worth over $2.4 billion;;

- A 30%-45% Holdco Discount was applied to Sina's valuation. ¶227 This statement was false and misleading because Defendants failed to disclose that this discount was of Defendants' own making and which would disappear once the Merger was completed;

- The Fairness Opinion represented "we are of the opinion on the date hereof that the Per Share Merger Consideration to be received by the holders of the Ordinary Shares (other than Parent and its affiliates) pursuant to the Merger Agreement is fair from a financial point of view to such holders." ¶241 This statement was false and misleading because MSAL did not believe that the Merger price was fair and failed to disclose the information concerning the valuation of TuSimple and the Holdco Discount.

## V. THE MERGER AND TUSIMPLE IPO

On December 23, 2020, the Company held an EGM at which the shareholders voted on and approved the Merger. ¶¶217-19. On the same day as the EGM, December 23, 2020, TuSimple

filed its 209-page ***confidential*** S−1 registration statement with the SEC. The first page states that the approximate date of the proposed IPO is: "As soon as practicable after the effective date of this Registration Statement." ¶¶130, 202 The Sina Merger was completed on March 21, 2021. ¶¶131 TuSimple ***publicly*** filed with the SEC its Form S-1 relating to its proposed IPO on March 23 2021. *Id*. The TuSimple IPO was completed on April 15, 2021, ***with a value of $8.5 billion***. *Id.* ***Sina's 34.44% interest was worth $2.4 billion***. The Caymen Island Court found: "[T]he completion of the IPO for TuSimple was connected to the merger transaction by Sina." ¶131

Certain Minority Shareholder who dissented from the Merger filed a Section 238 shareholder appraisal action captioned *In the Matter of the Companies Act (2021 Revision); In the Matter of Sina Corp.,* Cause No. FSD 128 of 2021 (RPJ) (Grand Court, F.S.D., Cayman Islands). On November 21, 2025, the court issued an order, holding that the fair value of the shares was ***$105.26 per share***, drastically surpassing the Merger price of $43.30. *See* Wernke Decl., Ex. 1.

## ARGUMENT

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and Fed. R. Civ. P. 9(b), a plaintiff is not required to plead a "detailed evidentiary matter," *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001), but simply sufficient facts "to support a reasonable belief" that defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). The Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiff's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Dismissal is appropriate only where "[Plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 249 (2d Cir. 2014).

## I. PLAINTIFFS' CLAIMS ARE TIMELY

"[T]he [two-year] limitations period does not begin to run until the plaintiff . . . discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' ***including scienter***." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (quoting 28 U.S.C. § 1658(b)(1)). "Until the plaintiff has uncovered — or a reasonably diligent plaintiff would have uncovered — enough information about the defendant's knowledge or intent to satisfy [the PSLRA's] pleading standard, he has not 'discovered' the fact of scienter, and the [two-year] statute of limitations cannot begin to run." *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011). "The lapse of a limitations period is an affirmative defense that a defendant must plead and prove." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

Defendants assert the following "key facts" were known as of April 2021 and began the running of the statute of limitations: (i) that in September 2020 ***MSAL*** valued TuSimple using public data about its book value and its 2019 equity financing; (ii) that ***MS&Co.*** was acting as an underwriter for TuSimple; and (iii) that TuSimple's IPO closed on April 15, 2021 with a valuation of $8.5 billion. MTD at 7-8.

The mere fact that TuSimple completed its IPO with a valuation of $8.5 billion in April 2021 with ***MS&Co.*** as an underwriter reveals nothing as to what TuSimple was valued as of September 2020 by ***MSAL***. These facts do not reveal that ***MSAL***'s valuation opinion was false and misleading when made, much less that ***MSAL*** made those statements with scienter. Tellingly, Defendants do not even discuss the element of scienter. This is fatal.

It was not until the proceedings in the Caymen Action in February and March 2025, that Plaintiffs (or any reasonably diligent plaintiff) could have possibly uncovered information about Defendants' knowledge or intent sufficient to satisfy the rigorous PSLRA pleading standards for

fraud. The Cayman Action revealed for the first time (among many things) (i) that TuSimple and MS&Co. had projections and valuations for TuSimple between $2 billion and $7 billion as early as June 2020; (ii) that at least two Morgan Stanley employees were on ***both*** the MS&Co. and MSAL deal teams; (iii) that Chao and B. Zheng were directors of TuSimple with inside information; (iv) that TuSimple and MS&Co. determined that Sina had to become a private company for the TuSimple IPO to go forward; (v) that Chao's offer letter was issued one business day after the TuSimple partnership with Navistar was approved by the TuSimple Board; (v) that MSAL acquiesced to Sina's demand for a lower TuSimle valuation even though they "disagreed" with it; (vi) that MSAL viewed Sina as a "treasure trove"; (vii) that the offer price was well below the Sina's value on a "break-up basis"; and (viii) no process was put in place for price discovery.

Defendants have failed to demonstrate that the details of the TuSimple IPO on April 15, 2021 would have come to the attention of a reasonable investor, much less that the information contained therein would have alerted a reasonable investor as to Plaintiffs' fraud claims. *See Berkshire Bank v. Lloyds Banking Grp. plc,* 2022 WL 569819, at *4 (2d Cir. Feb. 25, 2022) (holding that press reports "about an apparent discrepancy in the panel banks' USD LIBOR submissions" was insufficient to start the statute of limitations); *Staehr*, 547 F.3d at 431 ("In short, we cannot say either that this article would have come to the attention of a reasonable investor of ordinary intelligence, or that, if it had, its contents were sufficient to place such an investor on notice of the probability of fraudulent conduct by The Hartford."); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 84 (S.D.N.Y. 2022) (article

did not begin limitations period where "the article did not reference any individual defendant, and did not discuss the allegedly false and misleading marketing statements").[2]

The filing of the Caymen Action does not demonstrate that Plaintiffs could have brought their federal securities fraud claim sooner. The Action was brought pursuant to the shareholders Section 238 appraisal rights and was not subject to a similar pleading standard. It also did not allege any fraud by Sina, much less by MSAL or MS&Co. It merely alleged that the valuation was too low and sought information for purposes of appraising the fair value of Sina shares.

## II. PLAINTIFFS ADEQUATELY PLEAD SECTION 10(B) FALSE STATEMENT CLAIMS AGAINST MSA

### A. Plaintiffs Adequately Allege False and Misleading Statements

A statement is actionable if it, "viewed as a whole, would have misled a reasonable investor." *Berger v. Apple REIT Ten, Inc.*, 563 F. App'x 81, 83 (2d Cir. 2014). "Disclosure is required . . . when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

> The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers. Statements of literal truth can become, through their context and manner of presentation, devices which mislead investors.

*Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (citation omitted).

Statements of opinion are actionable if (1) "'the speaker did not hold the belief she professed[,]'" (2) "'the supporting fact[s] she supplied were untrue[,]'" or (3) "the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor."

[2] The case cited by Defendants is inapposite as it involved admissions by the defendants, including in SEC filings, as to the true value of the asset. *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 F. App'x 664, 666-67 (2d Cir. 2016) citing *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 537 (S.D.N.Y. 2014), aff'd, 639 F. App'x 664 (2d Cir. 2016).

*Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015)).

The Fairness Opinion and Presentation (i) valued TuSimple between a "book value" of $186 million and $288 million (¶225), (ii) applied at 30%-45% Holdco Discount to Sina (¶227); and (iii) represented that the Merger price was "fair from a financial point of view." ¶241 MSAL's valuation statements are actionable because Plaintiffs have adequately alleged that MSAL did not believe these statements.

There can be no dispute that MSAL knew prior to the date of the Fairness Presentation – September 28, 2020 – that its affiliate MS&Co. was simultaneously valuing TuSimple upwards of $7 billion. Internal MSAL communication show that MSAL was well aware of MS&Co.'s engagement and there was an overlap of at least two deal team members. ¶¶124-25 It is also beyond dispute that Plaintiffs have adequately alleged that MSAL ***did not believe*** that "book value" was an appropriate valuation for TuSimple. In an August 31, 2020 email, MSAL expressly stated that it "disagreed" that "book value" was an appropriate metric:

> ***Sandra [Special Committee] has called three times since Friday***...Long story short, sounds li[k]e the SC[Special Committee] ***thinks our range is too wide*** and has been sent to pass along some messages around valuation...***TuSimple – she thinks it should be carried at book value which <u>I disagreed</u> given <u>we are already conservatively valuing this at latest round of valuation</u> despite market rumour on its latest valuation and IPO in 2021 Q1 in the range of $3.5 – 7.0Bn***".

¶192 This email reveals several things: (i) that MSAL's original valuation, prior to the Special Committee calling "three times" within a single business day, was valuing TuSimple "at latest round of valuation" which was $1.2 billion, (ii) MSAL believed that even this $1.2 billion valuation (from September 2019) was "conservative," (iii) that TuSimple was ***currently*** being valued upwards of $7 billion; and (iv) MSAL "disagreed" that carrying TuSimple at book value was reasonable. While the Court is required to draw all inferences in Plaintiffs' favor at this stage,

none is needed. Plaintiffs have adequately alleged that MSAL did not believe either that the $186 million book value in the Fairness Presentation was reasonable or appropriate, or that the upper limit on the value of TuSimple was merely $288 million.

MSAL likewise did not believe that a Holdco Discount of up to 45% represented the true value of Sina and its assets. Internal MSAL messages introduced in the Caymen Action and summarized in open court demonstrate that MSAL struggled to come up with a valuation that supported the Merger price, describing Sina as a "treasure trove" and expressing concern about reputational issues for Morgan Stanley if MSAL issued the Fairness Opinion. In an August 19, 2020 email, MSAL acknowledged that "[t]he offer price falls short on a break–up basis (eg spin–off or sale of Weibo)" and only works under "the existing Holdco structure" ¶166 At this stage, Plaintiffs have adequately alleged that MSAL did not believe that it was appropriate to reduce Sina's "treasure trove" valuation of assets by as much as 45%. The Caymen Court held that the entire application of the Holdco Discount was improper, finding that "none of the factors put forward which are said to explain a HoldCo discount is corroborated by empirical evidence or academic analysis" and "it would be wrong for the Company to benefit by way of a significant discount in relation to a fair value determination from its own 'corporate mismanagement.'" Wernke Decl. Ex. 1, at 218-19

For the same reasons, Plaintiffs have adequately alleged that MSAL did not believe their statements concerning the fairness of the Merger price to Minority Shareholders.

The statements are actionable even if MSAL believed them. As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time.'" *Sanofi*, 816 F.3d at 210 (quoting *Omnicare*, 575

U.S. at 188–89). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 189); *see also Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable.").

Here, MSAL failed to disclose concrete facts—the existence of projections as well as valuations for in-process Series E financing and an in-process IPO valuing TuSimple at upwards of $7 billion. MSAL also failed to disclose that it viewed Sina as a "treasure trove" and that the Merger price was too low on a "break-up basis," that MSAL had conducted zero price discovery and the Holdco Discount would disappear upon completion of the Merger. These facts, had they been disclosed, would likely conflict with what a reasonable investor would take away from MSAL's assertions that that TuSimple was worth ***at most $288 million*** (about what Sina invested), that the value of Sina should be discounted up to 45%, and that the Merger was "fair" to Minority Shareholders. *See Qihoo*, 663 F. Supp. 3d 359 (opinion that merger was fair was false and misleading where the company "failed to disclose a concrete fact—the existence of a plan to relist Qihoo publicly, on a Chinese exchange, at a higher valuation"); *Lickteig v. Cerberus Cap. Mgmt., L.P.*, 2020 WL 1989424, at *10–11 (S.D.N.Y. Apr. 26, 2020) (opinion statement actionable where board chairman publicly stated that multiple used to calculate total enterprise value was "appropriate" and "reasonable," but privately stated appropriate multiple was higher); *In re KnowBe4, Inc. Sec. Litig.*, 2025 WL 3718352, at *12 (S.D. Fla. Dec. 23, 2025) (opinion in proxy that a per-share value in the ""mid-to-high $20[]s" was "appropriate" and fair actionable where defendant internally regarded values below $25 as "[n]ot the right zone," and values between $25

and $27 as at the "[l]ow end of guidance[,]" requiring "some work").[3] MSAL was under no requirement to provide any valuation to investors. However, once it did, "there is a duty to tell ***the whole truth***." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016).

**B. Plaintiffs Adequately Allege Scienter**

"[S]cienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Jt. Pension Trust of Chi.*, 553 F.3d 187, 198 (2d Cir. 2009). Scienter allegations must be viewed holistically. The issue is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Id.* At 324. Rather, an inference of scienter is sufficient if a reasonable person would deem it "at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. If the inferences for and against scienter are in "equipoise," the complaint survives. *Id.* at 331.

Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *In re Carter-Wallace, Inc. Sec. Litig*., 220 F.3d 36, 39 (2d Cir. 2000) (citation omitted). Conscious misbehavior or recklessness can be pled when a defendant "should have known" facts revealing falsity. *Novak v. Kasaks*, 216 F.3d 300, 308 (2d

[3] *See also Herbst v. Int'l Tel. & Tel. Corp.*, 495 F.2d 1308, 1316 (2d Cir. 1974) (statement of "book value" of $18.4 million while technically true was misleading for failure to disclose a serious offer to buy of only $5 million, which was "evidence that the interest was greatly overvalued on the books and that there was a likelihood that it might be sold at a substantial loss") (discussing *Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 367-69 (2d Cir. 1973); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 318 (S.D.N.Y. 2020) (opinion statements actionable where they omit material facts about the issuer's knowledge).

Cir. 2000). A classic fact pattern giving rise to a strong inference of scienter is "where defendants . . . knew facts or had access to information suggesting that their public statements were not accurate…" *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quotation marks omitted).

Plaintiffs allege that MSAL had access to all the undisclosed facts, including (i) that MS&Co. was engaged by TuSimple and the teams had an overlap of at least two members. ¶¶124-25; (ii) the valuations of TuSimple was upwards of $7 billion, (iii) that MSAL "disagreed" with any "book value" valuation; (iv) that Sina was a "treasure trove" with a much higher valuation on a "break-up" basis, (v) the lack of price discovery and (vi) that the Special Committee, which was supposed to be maximizing the value of Sina for Minority Shareholders, was repeatedly requesting that valuations be lowered. This alone is sufficient to allege scienter. Scienter is further supported by MSAL's knowledge that Sina agreed, without any attempt to gain a benefit for Minority Shareholders, to delay the Q2 financials by months until after the signing of the Merger Agreement, despite MSAL agreeing that "a merger agreement generally gets signed after earnings release, not before" and "flagged it." ¶¶204-214

Further supporting Plaintiffs scienter allegations is that the two teams moved in lock step, which would be impossible without coordination of information. In March 2020, TuSimple engaged MS&Co. as the placement agent for its Series E fundraising. ¶109 On June 15, 2020, MS&Co. formally approved the Series E financing with a valuation over $2 billion, which included funds to "build out of its Autonomous Freight Network" based on the near final partnership with Navistar. ¶110 MS&Co.'s mid-June financial projections for the Series E financing show significant revenue and income growth projected for 2023 and 2024 based on this partnership. ¶111 A June 23, 2020 email demonstrates that MS&Co. had already begun planning TuSimple's

IPO. ¶115 TuSimple and MS&Co. decided that the IPO could not proceed if Sina remained a listed company. ¶118 TuSimple's Board approved the partnership on July 3, 2020. ¶113 The next business day, Chao (a member of TuSimple's Board) made his go-private offer for the Merger. ¶127 Sina formed the Special Committee and engaged MSAL. By the end of July 2020, MS&Co. was valuing TuSimple as high as $7 billion for its IPO. ¶117

MSAL and MS&Co. continued to coordinate so that the TuSimple IPO could begin as soon as the Sina Merger was completed. An August 31, 2020, MS&Co. memo states that it was anticipated that the initial S-1 form for TuSimple's IPO would be confidentially filed on September 11, 2020 with "public filing expected [on November 20, 2020]." ¶128 That same day, B. Zhang spoke to MSAL, informing them that the then current timeline for signing the Merger Agreement was also "mid−September." ¶129 Ultimately, the Merger Agreement was approved by shareholders at the EGM at 9:00 a.m. on December 23, 2020 in Beijing. Later on December 23, 2020 (+13 hours, New York time), TuSimple confidentially filed with the SEC its draft Form S-1 relating to its proposed IPO. ¶130 The Sina Merger was completed on March 21, 2021. ¶¶131 TuSimple ***publicly*** filed with the SEC its Form S-1 relating to its proposed IPO on March 23 2021. *Id*. The TuSimple IPO was completed on April 15, 2021, ***with a value of $8.5 billion***. *Id. **Sina's 34.44% interest was worth $2.4 billion***. The Caymen Island Court found: "[T]he completion of the IPO for TuSimple was connected to the merger transaction by Sina." ¶131 This coordination would be impossible if MSAL and MS&Co. were separate as Defendants assert. At most, it would be a reasonable inference that MSAL was aware of MS&Co.'s valuations. And at this early stage, the Court must make all reasonable inferences in favor of Plaintiffs.

Viewed holistically, the inference of scienter is at least as strong as any non-culpable inference. Tellingly, MSAL offers no reason why it would tell investors that the absolute upper

value of TuSimple was ***$288 million*** (without any further disclosure to investors) when MSAL knew that an IPO was in the works where the valuation ***floor*** was ***$3.5 billion***, with a ceiling of ***$7 billion***. The only reasonable inference is that MSAL recklessly disregarded that the $186 million to $288 million range could mislead Sina investors as to the true value of TuSimple.

## III. PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY AGAINST MSAL AND MS&CO.

"To state a scheme liability claim, a plaintiff must show: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance," *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021). A "manipulative or deceptive act" is "some act that gives the victim a false impression." *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). Scheme liability is designed to "capture a wide range of conduct." *Lorenzo v. S.E.C.*, 587 U.S. 71, 79 (2019). And at the motion to dismiss stage, Plaintiffs must only allege MS&Co. "engaged in deceptive conduct that contributed to the larger scheme." *SEC v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020).

At least two individuals on the Sina Merger team were MS&Co. employees who were also on the TuSimple team. ¶124 Moreover, MS&Co. and MSAL improperly coordinated the TuSimple with the Sina Merger at every step, knowing that the valuation in the Sina Fairness Presentation was well below that of the imminent IPO. Notably, if Sina investors learned of the true value of TuSimple and Sina, the Sina go-private merger would have failed, thwarting TuSimple's IPO. The conflicts of interest and the improper coordination to the detriment of Sina Minority Shareholders is a "deceptive act" sufficient for scheme liability. MSAL and MS&Co. leveraged their inside information despite conflicts of interest to ensure that the valuation would support the offer price and the Sina Merger would be approved so that TuSimple could confidentially file its IPO forms on the same day as approval of the Merger such that investors would not appreciate the connection.

*See Sugarman*, 2020 WL 5819848, at *9 ("the money for this purchase took a circuitous route, which the SEC alleges was designed to disguise the source of the funds"). Members of both MS&Co. and MSAL's "course of conduct may not have been inherently unlawful, but it was deceptive." *Id.* at *7 (finding deceptive a misleading memo presented to the board of directors regarding an acquisition); *See* S.E.C. v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 495 (S.D.N.Y. 2007) ("[K]nowingly supervising employees who are carrying out a fraudulent scheme is itself the employment of a deceptive device"); *SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021) (scheme liability where "[t]he complaint alleges that Sequential's accounting and finance personnel covered up quantitative evidence of an impairment to its goodwill by discarding that quantitative evidence, conducting a biased qualitative assessment, and ultimately changing its methodology to assess goodwill…Those alleged acts were not isolated events; as alleged, they were part of a deliberate course of conduct continued for over a year"); *Malouf v. SEC*,933 F.3d 1248, 1259-61 (10th Cir. 2019) (finding that appellant's failure to correct another's false or misleading statements constituted a deceptive scheme or act under Rule 10b-5(a) and (c), where appellant had conflicted arrangement but failed to correct his firm's public representations that the firm provided impartial advice untainted by conflicts of interest).

Plaintiffs adequately allege scienter for MS&Co. for the same reasons as MSAL.

Plaintiffs adequately allege reliance because MSAL's and MS&Co.'s improper coordination on the one hand while disclaiming knowledge relevant to the TuSimple valuation resulted in the false statements in the Fairness Opinion and Presentation. *See In re Eletrobras Secs. Litig.*, 245 F. Supp. 3d 450, 457 (S.D.N.Y. 2017) (holding that plaintiffs "adequately pleaded scheme liability reliance because [defendant's] alleged participation in this deceptive scheme made it 'necessary or inevitable' that falsehoods on the part of [the company] would result").

## IV. PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION AND CLASS STANDING

**Loss Causation**: Plaintiffs meet their low burden of alleging "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). As discussed in Plaintiffs' opposition to Sina's motion to dismiss filed contemporaneously, Plaintiffs have adequately alleged loss causation for Sellers and Tenderers. *See* Opp. Sina MTD at 23-25.

Defendants assert that Plaintiffs cannot plead loss causation based on the theory that the fraud caused Plaintiffs "to sell their shares at a depressed price" because it "is not a viable theory of loss causation for minority shareholders who 'sell' into a freeze-out merger." MTD at 24 Defendants' argument fails because the Sina merger was ***not*** a freeze-out merger. While the Buyer Group held enough shares to veto alternative transactions, it still required some participation and approval of Minority Shareholders to approve the Merger. ¶¶178-80. The exclusive authority upon which Defendants rely explicitly states that the holding is limited to "freeze-out" mergers. *Shanda*, 128 F.4th at 59 n.21. This analysis is inapplicable where the buyer group needs at least some minority shareholder participation for approval of the merger. *See Qihoo*, 663 F. Supp. 3d at 365 ("The Court assumes, arguendo, that the FAC plausibly pleads reliance by the tenderer shareholders on its principal theory: that votes from at least some of these shareholders were required for approval of the Merger").

**Class Standing**: Continuing with their flawed premise that the Merger was a freeze-out merger, Defendants assert that Plaintiffs have no class standing because, they assert, none of the Plaintiffs sold into the Merger and that Plaintiffs, as Sellers, "may have additional theories available to them." MTD at 25, citing *Shanda*, 128 F.4th at 59 n.20. Again, *Shanda* concerned a freeze-out merger and its limitations on loss causation theories is inapplicable here. Defendants

have provided no basis, and Plaintiffs are aware of none, for concluding that Tenderers that sold into the Merger have any fewer loss causation theories available to them, much less that Sellers would not have an interest also pursuing the theories available to Tenderers because they apply equally to Sellers. Even if it were true, it would not preclude class standing. "[T]he Second Circuit's class standing doctrine focuses on the *conduct* of the defendant and whether that conduct implicates the same concerns for all putative class members." *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 158 (S.D.N.Y. 2017). It is well-settled that investors who sold (or purchased) securities not only have standing to pursue fraud claims on behalf of other sellers (or purchasers) that sold (or purchased) at different times when the fraud claims are based on the same false and misleading statements, but are also "typical" for purposes of class certification. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 159 (S.D.N.Y. 2007), *rev'd on other grounds*, 574 F.3d 29 (2d Cir. 2009); *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 277 (S.D.N.Y. 2008); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 169 (S.D.N.Y. 2010), vacated and remanded, 689 F.3d 229 (2d Cir. 2012) [4]

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss. In the alternative, Plaintiffs respectfully request leave to amend in the event that the Court finds that the

[4] The authorities upon which Defendants rely are inapposite for numerous reasons including that they involve situations in which the underlying ***misconduc***t relevant to the plaintiff was different than that of other class members. *See Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 162 (2d Cir. 2014) (In contrast to *NECA*, where the defendants' alleged Securities Act violations inhered in making the same misstatements across multiple offerings, BNYM's alleged misconduct must be proved loan-by-loan and trust-by-trust); *Curtis v. Aetna Life Ins. Co.*, 648 F. Supp. 3d 358, 371 (D. Conn. 2023) (Curtis's individual claim gives him no incentive to develop the medical evidence necessary to prove class allegations about *different* therapies for which he was never denied coverage). Here, the underlying misconduct, the false and misleading statements and related scheme, are the same.

Complaint falls short of any applicable pleading standards. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995).

Dated: July 14, 2026

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mjwernke@pomlaw.com

**POMERANTZ LLP**
Orly Guy
Eitan Lavie
HaShahar Tower
Ariel Sharon 4, 34th Floor
Givatayim, Israel 5320047
Telephone: +972 (0) 3 624 0240
Facsimile: +972 (0) 3 624 0111
oguy@pomlaw.com
eitan@pomlaw.com

*Counsel for Lead Plaintiffs Meitav Mutual Funds Ltd. and Migdal Mutual Funds Ltd. for Plaintiff Kevin Lu and for the Class*